IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| SUZANNE M. EGGLESTON and FREDERICK LOVEJOY, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civil Action No. 3:02CV188 ) (WWE)(HJF) |
| E*TRADE SECURITIES, INC., *et al.*, | ) ) |
| Defendants. | ) JUNE 10, 2004 |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO COMPEL DOCUMENTS FROM PLAINTIFFS

E*TRADE Securities, Inc. and the related defendants (collectively,

"E*TRADE") provide this memorandum of law in support of their motion to compel the

production of certain documents from Plaintiffs. E*TRADE seeks three (3) discrete categories

of documents that bear directly on the sole issue before this Court—the formation of an

agreement to submit disputes between the parties to arbitration.

## I.    *NATURE OF THE CASE*

This case arises out of Plaintiffs' claim that E*TRADE erroneously placed 500

shares of stock in their on-line brokerage account in 2001, and thereafter sold positions in the

account to satisfy margin calls. Although E*TRADE vigorously disputes Plaintiffs' claims, it

has moved to stay these proceedings pending arbitration pursuant to an arbitration agreement in

the E*TRADE Customer Agreement. Plaintiff Lovejoy signed E*TRADE's account

application, and acknowledged that he had received, read, and agreed to be bound by the

E*TRADE's Customer Agreement, including a "pre-dispute arbitration clause." Plaintiffs assert that no agreement to arbitrate was ever formed because they did not see the Customer Agreement on E*TRADE's website when they applied for an on-line trading account, did not receive a hard copy in the mail as part of E*TRADE's standard Welcome Kit, and did not understand that the reference to a "pre-dispute arbitration clause" in the account application required binding arbitration.

On November 16, 2003, this Court (Eginton, J.) denied without prejudice E*TRADE's Motion to Stay, concluding that issues of fact relating to the formation of an agreement to arbitrate were in dispute (as amended, the "Ruling"). The Court set the matter down for a trial limited to the issue of whether the parties agreed to arbitrate their disputes, and permitted discovery with respect to the formation of an agreement to arbitrate.

On March 1, 2004, E*TRADE propounded document requests upon Plaintiffs. A copy of Defendants' Document Requests and Plaintiffs' Responses thereto are appended hereto as Exhibit A.[1] The requests sought, *inter alia*, the production of: (i) customer agreements and account applications relating to Plaintiffs' other brokerage accounts (*See* Request Nos. 13-14); (ii) pleadings related to the proper forum (court vs. arbitration) filed in a dispute Plaintiff Lovejoy had with People's Securities that was initially filed in court before being arbitrated (Request No. 13); and (iii) Plaintiffs' copies of certain E*TRADE account statements and trade confirmations (*See* Requests 2-3, 5-6, 8-9). On May 7, 2004, Plaintiffs objected to these requests.

---

[1] E*TRADE has not included the documents that Plaintiffs' produced in response to E*TRADE's requests, which were appended to Plaintiffs' Responses.

By letter dated June 2, 2004, E*TRADE asked Plaintiffs to reconsider their objections, and explained the relevance of the requested materials. A copy of E*TRADE's letter to Plaintiffs is appended hereto as Exhibit B. Notwithstanding this, Plaintiffs have maintained their objection to producing these materials. A copy of Plaintiffs' letter to E*TRADE is appended hereto in redacted form as Exhibit C.[2] E*TRADE now seeks to compel Plaintiffs to produce these materials.

## II. ARGUMENT

### A. Customer Agreements and Account Applications Governing Plaintiffs' Other Brokerage Accounts Are Relevant to the Agreement between Plaintiffs and E*TRADE.

Although E*TRADE maintains that Plaintiff Lovejoy had access to and received a copy of the E*TRADE Customer Agreement, E*TRADE also asserts that, at a minimum, Plaintiffs had notice of the mandatory arbitration clause contained in the E*TRADE Customer Agreement because Plaintiff Lovejoy—an experienced litigation attorney—signed the Account Application immediately under the following pre-printed representations:

> **Please read and sign to apply for your E*TRADE account:**
>
> **I am of legal age to contract. I acknowledge that I have received, read, and agree to be bound by the terms and conditions as currently set forth in the E*TRADE Customer Agreement and as amended from time to time. . . .**
>
> **        *        *        ***
>
> **I UNDERSTAND THAT THIS ACCOUNT IS GOVERNED BY A PRE-DISPUTE ARBITRATION CLAUSE CONTAINED IN PARAGRAPH 31B OF THE E*TRADE CUSTOMER AGREEMENT.**

---

[2] Out of an abundance of caution, certain information contained in Plaintiffs' letter that does not relate to discovery issues has been redacted. E*TRADE has no objection if Plaintiffs would prefer to submit an unredacted version of the letter.

> **All account applicants must sign below:**
>
> **X  (Plaintiff Lovejoy's signature appears here)**

(Capitalization in original).  Plaintiffs claim that they did not understand the term "pre-dispute arbitration," and cannot be charged with notice that they were agreeing to mandatory arbitration.  In its Ruling, the Court held, *inter alia*, that because Plaintiff Lovejoy denied understanding the phrase "pre-dispute arbitration clause," a disputed issue of material fact existed that required a trial.  Ruling at 5-6.

At Plaintiff Lovejoy's recent deposition, he identified several other brokerage firms at which he has maintained accounts, including People's Securities, Ameritrade, E.F. Hutton, Morgan Keegan, and approximately ten (10) "mutual fund" accounts.  Moreover, Plaintiff Lovejoy revealed that he had been sued in Connecticut Superior Court by another brokerage firm, People's Securities, and the parties ultimately submitted the dispute to arbitration based on an agreement to arbitrate.

E*TRADE seeks the production of the customer/account agreements and account applications governing Plaintiff Lovejoy's other brokerage accounts to assess Plaintiff Lovejoy's familiarity with and understanding of the phrase "pre-dispute arbitration clause." Indeed, the term "pre-dispute arbitration clause"—which simply refers to an agreement to arbitrate that is reached before any dispute exists—is a very common term within the securities industry (and elsewhere).  *See Salomon Smith Barney, Inc. v. Cotrone*, 81 Conn. App. 755, 760 (2004) (holding investor who signed a brokerage account application directly under reference to "pre-dispute arbitration clause" was bound to arbitrate); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 234, *reh. denied* 483 U.S. 1056 (1987) (expressly

validating "pre-dispute" arbitration agreements between brokerage firms and customers); *City of Waterbury v. Merrill Lynch & Co.*, 1992 Conn. Super. LEXIS 3388, at *15 (Nov. 24, 1992) (Barnett, J.) (recognizing that federal law condones "pre-dispute arbitration agreements" between a broker and an investor)[3]; *see also* Securities & Exchange Commission Rule, 17 C.F.R. part 240 (1987) (noting that "predispute arbitration clauses (*i.e.*, agreements requiring customers to submit to arbitration all future disputes)" are enforceable). Thus, other brokerage account agreements that Plaintiff Lovejoy entered into likely also use the phrase "pre-dispute arbitration clause," and would demonstrate that Plaintiff Lovejoy understood the meaning of that term as used on E*TRADE's account application immediately above his signature. For example, if Plaintiffs' People's Securities account agreement also used the term "pre-dispute arbitration clause," and Plaintiffs in fact arbitrated a dispute with People's Securities, that would directly undermine Plaintiffs' claim that he was not placed on notice of an arbitration clause by E*TRADE's account application.

These materials also are directly relevant to assessing Plaintiff Lovejoy's knowledge of the custom within the securities industry to require customers to arbitrate disputes. Courts have considered both a party's experience with other brokerage firms and their knowledge of the securities industry when evaluating whether a party understood that they were bound to arbitrate a securities dispute. *See, e.g.*, *Scone Invs., L.P. v. American Third Mkt. Corp.*, 992 F. Supp. 378, 381 (S.D.N.Y. 1998) (finding an attorney and experienced investor "can be assumed to be familiar with the securities industry practice of requiring arbitration clauses"); *Blashka v. Greenway Capital Corp.*, No. 94Civ.5633, 1995 U.S. Dist.

---

[3] Copies of the unpublished cases cited are attached hereto as Exhibit D.

LEXIS 15195, at *15 (S.D.N.Y. Oct. 17, 1995) (recognizing that it is customary in securities
industry for customers to agree to arbitrate disputes in customer agreements and finding
plaintiff was bound to arbitrate despite absence of signed agreement because he had signed
other "account agreements for each account which he held in the past, all of which presumably
included an arbitration clause"); *Ilan v. Shearson/American Express, Inc.*, 632 F. Supp. 886,
890 (S.D.N.Y. 1985) ("In the securities industry, the vast majority of brokerage firms require
an investor to sign a contract with an arbitration clause in order to open an account"); *Dapuzzo
v. Globalvest Mgmt. Co. L.P.*, 263 F. Supp. 2d 714, 733-34 (S.D.N.Y. 2003) (investor who
signed a stock subscription agreement that incorporated by reference the terms of a partnership
agreement containing an arbitration provision that was not provided to investor at time of
execution, was required to arbitrate based in part on fact that he was a sophisticated investor
familiar with arbitration provisions and because he had represented that he had received and
reviewed the partnership agreement).[4]

---

[4] *See also Brown v. Dorsey & Whitney, LLP*, 267 F. Supp. 2d 61, 82-83 (D.D.C. 2003) (plaintiff-
attorney who signed employment agreement that referred to and incorporated the firm's
undisclosed "dispute resolution policy" which contained an arbitration provision was required to
arbitrate claims because she could have asked for a copy of the policy before executing
agreement and because she was an attorney and "courts dealing with similar situations have
taken the education and background of the employee into account in determining whether the
employee is bound by an arbitration agreement").

**B.    Pleadings Related to the Forum for Resolving Plaintiffs' Previous Dispute with a Brokerage Firm are Relevant.**

As noted above, in 2000-2001, Plaintiff Lovejoy arbitrated a dispute with another brokerage firm, People's Securities. The case was first filed in Connecticut Superior Court, but was ultimately referred to arbitration. Because Plaintiffs' understanding of the phrase "pre-dispute arbitration clause" and their knowledge of industry custom is squarely at issue, E*TRADE seeks any pleadings relating to the proper forum for resolving the dispute that were filed in that case. These pleadings may reveal, for example, Plaintiff Lovejoy's understanding or knowledge of the phrase "pre-dispute arbitration clause," and are therefore directly relevant to the formation of an agreement to arbitrate in this case.

**C.    Plaintiffs' E*TRADE Trade Confirmations and Account Statements are relevant to the Agreement to Arbitrate.**

E*TRADE also seeks the production of Plaintiff Lovejoy's copy of his E*TRADE account statements (with any accompanying documentation) and trade confirmations from 1999 through February 2001. These materials are relevant to whether Plaintiffs had notice of the E*TRADE Customer Agreement containing the arbitration clause based on the standard terms contained on these documents sent to Plaintiffs by E*TRADE during the course of their relationship. *See Stedor Enterprises, Ltd. v. Armtex, Inc.*, 947 F.2d 727, 733 (4th Cir. 1991) (manufacturer bound by arbitration provision on back of purchase confirmations it received in connection with each order purchase order placed).

The trade confirmations and account statements are relevant for yet another reason. Throughout this litigation, Plaintiff Lovejoy has denied receiving a hard copy of E*TRADE's Customer Agreement containing the arbitration clause. Plaintiff Lovejoy has

asserted that he maintains meticulous records concerning his brokerage accounts, and is certain

that he never received a copy of E*TRADE's Customer Agreement because it is not in his

personal file. Should Plaintiff Lovejoy be unable to produce his copies of his account

statements or trade confirmations, this would undermine his claim that he retained copies of all

documents relating to his account.

## III.   CONCLUSION

The documents E*TRADE seeks are directly related to the issue of whether the

parties agreed to arbitrate their disputes. Accordingly, E*TRADE respectfully requests that

this Court order Plaintiffs to produce:

- account/customer agreements and account applications relating to Plaintiffs' other brokerage accounts;

- pleadings relating to the proper forum for resolving Plaintiff Lovejoy's dispute with People's Securities; and

- Plaintiff Lovejoy's E*TRADE account statements (and any accompanying documentation) and trade confirmations through March 2002.

Dated:   June 10, 2004

**DEFENDANT
E*TRADE SECURITIES, INC.,
E*TRADE GROUP INC. and
STEPHEN TACHIERA**

James A. Budinetz, Esquire
Ct. Fed. Bar No.: ct16068
Pepe & Hazard LLP
225 Asylum Street
Goodwin Square
Hartford, CT  06103
e-mail: jbudinetz@pepehazard.com
Telephone:  860.241.2693
Facsimile:  860.522.2796

**OF COUNSEL:**

Douglas P. Lobel
ARNOLD & PORTER
1600 Tysons Boulevard, Suite 900
McLean, VA 22102
703.720.7035 (voice)
703.720.7399 (fax)
douglas_lobel@aporter.com

Attorneys for Defendants
    E*TRADE SECURITIES, INC.,
    E*TRADE GROUP, INC.
    (erroneously
    sued as E*TRADE, INC.), and
    STEPHEN TACHIERA

## CERTIFICATE OF SERVICE

I hereby certify that I have, this 10th day of June 2004, served a copy of the foregoing

by United States mail, first class postage prepaid, to:

Frederick A. Lovejoy, Esq.
P.O. Box 56
Easton, CT  06612
Fax:  (203) 459-9943


James A. Budinetz

**EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SUZANNE M. EGGLESTON and       :
FREDERICK A. LOVEJOY,           :
                                   :
          Plaintiffs,            :      3:02CV188(WWE)
                                     :
    -against-                        :
                                     :
E-TRADE SECURITIES, INC.,          :
E-TRADE, INC. and STEPHEN TACHIERA,   :      May 7, 2004
                                     :
          Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PLAINTIFFS' OBJECTIONS AND RESPONSES TO
DEFENDANTS' INTERROGATORIES AND REQUEST FOR PRODUCTION,
DATED MARCH 1, 2004

Pursuant to Federal Rule of Civil Procedure 33, Plaintiffs hereby object to the Interrogatories and Requests for Production (the "Discovery Requests") of Defendants on the grounds set forth below and respond as follows:

I.     GENERAL OBJECTIONS

The following General Objections are incorporated into each specific objection to each interrogatory and request below as if fully set forth therein.

1.     Plaintiffs object to the Discovery Requests to the extent that they purport to require the production of information and documents not required by the Federal Rules of Civil Procedure or any other applicable statute or rule.

2.     Plaintiffs object to the Discovery Requests to the extent that they purport to impose obligations on Plaintiffs beyond those set forth in the Federal Rules of Civil Procedure or any other applicable statute or rule.

3.     Plaintiffs object to the Discovery Requests to the extent that any specific interrogatory or request purports to seek the production, disclosure, or identification of any documents or information not within the possession, custody or control of Plaintiffs.

4.     Plaintiffs object to the definition of "You" in the Instructions and Definitions of the Discovery Requests as overly broad and beyond the scope of Plaintiffs' obligations under the Federal Rules of Civil Procedure to the extent that the definition purports to require Plaintiffs to produce, disclose, or identify documents and information from Plaintiffs' "affiliates or other people acting on its behalf." The below objections, as well as any subsequent objections or responses, to the Discovery Requests are on behalf of Plaintiffs only, and where applicable, its officers, managers, agents and/or representatives.

5.     Plaintiffs object to certain Discovery Requests as overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

6.     Plaintiffs object to the Discovery Requests on the grounds that (a) they are overly broad, unduly burdensome, vague and ambiguous, and/or (b) they seek the disclosure of information or documents that are not reasonably calculated to lead to the discovery of admissible evidence.

7.     Plaintiffs object to the Discovery Requests to the extent that they purport to seek the production of documents or disclosure of information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity from

2

discovery. Plaintiffs expressly reserve the right to demand the return of such documents, without prejudice to any claim of privilege, in the event any such document is inadvertently produced.

      8.      In providing these Objections to the Discovery Requests, Plaintiffs do not in any way waive or intend to waive, but rather intend to preserve and are preserving:

      (a)    all objections as to the competency, relevance, materiality, and admissibility of the requests, interrogatories or Plaintiffs' responses, or the subject matter thereof of any documents produced;

      (b)    all objections as to vagueness, ambiguity, and undue burden;

      (c)    all rights to object on any ground to the use of any of said documents or responses, or the subject matter thereof, in any subsequent proceedings;

      (d)    all rights to object on any ground to any request for further responses to these or any other requests for documents or interrogatories or to other discovery requests involving or related to the subject matter of the Discovery Request; and

      (e)    its right to supplement these Objections and provide responses in the future.

## RESPONSES TO INTERROGATORIES

      1.      Identify all documents that constitute or relate to any agreement between you and E*TRADE that concerned or governed your E*TRADE account.

RESPONSE TO INTERROGATORY NO. 1:

      See Exhibit A.

3

2.    Describe with specificity each and every step or act you took to apply for and open your E*TRADE account, including a description of all screens, fields, or hyperlinks you encountered on E*TRADE's website.

RESPONSE TO INTERROGATORY NO. 2:

A few days prior to December 20, 1998, plaintiff attempted to open an account via the internet, but was not able to do so because of problems with E-Trade's website. Thereafter, plaintiff telephoned E-Trade, which advised it was having difficulties with its website. A few days thereafter, plaintiff again went to E-Trade's website. This time plaintiff was able to print an application which he printed and filled out and thereafter mailed to E-Trade. Additionally, plaintiff attempted to open various tabs/links, had difficulty and, after a while, stopped his efforts.

3.    Identify all communications between you and E*TRADE concerning the terms governing your E*TRADE account or the Customer Agreement.

RESPONSE TO INTERROGATORY NO. 3:

Those terms contained in the application. The instructions to close the account in late 2000. Letter request in January 2001. Numerous requests, via telephone and in writing, following the relocation of plaintiffs, to have their address changed in E-Trade's records.

4.    State whether you printed any documents from E*TRADE's website when you applied for or opened your E*TRADE account, or at any time thereafter, and identify all such documents.

RESPONSE TO INTERROGATORY NO. 4:

Account Application. Additionally, attempts were made to print other documents, but they would not print.

4

5.   State specifically when and how you received:

    a.   Your E*TRADE account number;

    b.   Your user identification number for your E*TRADE account;

    c.   Your password for your E*TRADE account.

RESPONSE TO INTERROGATORY NO. 5:

See Exhibit B, otherwise all information was created by the plaintiff or received via telephone.

6.   State whether you received any documents in the mail from E*TRADE that related to your application for or the opening of your E*TRADE account, and identify all such documents.

RESPONSE TO INTERROGATORY NO. 6:

See Exhibit B.

7.   State whether Plaintiff signature appears on the document attached hereto as Exhibit A, and identify the location of each signature.

RESPONSE TO INTERROGATORY NO. 7:

There are four signatures on Exhibit A, three of which are plaintiff's, the fourth is unknown to plaintiffs. Each of plaintiff's signatures is readily identifiable, including its location.

8.    Describe how you filled in the information contained on the document attached as Exhibit A (*e.g.*, entered the information on your computer).

RESPONSE TO INTERROGATORY NO. 8:

It was typed.


9.    State whether you followed the instructions on page 1 of Exhibit A, that instructs you to print the application, sign it, and mail it to E*TRADE.

RESPONSE TO INTERROGATORY NO. 9:

Yes.


10.    State whether you received the "Welcome Kit" referenced on page 1 of Exhibit A, or any documents from E*TRADE, concerning your application or the opening of an E*TRADE account.

RESPONSE TO INTERROGATORY NO. 10:

No document identified as a "welcome kit" was ever received by plaintiff. See Exhibit B for documents received from E-Trade.


11.    Identify with specifity the type of the computer you used to apply for or open your E*TRADE account, the internet browser you used, and the internet service provider you used.

RESPONSE TO INTERROGATORY NO. 11:

Unknown.


6

12.   Identify all other brokerage accounts you have opened or used since 1997, and for each state:

a.   Whether the account is governed by an arbitration agreement;

b.   Whether you opened or applied for the account using the internet, in whole or in part.

RESPONSE TO INTERROGATORY NO. 12:

Plaintiffs object to this interrogatory as it is beyond the scope of the Court's order that limits discovery to the formation of the agreement(s) between plaintiffs and defendants.

13.   Identify each time you viewed or saw any reference of any kind to E*TRADE's Customer Agreement or any arbitration agreement (including hyperlinks or references to either in other documents), and for each instance, identify the date and circumstances.

RESPONSE TO INTERROGATORY NO. 13:

The only time prior to the placing of this matter in suit that plaintiff saw any reference to arbitration is the reference in Exhibit A to plaintiffs' Interrogatories and Request for Production. Additionally, defendants have failed to identify what it is referring to as the Customer Agreement so plaintiffs are not able to respond to this question. Additionally, in a letter dated April 6, 2001 E-Trade attached two pages which plaintiffs believe is part of the Customer Agreement that defendants are now alleging governs the instant dispute.

## RESPONSES TO REQUESTS FOR PRODUCTION

1.   All documents referred to or relied upon in responding to E*TRADE's First Set of Interrogatories.

RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

See Exhibits A and B.

2.    All documents that constitute or relate to the terms governing your E*TRADE account.

RESPONSE TO REQUEST FOR PRODUCTION NO. 2:

See Exhibits A, B and C

3.    All documents that constitute or relate to a contract or agreement between you and E*TRADE governing your E*TRADE account.

RESPONSE TO REQUEST FOR PRODUCTION NO. 3:

See Exhibits A and B.

4.    All documents relating to your application for or the opening of your E*TRADE account.

RESPONSE TO REQUEST FOR PRODUCTION NO. 4:

See Exhibits A.

5.    All documents constituting or relating to communications between you and E*TRADE concerning the terms governing your E*TRADE account.

RESPONSE TO REQUEST FOR PRODUCTION NO. 5:

See Exhibits A and B.

8

6.    All documents received by you from E*TRADE within ninety (90) days of your

submitting an application for an E*TRADE account.

RESPONSE TO REQUEST FOR PRODUCTION NO. 6:

See Exhibits A and B. To the extent that there were trade confirmations received during this time period, plaintiff objects to producing trade confirmations as they are already in the possession of defendants.

7.    All documents you printed out from your computer that relate in any way to

your application for or the opening of your E*TRADE account.

RESPONSE TO REQUEST FOR PRODUCTION NO. 7:

See Exhibit A to defendants' Interrogatories and Request for Production of Documents.

8.    All documents that you received that advised you of your E*TRADE account

number, your user identification number, or your account password.

RESPONSE TO REQUEST FOR PRODUCTION NO. 8:

See Exhibit B.

9.    All documents that relate to, reference, or constitute the E*TRADE Customer

Agreement or the terms governing your E*TRADE account.

RESPONSE TO REQUEST FOR PRODUCTION NO. 9:

See Exhibit A to defendants' Interrogatories and Request for Production of Documents.

9

10.    All documents that relate in any way to your assertion that you never viewed or received the E*TRADE Customer Agreement.

RESPONSE TO REQUEST FOR PRODUCTION NO. 10:

None, prior to the institution of this suit.

11.    Your copy of your E*TRADE account application and account opening documents.

RESPONSE TO REQUEST FOR PRODUCTION NO. 11:

See Exhibits A and B. (The original of Exhibit A is in the possession of Defendants.)

12.    All documents relating to any agreement to arbitrate your claims against E*TRADE.

RESPONSE TO REQUEST FOR PRODUCTION NO. 12:

See Exhibit A to defendants' Interrogatories and Request for Production of Documents.

13.    All documents relating to your agreement to arbitrate any claims with any other securities brokerage firm.

RESPONSE TO REQUEST FOR PRODUCTION NO. 13:

Plaintiffs object to this request as overly broad, burdensome, unlikely to lead to the discovery of admissible evidence, and beyond the scope of the Court's order concerning the agreement(s) that were entered into by and between plaintiffs and defendants.

14.    All account agreements governing any other brokerage accounts you have opened, maintained, or used since 1997.

RESPONSE TO REQUEST FOR PRODUCTION NO. 14:

See Response to Request for Production No. 13 above.

Dated: Easton, Connecticut          LOVEJOY & ASSOCIATES
       May 7, 2004                  Attorneys for Plaintiffs,
                                    Suzanne M. Eggleston and Frederick A. Lovejoy


                                    By: _____
                                    Frederick A. Lovejoy (CT 03121)
                                    P.O. Box 56
                                    276 Center Road
                                    Easton, Connecticut 06612
                                    (203) 459-9941
                                    (203) 459-9943 (telefax)

RussoResposnes.doc

11

VERIFICATION

28 U.S.C. §1746

I, Frederick A. Lovejoy, declare under penalty of perjury under the laws of the United States of America that the foregoing Interrogatory responses are true and correct to the best of my knowledge. Executed on this 7th day of May, 2004.

Dated:  Easton, Connecticut
        May 7, 2004                    Frederick A. Lovejoy

**EXHIBIT B**

# PEPE&HAZARD LLP

A BUSINESS LAW FIRM

GOODWIN SQUARE
225 ASYLUM STREET
HARTFORD, CONNECTICUT 06103-4302
860.522.5175 FACSIMILE: 860.522.2796

JAMES A. BUDINETZ
Attorney at Law
Direct: 860.241.2693
jbudinetz@pepehazard.com

June 2, 2004

**VIA FACSIMILE (203) 459-9943**

Frederick A. Lovejoy, Esq.
P.O. Box 56
Easton, CT 06612

     **Re:**   *Eggleston, et al. v. E\*TRADE, et al.*

Dear Attorney Lovejoy:

     **I** write in an effort to resolve certain discovery objections you have interposed in response to E\*TRADE's document requests.

     First, you have objected to producing brokerage account agreements that you entered into with other brokerage firms (Request Nos. 13, 14). At your deposition, you identified Ameritrade (an online brokerage firm), People's Securities, Morgan Keegan, E.F. Hutton, and approximately ten (10) "mutual fund accounts" as brokerage firms at which you maintained accounts. In fact, you arbitrated a dispute with People's Securities after the matter was initially filed in court. We believe that production of your other account agreements is relevant to demonstrate your knowledge and understanding that it is customary for brokerage firms to require customers to arbitrate disputes. *See Scone Investments, L.P. v. American Third Market Corp.*, 992 F. Supp. 378, 381 (S.D.N.Y. 1998) (finding an attorney a "sophisticated investor" who can be assumed to be familiar with the securities industry practice of requiring arbitration clauses"); *Ilan v. Shearson/American Express, Inc.*, 632 F. Supp. 886, 890 (S.D.N.Y. 1985) ("The vast majority of brokerage firms require an investor to sign a contract with an arbitration clause in order to open an account."). Further, the terms of these agreements may be relevant to your understanding of the term "pre-dispute arbitration clause," which appears immediately above your signature on the E\*TRADE account application.

     Second, in light of the fact that you arbitrated another dispute with a brokerage firm that was initially filed in court, we ask that you produce all pleadings in that case relating to any motion to compel arbitration (Request No. 13). This would include, for example, copies of motions to stay or compel arbitration, oppositions, reply memoranda, court decisions, etc.

PEPE&HAZARD LLP

Frederick A. Lovejoy, Esq.
June 2, 2004
Page 2

Finally, we request that you reconsider your objection to producing your copies of all
account statements and trade confirmations pertaining to your E*TRADE account (Request Nos. 5,
6, 9). At a minimum, these records are relevant to determining whether your copies of these
documents reference the E*TRADE Customer Agreement.

Please advise as to whether we can resolve these issues. Also, I look forward to hearing
from you with respect to your availability for a status conference before Judge Fitzsimmons.

Sincerely,

James A. Budinetz

# EXHIBIT C

# LOVEJOY & ASSOCIATES
### ATTORNEYS AT LAW

Frederick A. Lovejoy*

Jennifer L. Hayes☐
Patricia A. Shepard†

*Admitted NY, CT, RI and NJ
☐Admitted in NY and CT
†Admitted in CT

276 CENTER ROAD
EASTON, CONNECTICUT 06612
TELEPHONE (203) 459-9941
TELEFAX (203) 459-9943
EMAIL ADDRESS: LOVEJOYADM@AOL.COM

June 3, 2004

Re:   Eggleston v.
      E-Trade Securities, et al.
      Docket No.: 3:02CV188 (WWE)
      (Our File 03-354)

James A. Budinetz, Esq.                    **VIA TELEFAX**
Pepe & Hazard, LLP                         (860) 522-2796
225 Asylum Street
Hartford, Connecticut 06103-4302

Dear Mr. Budinetz:

    We have your telefaxes of May 28, 2004 and June 2, 2004.

# REDACTED

    With respect to your June 3, 2004 telefax it is our understanding of the Court's Order that discovery is to be limited to the formation of any agreement entered into by and between the plaintiffs and the defendants and nothing more. In fact, that appeared to be your position when we went before Judge Fitzsimmons and argued the scope of the discovery sought by plaintiffs.

<u>RHODE ISLAND OFFICE</u>:   1536 WESTMINSTER STREET, PROVIDENCE, RHODE ISLAND 02909
                            TELEPHONE: (401) 273-7747   TELEFAX: (401) 421-4818

<u>NEW YORK OFFICE</u>:   82 WALL STREET, SUITE 1105, NEW YORK, NEW YORK 10005
                        TELEPHONE: (212) 344-1717   TELEFAX: (203) 459-9943

James A. Budinetz, Esq.
Pepe & Hazard, LLP
June 3, 2004
Page 2


As I testified, I have seen hundreds if not thousands of arbitration/appraisal agreements; will you next be requesting each and every one of those agreements.

I have read the first case you cite; i.e. Scone Investment, L.P. v. American Third Market Corp., 992 F.Supp 378 (S.D.N.Y. 1998). Unfortunately you misrepresent the holding therein. The Court held that Mr. Stanley Cohen, who was an attorney and a general partner of Scone Investments, L.P. was a sophisticated investor. Nowhere in the decision does The Court hold that attorneys are per se to be considered sophisticated investors. In other words, it is a question of fact.

Finally, you are more than welcome to file a motion, which plaintiffs will oppose, with Judge Eginton seeking to expand the scope of discovery in this case.

Yours very truly,

Frederick A. Lovejoy

FAL/jml
EgglestonBudinetz.doc

# EXHIBIT D

Service: **Get by LEXSEE®**
Citation: **1992 conn super lexis 3388**

*1992 Conn. Super. LEXIS 3388, ** 

CITY OF WATERBURY v. MERRILL LYNCH & CO., ET ALS

No. 102136

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF WATERBURY

1992 Conn. Super. LEXIS 3388

November 24, 1992, Decided

## NOTICE:    [*1]

THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW.
COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF
THIS CASE.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendants, the investment advisor, an investment bank,
and their officers, filed a motion to compel arbitration and stay the proceedings in an
action filed by plaintiff City of Waterbury for breach of contract.

**OVERVIEW:** The City filed an action for breach of contract against, among others, its
investment advisor, an investment bank, and the officers of those two entities.
Defendants sought enforcement of an arbitration clause in the agreement between the
City and the investment bank. The court held (1) by virtue of its non-discretionary
investment agreement, the investment advisor became substituted for the City in dealing
with the investment bank; (2) the agreement was not indicative of an intent to include
the investment advisor and other defendants in the arbitration agreement of the
previously executed agreement with the investment bank; (3) the investment advisor
and investment bank were not alter egos of each other; and (4) the Federal Arbitration
Act required that arbitrable claims were to be severed from non-arbitrable claims even
though such action would promote piece-meal resolution.

**OUTCOME:** The court granted the motion to compel arbitration and stay proceedings as
it related to the claims against the investment bank and its officer. The court denied the
motion as it related to all other defendants. The claims ruled arbitrable were stayed until
completion of the trial of the non-arbitrable claims.

**CORE TERMS:** arbitration, broker, customer, clearinghouse, undersigned, introducing, non-
signatory, cash management, arbitration clause, portfolio, nondiscretionary, vice-president,
arbitrability, arbitrable, signatory, arbitration agreement, third party, federal law, beneficiary,
margin, motion to compel arbitration, submitted to arbitration, alter ego, stock, designated,
affiliate, manager, advice, Connecticut Uniform Securities Act, contracting parties

### LexisNexis (TM) HEADNOTES - Core Concepts - ✦ Hide Concepts

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses 🖫
*HN1*⚓ Whether parties to a contract have agreed to arbitrate their disputes presents a
        question of fact. More Like This Headnote

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses 🖫

*HN2*⚡ Arbitration is a creature of contract. A person cannot be compelled to arbitrate a
dispute unless he has agreed to do so. The question of what persons or entities are
bound by an arbitration agreement affecting interstate commerce is one of federal
law. Since the question involves general concepts of contracts and agency, federal
courts look to state law in determining what the federal law of contracts or agency
is or should be. Questions concerning arbitrability, however, are to be examined
from the point of view that favors arbitration. More Like This Headnote

Business & Corporate Entities > Corporations > Shareholders & Other

Constituents > Disregard of Corporate Entity 🖫

*HN3*⚡ For a court to be able to find that one party is the alter ego of another, there must
be proof of control in the case of a corporation not mere majority or even complete
stock control, but complete domination, not only of finances, but of policy and
business practices respecting to the transaction at issue so that the corporate
entity as to this transaction had at the time no separate mind, will or existence of
its own. More Like This Headnote

**JUDGES:** BARNETT

**OPINIONBY:** BARNETT

**OPINION:** MEMORANDUM OF DECISION RE: MOTION TO COMPEL ARBITRATION AND STAY
PROCEEDINGS

In this case the court must decide whether all counts of the plaintiff's complaint should
remain as a viable suit or whether the first three counts should be severed and sent to
arbitration as sought by certain defendants. Reference to the pleadings places the matter
into proper perspective. The amended complaint is in five counts. n1 The first three counts
are directed to the defendants, Merrill Lynch & Co., Merrill Lynch Asset Management, Inc.
(MLAM), Merrill Lynch, Pierce, Ferrer & Smith (MLPF & S), Frederick M. Genung and Edmund
C. Hyland. Count 4 concerns the defendants, James Cahill and Colonial Equities Corporation
n2 while count 5 contains allegations directed to the defendants, Wal-Don Group, Inc.,
Patrick F. Waldron and James R. Donovan.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 A sixth count wherein the defendants, MLAM, Frederick M. Genung and Edmond C.
Hyland, were charged with conduct incident to the purchase of the bonds that the plaintiff
alleged was in violation of the Connecticut Unfair Trade Practices Ace (CUTPA) § 42-110b et
seq. was stricken pursuant to the court's memorandum of October 5, 1992, based on Russell
v. Dean Witter Reynolds, Inc., 200 Conn. 172 (1986). **[*2]**

n2 In the original complaint the fourth count included allegations against Peter J. Curley, but
the case was withdrawn as to him on November 4, 1991. Also, on August 19, 1991, the case
was withdrawn as to an entity described as "Colonial Realty Company." Without further
information, the court cannot say that "Colonial Realtty Company" and the defendant Colonial
Equities Corporation are the same enterprise.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In the first count the allegations are that one or more of Merrill Lynch & Co., MLAM, MLPF & S, Genung and Hyland, hereinafter referred to as the "Merrill Lynch defendants", breached a contract with the plaintiff when, on behalf of the plaintiff, subscription documents were signed for $ 506,005.95 worth of Colonial Diversified Zero Coupon Bonds in the face amount of $ 1,300,000.00. The second count refers to several allegations of negligence on the part of one or more of the Merrill Lynch defendants in the acquisition by the plaintiff of the Colonial Diversified Coupon Bonds, including a claim that said purchase was not permitted under the statute governing the investment of trust funds, Gen. **[\*3]** Stat. § 45a-203 (formerly § 45-88). In the third count, the allegations are that in the purchase of the Colonial Diversified Zero Coupon Bonds, one or more of the Merrill Lynch defendants violated the Connecticut Uniform Securities Act (CUSA), specifically Gen. Stat. §§ 36-473 and 36-474.

As for the remaining defendants, the fourth count alleges CUSA violations relating to § 36-485 and for § 36-498(a)(2) by James Cahill and Colonial Equities Corporation, making them both liable to the plaintiff pursuant to § 36-498(c). In the fifth count, the claims are that Wal-Don Group, Inc., by virtue of a trust indenture forming part of the offer of the bonds, became a fiduciary with obligations to the plaintiff that were ignored and that Wal-Don is merely the alter ego of the defendants, Patrick F. Waldron and James R. Donovan.

The Merrill Lynch defendants contend that the plaintiff's claims against all of them are arbitrable because of a provision in the Cash Management Account Agreement between the trustees of the plaintiff's retirement fund, designated in the agreement as the "undersigned", and the defendant, MLPF & S. That provision reads as follows:

Agreement to Arbitrate Controversies **[\*4]**

> Except to the extent that controversies involving claims arising under the Federal securities may be litigated, the undersigned n3 agrees that any controversy arising out of the business of MLPF & S or this Agreement shall be submitted to arbitration conducted under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc. or pursuant to the Code of Arbitration Procedure of the National Association of Securities Dealers, Inc. as the undersigned may elect. If the controversy involves any security or commodity transaction or contract related thereto executed on an exchange located outside the United States then such controversy shall, at the election of the undersigned be submitted to arbitration conducted under the constitution of such exchange or under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc. or the Code of Arbitration Procedure of the National Association of Security Dealers, Inc. Arbitration must be commenced by service upon the other of a written demand for arbitration or a written notice of intention to arbitrate, therein selecting the arbitration tribunal. **[\*5]** In the event the undersigned does not make such designation within five (5) days of such demand or notice, then the undersigned authorizes MLPF & S to do so on behalf of the undersigned.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 The Trustees of the City of Waterbury Retirement Fund.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Fortunately, in considering the question of arbitrability, the court is not confined to the rather open ended allegations of the complaint. The parties have furnished the agreement between the trustees of the plaintiff's retirement fund with MLPF & S and the agreement between said trustees, described therein as the plaintiff's Retirement Board, with MLAM. In addition, the Merrill Lynch defendants have submitted an affidavit from John Ruby, a vice-president of MLPF & S, and the manager of its Southbury office, and the plaintiff has provided portions of depositions taken of Barbara O'Brien, an employee of MLPF & S, and the defendant, Edmund C. Hyland, who works for MLAM. From the evidence presented, the court finds that the facts set forth below are relevant to the issue **[*6]** at hand.

On March 21, 1985, the agreement between the plaintiff's representatives and MLPF & S was executed. That agreement is in a printed form designated as the "Cash Management Account Agreement for Pension and Profit Sharing Plans." The agreement provides that the cash management account program offers an itemized financial service that links together three components: a securities account for the buying and selling of stocks, bonds and the like, a choice of money accounts and a check/card account. With respect to the securities account, the agreement states expressly that MLPF & S does not and will not have any discretionary authority or control over the plaintiff's investments and that MLPF & S will not serve as a primary and regular advisor regarding the plaintiff's investment decisions.

According to the agreement, cash accumulating in the securities account is to be automatically invested by MLPF & S into shares of the money account chosen by the plaintiff. No fees or commissions are to be charged for purchase or redemptions of money account shares. An unspecified affiliate of MLPF & S, however, will receive a fee for acting as investment advisor to each of the money **[*7]** funds.

The check/card account requires that a bank approval by MLPF & S accept the plaintiff's application to open an account. Checks drawn on such account will be honored to the extent of available funds in the securities account and in the designated money account.

John Ruby, in his affidavit, says that the cash management account agreement with MLPF & S was entered into prior to and in connection with the establishment by the plaintiff of an investment advisory agreement with MLAM. The cash management account agreement, however, does not mention or refer in any way to the investment advisory agreement or to MLAM. One provision of the cash management account agreement is that the plaintiff at any time, may withdraw any uninvested balance from its securities account upon notifying its account executive to MLPF & S by telephone or letter.

The agreement with MLAM was signed on June 5, 1985. Like the agreement between the plaintiff's representatives and MLPF & S, the MLAM contract is also a printed form. Pursuant to its terms, MLAM became the plaintiff's investment advisor and the manager of the securities in the plaintiff's portfolio. This agreement is nondiscretionary. The **[*8]** defendant, Edmund C. Hyland, described a nondiscretionary account as one in which the manager decides that investments should be bought and sold but before any transaction can be executed, approval of the customer must be obtained.

In the MLAM agreement several references to MLPF & S have been typed in. One clause directs that all transactions be carried out through MLPF & S as broker dealer in account 887-058967-05896 which is the number assigned to the plaintiff's cash management account. In another clause, the plaintiff directs that MLPF & S shall act as custodian of the assets of the portfolio. The affiliation of MLAM and MLPF & S is mentioned throughout the agreement and, in a third clause, the plaintiff authorizes MLAM to establish accounts with other securities dealers if transactions with its affiliate are prohibited by the (federal) Employee Retirement

Income Security Act.

It is the MLAM agreement that in addition to establishing the relationship between the plaintiff and MLAM, also imposes obligations on the part of both MLAM and the plaintiff to MLPF & S. Pursuant to the agreement, MLAM is appointed as the plaintiff's agent and attorney-in-fact to buy,sell or otherwise **[*9]** effect transactions in stocks, bonds and other securities for the plaintiff's account and in its name. This broad grant of authority is qualified, however, by another provision whereby before placing any orders for the plaintiff's account, MLAM is to obtain the plaintiff's consent. In fact, the only disagreement between the written contract and Mr. Hyland's description of a nondiscretionary account is that the written contract provides that consent does not have to be obtained if the investment is in a money market account or the action to be taken is ministerial in nature.

The agreement between the plaintiff and MLAM contains references to the affiliated status of MLAM and MLPF & S n4 but also to the independence of each corporation. MLAM is hired to give advice as to what securities should be bought or sold for the plaintiff's retirement account. MLPF & S is to act as the broker in such transactions and as custodian of the securities in the plaintiff's portfolio. The plaintiff's contract with MLAM provides that at no time shall MLAM have physical control of any of the assets of the portfolio. A specific provision in the contract between the plaintiff and MLAM is that notwithstanding **[*10]** its affiliation with MLPF & S, MLAM "is exclusively responsible for the performance of its duties and any liabilities to the [plaintiff] arising under this agreement or otherwise."

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 The agreement states that MLAM is a subsidiary of Merrill Lynch & Co., Inc., and an affiliate of Merrill Lynch, Pierce, Fenner & Smith.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

I.

Generally, *HN1*whether parties to a contract have agreed to arbitrate their disputes presents a question of fact. A.T. & T. Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 6649, 206 S. Ct. 1415, 89 L. Ed. 2d 648 (1986). A. Dubrevil & Sons, Inc. v. Lisbon, 215 Conn. 604, 608 (1990). The plaintiff, however, has raised two defenses to the requested arbitration that the court interprets as defenses in law. First, the plaintiff claims that the method chosen to raise the arbitration question - a motion to compel arbitration and stay proceedings - is an improper procedure. n5 Second, **[*11]** the plaintiff contends that its CUSA claims in the third count of the complaint, as a matter of law, can be tried only in a "judicial" forum.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 In this section of the plaintiff's brief, the word "forget" has been handwritten. But the plaintiff pressed the claim of improper procedure in oral argument.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Regarding these claims and other issues, the plaintiff and the Merrill Lynch defendants seemingly have agreed that their dealings affect interstate commerce and come under the Federal Arbitration Act (F.A.A.), 9 U.S.C. § 1-14, inclusive. Section 2 n6 of the F.A.A.

embodies a substantive rule applicable in state as well as federal courts, whereby Congress acting under the Commerce Clause n7 foreclosed state legislatures from undercutting the forceability of arbitration agreements. Southland Corporation v. Keating, 465 U.S. 1, 16, 104 S. Ct. 582, 79 L. Ed. 2d (1984). But the F.A.A. contains no express preemptive provision **[*12]** nor does it reflect a congressional intent to occupy the entire field of arbitration. Volt Info Sciences v. Board of Trustees of the Leland Stanford University, 487 U.S. 468, 477, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989). Therefore, even when the F.A.A.is applicable, state law still may be utilized in arbitration matters subject to preemption only to the extent of an actual conflict with federal law. Fahnestock & Co., Inc. v. Waltman, 935 F. 2d 512 (2d Cir.) cert. denied 112 S. Ct. 380, 116 L. Ed. 2d 381 (1991). Specifically, the procedures outlined in § 4 of the F.A.A. for raising the question of whether an agreement is arbitrable apply only to actions in the federal district courts. Southland Corporation v. Keating, supra at 16 and n. 10.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n6 The precise language of § 2, 9 U.S.C. § 2, is as follows: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration or controversy thereafter arising out of such contract or transaction or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration in existing controversy arising out of such a contract, transaction or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist or in equity for the revocation of any contract." **[*13]**

n7 U.S. Const. art. I § 8.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The plaintiff's objection to the motion of the Merrill Lynch defendants concerns Gen. Stat. § 52-410. n8 Under that section, anapplication for an order of arbitration is supposed to be initiated by a writ of summons and a complaint. Instead of using § 52-410, the Merrill Lynch defendants followed § 52-409, which states that if an action is brought by a party to a written agreement to arbitrate, the court, on motion by any party to the agreement, may stay the action until an arbitration has been had.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n8 The parties appear to have forgotten that the cash management account agreement between the plaintiff and MLPF & S specifies that it "shall be governed by and construed in accordance with the laws of the State of New York." No analysis of New York law has been offered to the court.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In Zarchen v. Union Equipment Co., 20 Conn. Sup. 44, 45 (1956), **[*14]** the requirements of a summons and complaint were determined to be mandatory. Zarachen, however, was a situation where the movant for arbitration was the plaintiff who had brought the suit. Of more recent date is KND Corporation v. Hartcom, Inc., 5 Conn. App. 333, 336-37 (1985) where the Appellate Court said "it would make little sense to require a party being sued to initiate an [§ 52-410] action" and sanctioned a § 52-409 motion when the issue of arbitration

was injected into a case by a defendant. The decision in KND Corporation v. Hartcom, Inc. prevents the court from considering Zarchen v. Union Equipment Co. as persuasive authority.

The plaintiff's second point is that similarity in language between the Connecticut Uniform Securities Act (CUSA) and federal securities legislation should mean that arbitration of the CUSA cause of action is prohibited Apparently, the source for this argument is Wilko v. Swan, 346 U.S. 427, 434, 74 S. Ct. 182, 98 L. Ed. 18 (1953), wherein a section of the Securities Act of **[*15]** 1933, 15 U.S.C. § 77n invalidating any stipulations waiving the Act's provisions was interpreted to prohibit the operation of a predispute arbitration clause. More than thirty years later, however, in Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 234, 107 S. Ct. 2332, 96 L. Ed. 2d 185 reh. denied 483 U.S. 1056, 108 S. Ct. 31 (1987) the Supreme Court refused to place the same construction on essentially identical language in the Securities Exchange Act of 1934, 15 U.S.C. § 78cc (a). And, in Rodriguez De Quijas v. Shearson/American Express, Inc., 109 S. Ct. 1917, 1922 (1989), Wilko v. Swan was overruled. At the present time, no federal statute prevents or renders ineffective a predispute arbitration agreement between a broker and an investor.

Obviously, Rodriguez De Quijas v. Shearson/American Express, Inc., supra is controlling authority for the present controversy. That decision was issued on May 15, 1989, two and one-half months **[*16]** before the Colonial Diversified Zero Coupon bonds were purchased. Further, the decision is retroactive, 109 S. Ct. at 1922. If the motion to compel arbitration rests on sound grounds, neither of the two foregoing claims provides an effective reason to deny it.

II.

HN2Arbitration is a creature of contractQ. A person cannot be compelled to arbitrate a dispute unless he has agreed to do so. A. T. & T. Technologies, Inc. v. Communications Workers, 475 U.S,. 643, 648, 106 S. Ct. 1415, 89 L. Ed. 2d 648, 655 (1986) (quoting Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S. Ct. 1347, 4d Ed. 2d 1409 (1960)). The question of what persons or entities are bound by an arbitration agreement affecting interstate commerce is, as previously stated, one of federal law. Since the question involves general concepts of contracts and agency, federal courts have looked to state law in determining what the federal law of contracts or agency is or should be. Flink v. Carlson, 856 F. 2d 44, 46 and n. 3 (8th Cir. 1988). **[*17]** Questions concerning arbitrability, however, are to be examuined from the point of view that favors arbitration. Mitsubishi Motors Corporation v. Soler Chrysler - Plymouth, Inc., 473 U.S. 614, 626, 105 S. Ct. 3346, 87 L. Ed. 444 (1985).

Here, of course, the dispute as to arbitrability is between the plaintiff, a signatory to a contract containing an arbitration clause, and four non-signatories, Merrill Lynch & Co., MLAM, MLPF & S' vice-president Genung and MLAM's vice-president Hyland. The non-signatories predicate the claim for arbitration upon their relationship with MLPF & S the other signatory.

In certain situations, courts have deemed non-signatories to a contract containing an arbitration clause to be parties to the contract for purposes of the F.A.A... Merrill Lynch Commodities, Inc. v. Richall Shipping Corporation, 581 F. Supp. 933, 940 (S.D.N.Y. 1984). These instances are principally an agency relationship between a signatory and a non-signatory as was found in Okcuoglu v. Hess, Grant & Co., Inc., 580 F. Supp. 749, 751-52 (E.D. Pa. 1984), **[*18]** or a contract whereby the non-signatory was made a third party beneficiary as in Cauble v. Mabon Nugent & Co., 594 F. Supp. 985, 992 (S.D.N.Y. 1989) or where the non-signatory is, in effect, the alter ego of a signatory, see Fisser v. International Bank, 282 F. 2d 231, 234 and n. 6 (2d Cir. 1960) or where the contract incorporated by reference another contract to which the non-signatory is a party. Cianbro Corporation v. Empressa Nacional de Ingenieria y Technologia, S.A., 697 F. Supp. 15, 18 (D. Me. 1988). All

of these cases were decided on their own peculiar facts and with a view of ascertaining the intent of the contracting parties. The intent of the contracting parties becomes all-important when a non-party seeks to take advantage of the contractual language. See Mowbray v. Moseley, Hallgarten, Estabrook & Weeden, 759 F. 2d 1111, 1117 (1st Cir. 1986).

Okcuoglu v. Hess, Grant & Co., Inc., supra was decided upon the relationship that the introducing broker had with both the customers and the clearinghouse **[*19]** brokers. The introducing broker approved the customer for options trading through one clearinghouse, thus acting as that clearinghouse's agent and was authorized by the customers to execute the form by which their options trading was continued at the second clearinghouse. The forms used by both clearinghouses contained arbitration clauses and the introducing broker was permitted to invoke each of them as agent for the first clearinghouse and as agent for the customers when the form of the second clearinghouse was signed.

In Cauble v. Mabon Nugent & Co., supra the futures contract between the customer and the clearinghouse broker contained a clause that if the customer's account did not contain the amount of margin required, the broker could without notice liquidate the customer's open positions or take what other action it deemed necessary. Cauble was a situation where, although the customer's account was nondiscretionary, the introducing broker had supervision over the account including authority to collect margins for the clearinghouse broker who did nothing more than clear trades. The court in Cauble, was of the opinion that the services **[*20]** rendered by the introducing broker of which the customer and clearinghouse broker were fully aware, shared an interest in their part to regard the introducing broker as a third party beneficiary so that it too could sell the customer's interests if proper margins were not maintained.

Differences exist between the two decisions supporting an agency or third party beneficiary status for the so-called introducing broker n9 and the present case. Previously noted was the omission in the plaintiff's contract with MLPF & S of any reference to MLAM. Some courts have found that such omission alone is indicative of an intent not to include the advising broker in the arbitration agreement between the customer and clearinghouse broker. See Wilson v. D.H Blair, 731 F. Supp. 1359, 1362 (N.D. Ind. 1990). Parenthetically nothing in John Ruby's affidavit rebuts this inference. Moreover the differences appear in the plaintiff's agreement with MLAM as the following facts show. In that contract the plaintiff agreed to indemnify MLPF & S for any loss or damage sustained as a result of following MLAM's instructions. MLAM itself, however, would be liable, according **[*21]** to the contract for losses to the plaintiff that were caused through its negligent, willful or reckless misconduct or its violation of some applicable law. By virtue of its agreement, MLAM became substituted for the plaintiff in dealing with MLPF & S. But this status is not indicative of an intent to include MLAM and other Merrill Lynch defendants in the arbitration clause of the previously executed MLPF & S agreement. McPheeters v. McGinn, Smith & Co., Inc., 953 F. 2d 771 (2d Cir. 1992) Especially so, in this case, where the defendant Hyland, who managed the plaintiff's account at MLAM, testified in deposition that he had never seen the plaintiff's agreement with MLPF & S before.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n9 The Merrill Lynch defendants object to the plaintiff's reference to MLAM as an introducing broker. In the scheme of cases, however, that is what MLAM appears to be.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The Merrill Lynch defendants do not claim to be alter egos of each other. $^{HN3}$For a court to be able to find that one party is the alter **[*22]** ego of another, there must be proof of

control in the case of a corporation not mere majority or even complete stock control, but complete domination, not only of finances, but of policy and business practices respecting to the transaction at issue so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own. Fisser v. International Bank, 202 F. 2d 231, 238 (2d Cir. 1960); Coastal States Trading, Inc. v. Zenith Navigation S.A., 446 F. Supp. 330, 336-37 (S.D.N.Y. 1977); see Dighello v. Busconi, 673 F. Supp 85-87 (D. Conn. 1987) aff'd mem. 849 F. 2 1487 (2d Cir 1988).

Only obliquely do the Merrill Lynch defendants argue for incorporation by reference of the plaintiff's agreement with MLPF & S into the plaintiff's agreement with MLAM. The court rejects the argument. The MLAM agreement purports to appoint MLPF & S as the closing broker and designates the plaintiff's account with MLPF & S by number. These acts had already happened as a result of the plaintiff's agreement with MLPF & S. In any event,
[*23] a recital of some previously accomplished items is not sufficient evidence of an intention to incorporate by reference the provisions of one agreement into the other. See Ciambro Corporation v. Empressa Nacional de Ingenieria y Technologia, supra at 18; Coastal States Trading, Inc. v. Zenirh Navigation, S.A., supra at 338.

The principal contention of the Merrill Lynch defendants is that the arbitration claim is sufficiently broad to encompass the plaintiff's claims against all of them in that the transaction giving rise to the suit arose out of the business of MLPF & S. Again, the court must disagree. The wordage in question is "the undersigned agrees that any controversy existing out of the business of MLPF & S or this agreement shall be submitted to arbitration." When the account was executed the duties as well as the business of MLPF & S was to buy and sell securities as the plaintiff and subsequently MLAM requested. In the agreement, MLPF & S precluded itself from exercising discretionary authority or giving advice. A review of the amended complaint shows the gravamen of the plaintiff's suit to be lack of proper advice, lack [*24] of informed consent and improper management of the plaintiff's portfolio. If these allegations are proved, MLAM, at least, will be liable because of the functions assigned to it in its contract with the plaintiff. In the court's view, the arbitration clause does not encompass MLAM's functions and does not extend beyond MLPF & S and Frederick M. Genung, its vice-president. See McPreeters v. McGinn, Smith & Co., Inc., supra at 773; Mowbray v. Mosley, Hallgarten, Estabrook & Weeden, supra at 1117.

To be sure some of the plaintiff's allegations, particularly those concerning agency, go against its present opposition to arbitration. See J.J. Ryan & Sons, Inc. v. Rhone Poulewc Textile, S.A., 863 F. 2d 315, 320-21 (4th Cir. 1988). On the issue of arbitrability, however, the Merrill Lynch defendants are the proponents with the burden of persuasion. Except for the obvious situations of MLPF & S and Genung, the burden was not satiasfied.

III.

The F.A.A. requires that arbitrable claims be severed from non-arbitrable claims even though such action will promote piece-meal resolution. Dean Whitter Reynolds v. Byrd, 470 U.S. 213, 221, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985). [*25] The motion to compel arbitration and stay proceedings is therefore granted to the extent of the plaintiff's claims against MLPF & S and Frederick M. Genung. The claims ruled arbitrable, however, are themselves stayed until completion of the trial of the non-arbitrable claims. In this way the court seeks to prevent the arbitration hearing from having any preclusive effect on the litigation of the nonarbitrable claims. See Dean Whitter Reynolds v. Bird, supra at 222-223.

BARNETT, J.

Service: **Get by LEXSEE®**
Citation: **1995 us dist lexis 15195**

*1995 U.S. Dist. LEXIS 15195, \**

ROBERT BLASHKA, Plaintiff, - against - GREENWAY CAPITAL CORPORATION, MAYER AMSEL, DAVID AMSEL, NATIONAL FINANCIAL SERVICES CORPORATION, and JOHN DOES I-XX, Defendants.

94 Civ. 5633 (SAS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1995 U.S. Dist. LEXIS 15195

October 16, 1995, Decided
October 17, 1995, FILED

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff customer initiated an action alleging that defendants, a broker, the broker's registered representative, a clearing broker, and several John Does, injured him through violations of §§ 10(b) and 10(b) (5) of the 1934 Securities Act; RICO; common law fraud; breach of fiduciary duty; breach of contract; and, tortious interference with contract. Defendants filed a motion to compel arbitration under 9 U.S.C.S. § 3 et seq.

**OVERVIEW:** The controversy between the parties arose from a margin account agreement and certain losses incurred by the customer in margin trading. The account application and agreement contained a pre-dispute arbitration clause. The face sheet of the customer's application was located but the signature page was not. The court granted defendant's motion to compel arbitration. Pursuant to § 3 stay proceedings was required if the court found a valid arbitration agreement. Under 9 U.S.C.S. § 4 the court was entitled to compel arbitration when a party did not abide by such an agreement. Moreover, federal policy favored arbitration and from a party's conduct an implied agreement to arbitrate was possible. Thus, absent a signature the customer still was bound to the agreement. The court found that the parties had agreed to arbitrate and that the scope of the agreement encompassed the asserted claims. The customer's causes of action stemmed from an alleged neglect and fraud on the part of defendant. The complained of conduct concerned orders and transactions, and arose in the context of the performance or breach of the underlying agreement.

**OUTCOME:** The court directed the parties to arbitration.

**CORE TERMS:** margin account, signature, trading, margin, customer, arbitration clause, arbitration, agreement to arbitrate, business practice, new account, arbitrate, regular, monthly, agreements to arbitrate, parties agreed, opening, arbitration agreement, pre-dispute, confirmations, routine, stock, sheet, Federal Arbitration Act, favoring arbitration, federal policy, arbitrability, approving, encompasses, brokerage, coverage

### LexisNexis (TM) HEADNOTES - Core Concepts - ◆ Hide Concepts

Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods
*HN1* The Federal Arbitration Act provides that agreements to arbitrate shall be valid,

irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. 9 U.S.C.S. § 2. Therefore, a district court must stay proceedings if it finds a valid arbitration agreement, 9 U.S.C.S. § 3; and, it may compel arbitration when a party does not abide by that agreement. 9 U.S.C.S. § 4. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Federal Arbitration Act
*HN2* The United States Supreme Court has consistently stated that the Federal Arbitration Act establishes a federal policy favoring arbitration. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods
*HN3* When it is established that an agreement to arbitrate exists, federal policy requires that the federal courts rigorously enforce agreements to arbitrate. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods
*HN4* A question as to whether the parties have agreed to arbitrate is an issue for judicial determination. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods
*HN5* In determining the arbitratability of a particular dispute, a court must decide: (1) whether the parties agreed to arbitrate, and (2) if so, whether the scope of the agreement encompasses the claims being asserted. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods
Civil Procedure > Alternative Dispute Resolution > Federal Arbitration Act
*HN6* The courts must enforce the intent of the parties as embodied in their agreement to arbitrate. If the court finds that the parties did intend that disputes be arbitrated, the Federal Arbitration Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods
Contracts Law > Types of Contracts > Implied-in-Fact Contracts
Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
*HN7* When questions as to whether a party actually entered into an agreement arise, a party's agreement to arbitrate may be implied from that party's conduct. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods
Contracts Law > Types of Contracts > Implied-in-Fact Contracts
Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
*HN8* Since an agreement may be implied, the Second Circuit has consistently held that a party may be bound by an agreement to arbitrate even absent a signature to that agreement. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods
Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
*HN9* Once a court determines that an arbitration clause has been agreed to by the parties, the court must define the scope of the arbitration clause and determine whether a particular dispute falls within that scope. However, any doubts regarding the existence of an arbitration clause or the scope of its coverage in a particular dispute ought to be resolved in favor of coverage. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

HN10⚡Arbitration should be enforced unless it is clear that the parties did not so intend. Contracts to arbitrate are not be avoided by allowing one party to ignore the contract and bring the action in federal court. Accordingly, where an agreement to arbitrate is found, it will be enforced. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods

HN11⚡To determine the arbitratability of a dispute, the first question to be addressed is whether the parties agreed to arbitrate. More Like This Headnote

Evidence > Relevance > Routine Practices

HN12⚡Fed. R. Evid. 406 provides, in pertinent part, that evidence of the routine practice of an organization is relevant to prove that the conduct of the organization on a particular occasion was in conformity with a routine practice. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Types of Contracts > Implied-in-Fact Contracts

HN13⚡Even in the absence of a signed agreement, an agreement to arbitrate may be implied from the conduct of the parties. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods

HN14⚡Where a party knowingly benefits from an agreement without rejecting an arbitration clause contained therein, that party is bound to that agreement. More Like This Headnote

**COUNSEL: [*1]** For ROBERT BLASHKA, plaintiff: Martin H. Kaplan, Gusrae, Kaplan & Bruno, New York, NY.

For GREENWAY CAPITAL CORPORATION, defendant: Ruthann G. Niosi, Esq., LAW OFFICES OF RUTHANN G. NIOSI, New York, NY.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINIONBY:** Shira A. Scheindlin

**OPINION:** OPINION AND ORDER

This action was initiated by Robert Blashka ("Blashka") alleging that defendants Greenway Capital Corporation ("Greenway") Mayor Amsel ("Amsel"), and National Financial Services Corporation ("National"), as well as several John Does, injured him through violations of §§ 10(b) and 10(b) (5) of the 1934 Securities Act; RICO; common law fraud; breach of fiduciary duty; breach of contract; and, tortious interference with contract. Defendants moved to compel the present dispute to arbitration under 9 U.S.C. § 3 et seq.

I. Background

A. The Relationship Between Greenway, Amsel and National

Greenway is a broker/dealer and is a member of the National Association of Securities Dealers (NASD); National is the clearing broker for all of Greenway's customer's accounts. See Plaintiff's Complaint ("Complaint") at P 6. Amsel is a registered representative of

Greenway. Under the Clearing Agreement between Greenway and National, Greenway is required to obtain and verify information necessary to maintain and retain account applications and agreements, to obtain margin account applications and agreements **[\*2]** and to forward them to National. See Clearing Agreement, annexed as Ex. 1 to the Affidavit of Carlos Cartaya ("Cartaya Aff."), Director of National's Client Services Department.

According to Harold Smith, Greenway's Director of Operations, Greenway is required to obtain and maintain certain documents, including the customer account application and agreements. See Affidavit of Harold Smith ("Smith Aff.") at P 3; Clearing Agreement. Moreover, this practice is required both for new accounts and margin accounts "As to any Account, until [Greenway] has furnished [National] with an executed margin agreement, [Greenway] will not place orders to be executed on margin for any such Account." See Clearing Agreement at Article III, P 1.

B. The Relationship Between Defendants and Plaintiff

1. The Initial Account Agreement

"On or about March 11, 1992, Defendant Amsel as a Registered Representative of Defendant Greenway with the knowledge and consent of [Blashka] opened an account for [Blashka] Complaint at P 12. Blashka recalls having a discussion with Amsel, in which he told Amsel to open an account in his name. See Blashka Deposition ("Blashka Dep.") at 23. **[\*3]** During this discussion, Amsel requested certain information in order to fill out a "questionnaire or ... format sheet" in order to open the account. Id. By the end of this discussion, it was Blashka's understanding that Amsel would do whatever was necessary to open the account. See id. at 32. Amsel opened the trading account with Blashka's consent. See id. at 41.

Blashka began trading in the account on March 18, 1992. See Complaint at P 13. Through December, 1992, Blashka participated in "approximately 25 trades (buys and sells), approximately 20 payments, deposits of checks or other credits and activity involving a variety of securities." See Cartaya Aff. at P 7; Complaint at P 16. Blashka received monthly account statements and confirmations for the various transactions, which were sent by Greenway. See Complaint at P 117. The monthly account statements sent by Greenway to Blashka demonstrate that Blashka transferred substantial funds and valuable securities into his account. See Monthly Account statements for the period March 1992 through November 1993, annexed as Ex. I to the Affidavit of Michael G. Shannon ("Shannon Aff."), Special Counsel to National's **[\*4]** attorney.

Greenway has a standard application and agreement which is completed for all customers with whom it opens a new account. Smith testified that it was and is Greenway's regular business practice not to permit trading in a customer's account unless and until the account application and agreement have been approved. See Smith Aff. at P 5. According to Cartaya, National would not clear trades in a Greenway customer account unless both the account application and agreement had been completed. See Cartaya Aff. at P 5.

The following clause appears above the signature line of Greenway's new account agreement:

> THIS ACCOUNT IS COVERED BY A PRE-DISPUTE ARBITRATION AGREEMENT WHICH IS ENCLOSED. I ACKNOWLEDGE RECEIPT OF THE PRE-DISPUTE ARBITRATION AGREEMENT.

The Pre-Dispute Arbitration Clause of the Agreement provides, in pertinent part:

> I AM AWARE OF THE FOLLOWING:
>
> ...
> (B) THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.
>
> ...
> I AGREE THAT ALL CONTROVERSIES THAT MAY ARISE BETWEEN US CONCERNING ANY ORDER OR TRANSACTION, OR THE CONTINUATION, PERFORMANCE OR BREACH OF THIS OR ANY OTHER AGREEMENT BETWEEN US ... **[\*5]** SHALL BE DETERMINED BY ARBITRATION...

National requires Greenway to include these terms in all of Greenway's account agreements. See Cartaya Aff. at PP 3-4. Greenway gives each new customer a copy of the pre-dispute arbitration clause. See Smith Aff. at PP 6-7.

A search of Greenway's business records located the face sheet of Blashka's application. See Ex. 3 to Cartaya Aff. However, the signature page of the application has not been located. Amsel stated that he signed the approval of Blashka's accounts, and that it was his regular business practice to sign an account approval only after seeing a customer's signature. See affidavit of Mayer Amsel ("Amsel Aff.") at P 3. Blashka denies signing any agreement with Greenway and claims that he never agreed to arbitrate his disputes with Greenway. See Defendants' Memorandum of Law at 3-8; Transcript of Oral Argument of August 18, 1995 ("Transcript") at 16-23.

2. The Margin Account Agreement

On or about March 5, 1993, Blashka began trading in a Greenway margin account. See Complaint at P 42. Blashka continued margin trading in this account through October of 1993. Blashka received confirmations from Greenway **[\*6]** regarding the various transactions in his margin account. See Blashka Dep. at 62. At no point prior to October, 1993 did Blashka tell anyone at Greenway that he had not authorized margin trading or a margin account. Id. at 62, 64. Nor did Blashka ever complain to Greenway or National about a particular trade in his margin account. Id. Blashka stated that from his prior experience he assumed that "one should have a margin account" in order to trade on margin. Id. at 74.

Greenway's regular business practice regarding margin accounts is that both the margin account application and agreement must be completed and signed before Greenway will trade in the account. See Smith Aff. at P 12. National's regular business practice is to refrain from trading in a margin account until the application and agreement for the account have been completed. In fact, one clause of the agreement between National and Greenway states, in pertinent part, that "[National] will review all new account applications for completeness once a week. If a new account is incomplete when it is received, the application will be returned to [Greenway]." See Shannon Aff. at Ex. A. Greenway's written **[\*7]** policy is that if such an agreement is not signed within 30 days, the account is frozen. See id. at Ex. B. Fred Luthy, a principal of Greenway, approved Blashka's margin application and agreement. Luthy stated that it is his regular business practice not to approve a margin account until the application and agreement have been completed. See Affidavit of Fred Luthy ("Luthy Aff.") at P 3.

Greenway has produced a copy of Blashka's agreement to open a margin account. Blashka contends, however, that the signature on the margin agreement is not his. See Affidavit of

Robert Blashka ("Blashka Aff.") at P 6. National's records show that it received the original agreement with what appears to be the customer's signature. See Shannon Aff. at Ex. H. Luthy stated that he would not have approved the account if he had not seen the customer's signature on the agreement. See Luthy Aff. at P 3. Nonetheless, for the purposes of this motion, the Court assumes that the agreement was not signed by Blashka, although someone did sign his name. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 It is unclear whether the signature on the margin account is Blashka's. Neither party has submitted expert testimony from a handwriting expert, although defendants concede that the signature on the margin account agreement is slightly different from the signature samples provided by Blashka. See Transcript at 10.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*8]**

From March, 1993 through the end of his relationship with Greenway, Blashka continued to trade in his margin account. He received confirmations and monthly statements regarding the trading in this account, and authorized Greenway to do whatever had to be done to effect an order. See Blashka Dep. at 62, 91.

The Complaint is based on margin trading which took place in Vertex securities. Blashka alleges that on October 18, 1993 he ordered Greenway and Amsel to sell 24,000 shares of Vertex, but the sale did not occur until October 21, 1993. Complaint at PP 61-64. As a result of this delay, Blashka alleges a loss of $ 357,000. Id. at 63-64. Blashka does not contest Greenway's assertion that he enjoyed a $ 315,000 profit through the eight months of trading in his margin account. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Blashka purchased $ 187,000 of Vertex stock in his margin account. Blashka sold this stock for $ 502,000, thus making a profit of $ 315,000. Blashka's complaint alleges that he should have been able to sell the stock for $ 859,000. See Shannon Aff. Ex. I (records of transactions in Blashka's accounts); Complaint at PP 12-65.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*9]**

II. Discussion

A. Arbitration

*HN1*⎯The Federal Arbitration Act provides that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Therefore, a district court must stay proceedings if it finds a valid arbitration agreement, 9 U.S.C. § 3; and, it may compel arbitration when a party does not abide by that agreement. 9 U.S.C. § 4.

*HN2*⎯The Supreme Court has consistently stated that the Federal Arbitration Act "establishes a 'federal policy favoring arbitration'." Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226, 96 L. Ed. 2d 185, 107 S. Ct. 2332 (1987) (quoting Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983)). See also Southland Corp. v. Keating, 465 U.S. 1, 10, 79 L. Ed. 2d 1, 104 S. Ct. 852

(1984) ("In enacting § 2 of the [Federal Arbitration] Act, Congress declared a national policy favoring arbitration."). The Second Circuit has uniformly recognized and abided by this policy. See e.g. Com-Tech Associates v. Computer Associates Intern, Inc., 938 F.2d 1574, **[\*10]** 1576 (2d Cir. 1991) ("there are strong federal policies in favor of arbitration") This policy is premised on the notion that "the legislative history of the [Federal Arbitration] Act establishes that the purpose behind its passage was to ensure judicial enforcement of privately made agreements to arbitrate." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 219, 84 L. Ed. 2d 158, 105 S. Ct. 1238 (1985).

Accordingly, *HN3*⚓when it is established that an agreement to arbitrate exists, the aforementioned federal policy "requires that '[the federal courts] rigorously enforce agreements to arbitrate.'" Shearson/American Express, 482 U.S. at 226 (quoting Dean Witter, 470 U.S. at 220). See also Southland Corp. v. Keating, 465 U.S. at 10 ("Congress has thus mandated the enforcement of arbitration agreements").

*HN4*⚓A question as to whether the parties have agreed to arbitrate is an issue for judicial determination. See AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 649, 89 L. Ed. 2d 648, 106 S. Ct. 1415 (1986); Corallo v. Merrick Cent. Carburetor, Inc., 733 F.2d 248 (2d Cir. 1984). *HN5*⚓In determining the arbitratability of a particular dispute, a **[\*11]** court must decide: (1) whether the parties agreed to arbitrate, Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc., 473 U.S. 614, 626, 87 L. Ed. 2d 444, 105 S. Ct. 3346 (1985), and (2) if so, whether the scope of the agreement encompasses the claims being asserted. See Progressive Casualty Insurance Co. v. C.A. Resaguradora Nacional De Venezuela, 991 F.2d 42, 45 (2d Cir. 1993).

Thus, *HN6*⚓the courts must enforce the intent of the parties as embodied in their agreement to arbitrate. See Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University, 489 U.S. 468, 478-79, 103 L. Ed. 2d 488, 109 S. Ct. 1248 (1989). If the court finds that the parties did intend that disputes be arbitrated, "the [Federal Arbitration] Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. at 220 (emphasis in original).

*HN7*⚓When questions as to whether a party actually entered into an agreement arise, a party's agreement to arbitrate may be implied from that party's conduct. See Gvozdenovic v. United **[\*12]** Air Lines, Inc., 933 F.2d 1100, 1105 (2d Cir. 1991), cert. denied, 502 U.S. 910, 116 L. Ed. 2d 248, 112 S. Ct. 305, (1991) (citing Kamakazi Music Corp. v. Robbins Music Corp., 684 F.2d 228, 231 (2d Cir. 1981) and Teamster's Local Union #764 v. J.H. Merritt & Co., 770 F.2d 40, 42 (3rd Cir. 1985)). See also Franklin Elec. Co. v. International Union, United Auto. Aerospace and Agr. Implement workers of America (UAW), 886 F.2d 188 (8th Cir. 1989) and cases cited therein.

Therefore, *HN8*⚓since an agreement may be implied, the Second Circuit has consistently held that a party may be bound by an agreement to arbitrate even absent a signature to that agreement. See Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 846 (2d Cir. 1987); McAllister Brothers, Inc. v. A & S Transportation Co., 621 F.2d 519, 524 (2d Cir. 1980); A/S Custodia v. Lessin Int'l, Inc., 503 F.2d 318, 320 (2d Cir. 1974); Fisser v. International Bank, 282 F.2d 231, 233 (2d Cir. 1960). Two of the three other circuits that have addressed this issue have reached the same conclusion. See Republic of Nicaragua v. Standard Fruit Co., 937 F.2d 469 (9th Cir. 1991), cert. denied, 503 U.S. 920 **[\*13]** (1992), and Stedor Enterprises, Ltd. v. Armtex, Inc., 947 F.2d 727 (4th Cir. 1991). Cases from the Southern District of New York have also consistently held that a signature is not necessary to bind a party to an arbitration agreement. See e.g. Matter of Arbitration Between Herlofson Management A/S and Ministry of Supply, Kingdom of Jordan, 765 F. Supp. 78, 85 (S.D.N.Y. 1991); Creative Securities Corp. v. Bear Stearns & Co., 671 F. Supp. 961, 965 (S.D.N.Y.

1987; aff'd, 847 F.2d 834 (2d Cir. 1988). See also Ziegler v. Whale Securities Co., 786 F. Supp. 739 (N.D.Ind. 1992) (under New York law, party can be bound to an arbitration agreement even absent a signature).

*HN9*⇲Once a court determines that an arbitration clause has been agreed to by the parties, the court must define the scope of the arbitration clause and determine whether a particular dispute falls within that scope. See Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 121 (2d Cir. 1991). However, any doubts regarding the existence of an arbitration clause or the scope of its coverage in a particular dispute ought to be resolved in favor of coverage. See AT&T Technologies, Inc. v. Communications Workers **[\*14]** of America, 475 U.S. 643, 649, 89 L. Ed. 2d 648, 106 S. Ct. 1415 (1986).

Thus, *HN10*⇲arbitration should be enforced unless it is clear that the parties did not so intend. See AT&T Technologies, 475 U.S. at 648 (citing Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960)). Moreover, "contracts to arbitrate are not be avoided by allowing one party to ignore the contract" and bring the action in federal court. Southland Corp. v. Keating, 465 U.S. at 7. Accordingly, where an agreement to arbitrate is found, it will be enforced. See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. at 220.

B. The New Account Application/Agreement

*HN11*⇲To determine the arbitratability of this dispute, the first question to be addressed is whether the parties agreed to arbitrate. See e.g. Mitsubishi Motors Corp. v. Soler Chrysler Plymouth Inc., 473 U.S. at 626. Here, Greenway has a standard agreement which it required all of its customers to sign when opening a new account. Similarly, National's standard business practice only permits trading in accounts with a completed agreement. Finally, Amsel had a standard practice of not approving an **[\*15]** account application without a signature. In addition, Blashka is a highly sophisticated investor. He has been involved in, and even managed, securities accounts in the past. See Blashka Dep. at 7. Blashka recalls signing account agreements for each account which he held in the past, all of which presumably included an arbitration clause. See Ilan v. Shearson/American Express., Inc., 632 F. Supp. 886, 890 (S.D.N.Y. 1985) ("in the securities industry, the vast majority of brokerage firms require an investor to sign a contract with an arbitration clause in order to open an account.") Blashka Dep. at 11. There is no question here that Blashka sought the opening of this account and actively traded in it.

Rule 406 of the Federal Rules of Evidence *HN12*⇲provides, in pertinent part, that "evidence of ... the routine practice of an organization ... is relevant to prove that the conduct of ... the organization on a particular occasion was in conformity with a routine practice." Applying this rule, it is reasonable to conclude based on the uncontradicted evidence of standard business practices that an application was completed for Blashka's account. Blashka's statement that he recalls answering **[\*16]** questions in order to fill out "a questionnaire or ... format sheet" coupled with his knowledge that such account agreements were necessary at all other brokerage firms supports this conclusion. Thus, even though a signed agreement cannot be located by Greenway, the Court concludes that Blashka either signed such an agreement or authorized someone else to sign on his behalf.

Because Greenway's account agreement contained a standard arbitration clause and Blashka traded with Greenway over a lengthy period of time, it is reasonable to conclude that, *HN13* ⇲even in the absence of a signed agreement, an agreement to arbitrate may be implied from the conduct of the parties. See Gvozdenovic v. United Airlines, Inc., 933 F.2d at 1105. Furthermore, Blashka was well acquainted with the industry custom of using arbitration clauses.

## C. The Margin Account Agreement

Greenway has produced a signed copy of a margin agreement with Blashka. Blashka contends, however, that the signature is a forgery. See Blashka Aff. at P 6. Assuming, arguendo, that the signature is not Blashka's, the Court nevertheless finds that a valid agreement to arbitrate exists with respect to this account.

Greenway **[\*17]** has a standard agreement which it requires all customers to sign when opening a margin account. As noted above, if a margin account agreement is not completed for a customer, National will return the agreement to Greenway and abstain from trading in the account. Finally, Luthy had a standard business practice of not approving a margin account agreement without a signature. As explained above, Rule 406 of the Federal Rules of Evidence states that evidence of an organization's routine practice is relevant for proving conduct of the organization on a particular occasion. Accordingly, when applying this Rule to the uncontradicted evidence of the normal business customs and practice of Greenway, National and Luthy, it is reasonable to conclude that a margin account agreement was completed for Blashka's account.

Blashka's statements that he knew what margin trading was, and that he was aware that margin trading required a margin account, demonstrate Blashka's knowledge and belief that National's and Greenway's business practices are the norm in the industry. Moreover, as stated above, Blashka began trading in this account near the date the margin account agreement was signed. Finally, although **[\*18]** Blashka engaged in margin trading in this account and received monthly account statements, he never once indicated that anything in the account happened without his authority, or complained about the management of the account. Thus, even though questions exist regarding the signature on the agreement, the Court concludes that Blashka agreed to the terms of the margin account agreement.

Greenway's standard account agreement contains an arbitration clause. Despite his present claim, Blashka made $ 315,000 from the margin trading. Until he closed his account with Greenway, Blashka never once complained about anything related to his margin account. *HN14*Where a party knowingly benefits from an agreement without rejecting an arbitration clause contained therein, that party is bound to that agreement. See Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060 (2d Cir. 1993). Therefore, because the parties made an agreement, and because that agreement included a pre-dispute arbitration clause, it is reasonable to conclude, even in the absence of a signed agreement, that an agreement to arbitrate may be implied from the conduct of the parties. See Gvozdenovic v. United Airlines, **[\*19]** Inc., 933 F.2d at 1105; Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d at 846.

### III. Conclusion

Because the parties agreed to arbitrate, all that remains to be determined is whether the scope of the agreement encompasses the asserted claims. See e.g. Progressive Casualty Insurance Co. v. C.A. Resaguradora Nacional De Venezuela, 991 F.2d at 45. As the causes of action asserted by Blashka stem from an alleged neglect and fraud on the part of Greenway, National, Amsel, and twenty John Does, it is apparent that the complained of conduct concerned orders and transactions, and arose in the context of the performance or breach of the underlying agreement. As such, the complaints alleged by Blashka are covered by the arbitration clauses of both agreements.

Accordingly, the parties are directed to arbitration.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

October 16, 1995

Service: **Get by LEXSEE®**
Citation: **1995 us dist lexis 15195**
View: Full
Date/Time: Wednesday, June 9, 2004 - 5:16 PM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.