# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| SUZANNE M. EGGLESTON and<br>FREDERICK LOVEJOY,<br><br>Plaintiffs,<br><br>v.<br><br>E*TRADE SECURITIES, INC., *et al.*,<br><br>Defendants. | Civil Action No. 3:02CV188 (JBA)<br><br><br>NOVEMBER 15, 2004 |

## DEFENDANTS' TRIAL MEMORANDUM

Defendants, E*TRADE Securities, Inc., E*TRADE Financial Corp., and Stephen Tachiera (collectively "E*TRADE"), respectfully submit this Trial Memorandum pursuant to this Court's Order dated June 29, 2004. The undersigned represents that it attempted to contact Plaintiffs' counsel on numerous occasions by telephone, letter and email in an effort to file a joint trial memorandum, but such efforts were unsuccessful. At 9:30 a.m. today, E*TRADE received sections of Plaintiffs' Trial Memorandum. As requested by Plaintiffs, that document is attached as **Exhibit A** hereto.

Simultaneously with the filing of this Trial Memorandum, Defendants are filing a

Motion for Leave to File this Memorandum which details its efforts to contact Plaintiffs'

counsel and seeks sanctions.

## I.     TRIAL COUNSEL

For Defendants:

James A. Budinetz
Pepe & Hazard LLP
Goodwin Square, 225 Asylum Street
Hartford, CT   06103-4302
860.522.5175
jbudinetz@pepehazard.com

## II.    JURISDICTION

This Court's jurisdiction over this matter is premised upon 28 U.S.C. § 1332.

## III.   JURY/NON-JURY

Trial in this matter is limited to the issue of arbitrability.  It will be tried to the

Court.

## IV.    LENGTH OF TRIAL

Defendants estimate that trial will last one (1) to two (2) days.

## V.    FURTHER PROCEEDINGS

Defendants respectfully request that this Court permit E*TRADE to file a Motion for Summary Judgment or other dispositive motion addressing the issue of arbitrability now that discovery has been completed and the issues are fully framed.  Defendants believe this matter can be resolved short of trial.

## VI.    NATURE OF THE CASE

Plaintiffs—husband and wife—allege that Defendants mishandled a securities transaction in a self-directed online securities trading account opened by Lovejoy, and then liquidated other securities positions to meet margin calls.  In the underlying action, Plaintiffs have alleged identical claims of fraud, negligence, breach of contract, and a violation of CUTPA.

Although Defendants unequivocally deny these claims, they have moved to stay this action based upon a binding and mandatory agreement to arbitrate *all* disputes relating to their E*TRADE account.  **The sole issue before the Court is whether Plaintiffs must arbitrate their claims against E*TRADE.**

## VII.    TRIAL BY MAGISTRATE JUDGE

The parties were unable to agree to a trial by a Magistrate Judge.

## VIII.  WITNESSES AND EXHIBITS

### A.    Witnesses

Defendants may call the following witnesses at trial.  A brief summary of each witness's testimony is set forth below, although Defendants respectfully reserve the right to have these witnesses address other issues that may arise or in response to witnesses that Plaintiffs may disclose.

1.    **Erik Renga.**

> Mr. Renga will testify concerning his background and experience at E*TRADE generally, the relationship between the defendants, the account application process, the Customer Agreement and the terms thereof, the importance of those terms, the frequency with which arbitration clauses are included in customer account agreements, and the welcome kit process and contents.  Mr. Renga will also address Mr. Lovejoy's account generally, the number of trade confirmations that Mr. Lovejoy received, and the terms disclosed on the back of the trade confirmations, and Plaintiffs' claim that the account at issue was closed and later reopened.

2.    **Marcus Kazmierczak.**

> Mr. Kazmierczak will testify concerning his background and experience at E*TRADE and the E*TRADE online application process as it existed in 1998.  At that time, Mr. Kazmierczak was an E*TRADE software engineer, with responsibilities that included the design and maintenance of the E*TRADE online application process.  Mr. Kazmierczak will also testify concerning the

prominence of the link to the E*TRADE customer agreement, the importance of the arbitration provision contained in the E*TRADE customer agreement, the fact that E*TRADE generated trade confirmations and sent them to customers, and generally how an online account is accessed and operated. Mr. Kazmierczak will also testify that the E*TRADE system was experiencing no problems that would have affected the online application process on the date that Mr. Lovejoy prepared his online application. Mr. Kazmierczak will also testify concerning E*TRADE generally, and his background and experience.

3. **Frederick Lovejoy.**

Because Mr. Lovejoy is an adverse party, it is difficult to predict with any degree of accuracy the nature of his testimony. It is expected that Mr. Lovejoy will testify concerning his experience in opening his E*TRADE account, his recollection (or lack thereof) of encountering certain hyperlinks during the application process, the process by which he prepared and submitted an application for an E*TRADE account, and his understanding of the E*TRADE application that he signed and its terms. Mr. Lovejoy is also expected to testify concerning the receipt of a letter and other materials from E*TRADE that allowed him to access his E*TRADE account via the Internet. In addition, it is expected that Mr. Lovejoy will testify about his receipt of trade confirmations and their content, as well as his experience in applying for and using other brokerage accounts. Mr. Lovejoy is also expected to testify concerning his education, background, history, professional experience, and investment experience. Defendants may present testimony from Mr. Lovejoy through his deposition taken in this matter.

4. **Suzanne Eggleston.**

Ms. Eggleston is an adverse party, and it is difficult to predict with any degree of accuracy the nature of her testimony. Ms. Eggleston is expected to testify concerning her claim that she entered into a contractual relationship with E*TRADE, the terms governing that relationship, whether she availed herself of the E*TRADE account, and whether her claims are distinct from those of her husband. Defendants may present testimony from Ms. Eggleston through her deposition taken in this matter.

**B.    Exhibits**

The Defendants attach a list of those exhibits it may offer at trial, with a brief description of their contents, as **Exhibit B**.

## IX.    PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    Defendants' Proposed Findings of Fact

Defendants respectfully propose the following findings of fact:

1.    The underlying action is brought by Plaintiffs Frederick Lovejoy and Suzanne M. Eggleston, who are husband and wife. Plaintiffs claim that E*TRADE Securities, Inc., E*TRADE Financial Corp. and Stephen Tachiera (collectively "E*TRADE") mishandled certain trades in Plaintiffs' online securities account. The sole issue before the Court is whether Plaintiffs must arbitrate their disputes with E*TRADE.

## E*TRADE History and Background.

2.      E*TRADE Securities, Inc. is based in New York, New York. Defendant E*TRADE Financial Corp. (erroneously sued as E*TRADE, Inc.) is affiliated with E*TRADE Securities, Inc. Defendant Stephen Tachiera is an employee of E*TRADE Securities. Testimony of Erik Renga ("Renga Test.").

3.      E*TRADE Securities, Inc. is an online brokerage firm that allows customers to apply for online accounts through which customers can buy or sell securities. Customers securely access their account via the Internet using a pass code and other unique identifying information. Renga Test.

4.      Customer accounts are completely "self-directed"—meaning that E*TRADE provides no investment advice of any kind. The customer is charged a fee for each purchase or sale of securities generally in the $15 to $30 range, regardless of the size of the trade. Renga Test.

5.      At all times relevant hereto, E*TRADE provided a toll-free telephone number for customers to call if the customer needed technical assistance or had a question about his or her account. Renga Test.; Exh. 500 (1998 Online Application); Exh. 505 (Welcome Letter); Exh. 502 (Account Application).

**E*TRADE Online Account Application Process in 1998.**

6.     In late 1998, at the time Lovejoy established the account that is the subject of this litigation, an E*TRADE customer could apply for an account by one of two methods:  1) customers could request that an application be sent to them in the mail and, upon receipt, complete it and return it by mail to E*TRADE; or 2) they could access E*TRADE's website, go to E*TRADE's online account application, enter the information called for by the application, print it, sign it, and mail the completed form to E*TRADE.  Renga Test.; Testimony of Marcus Kazmierczak ("Kazmierczak Test."); Exh. 500 (1998 Online Application).

7.     To apply for an account in December 1998, an applicant would have begun at E*TRADE's Internet home page, and clicked the hypertext link that appears on the home page that states "Open an Account."  Kazmierczak Test.; Exh. 500 (1998 Online Application).

8.     The applicant then would have been hyperlinked to the beginning of the application process. This webpage invited applicants to "Apply for an E*TRADE Account Today!" and explained that the applicant could either apply for an E*TRADE account online or have E*TRADE mail them an application.  Kazmierczak Test.; Exh. 500 (1998 Online Application).

9.      If the applicant desired to proceed with an online account application, he or she
would "click" on the hyperlink that stated "Start Here," that appeared under the heading
"Apply Online Now." Kazmierczak Test.; Exh. 500 (1998 Online Application).

10.     Upon clicking the "Start Here" hyperlink, the applicant was then guided to a series
of questions that appeared on separate webpages. The applicant would answer the
questions online by either clicking on the answer that applied to him or her, or by typing
certain information into boxes provided under the questions. These questions were
designed to allow E*TRADE to determine whether it was appropriate for the applicant to
open an online trading account. Renga Test.; Kazmierczak Test.; Exh. 500 (1998 Online
Application).

11.     The applicant was first asked to select the type of account they intended to apply
for—a brokerage account or an IRA account. After responding, the applicant then clicked
the hyperlink "CONTINUE," to continue the online application process. The type of
account that the applicant wished to apply for determined the next screen that the applicant
would see. Kazmierczak Test.; Exh. 500 (1998 Online Application).

12.     If the applicant indicated an intention to apply for a brokerage account, he or she
was then directed to a screen that asked the applicant whether they were applying for an
individual or joint account, whether they wished to open a "cash/margin" account, and how

the applicant intended to fund the account (*i.e.*, by check, account transfer, wire, or security

certificate).  The applicant was then instructed to click the hyperlink "CONTINUE," to

continue the online application process.  Kazmierczak Test.; Exh. 500 (1998 Online

Application).

13.     At the top of the next webpage, the applicant was instructed to "Please read

E*TRADE's Customer Agreement."  The words "Customer Agreement" were clearly a

hyperlink and were prominent.  The words "Customer Agreement" were underlined and

appeared in a different color from the other words on the page.  Kazmierczak Test.; Exh.

500 (1998 Online Application).

14.     Upon clicking the hyperlink, the applicant was next directed to the E*TRADE

Customer Agreement, which contained the terms and conditions that would govern the

new account, including the following arbitration provision:

> 31. a.  Arbitration Disclosures.  The following is a required
> disclosure for all brokerage agreements containing a pre-
> dispute arbitration provision:
>
> (1)  Arbitration is final and binding on the parties.
>
> (2)  The parties are waiving their right to seek remedies in
> court, including the right to jury trial.
>
> (3)  Pre-arbitration discovery is generally more limited than
> and different from court proceedings.

(4)  The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.

(5)  The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

31.b.  Arbitration Agreement.  You agree to arbitrate any controversy between you and E*TRADE or any of its officers, directors, employees, agents or affiliates arising out of or relating in any way to your Account, including but not limited to:  (i) transactions of any kind made on your behalf by, through or with E*TRADE, its officers, directors, employees, agents and/or affiliates; or (ii) the performance, construction or breach of this Agreement or any other written agreement between you and E*TRADE.  Such arbitration shall be conducted in accordance with the rules then in effect of the National Association of Securities Dealers, Inc.  You understand that judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

Renga Test.; Kazmierczak Test.; Exh. 500 (1998 Online Application).

15.    The Customer Agreement was capable of being read online or, alternatively, was easily printed and reviewed in hard copy.  Renga Test.; Kazmierczak Test.; Exh. 500 (1998 Online Application).

16.    After reviewing and/or printing the E*TRADE Customer Agreement, including the arbitration agreement, the applicant then clicked on the "Back" button on their web

browser to return to complete the application.  Kazmierczak Test.; Exh. 500 (1998 Online Application).

17.     The applicant was next asked to review their previous responses, which were summarized on one webpage.  By scrolling down on that webpage, the applicant was also asked to enter an initial amount to fund the account, and to enter information such as their name and address, social security number, date of birth, telephone numbers, and citizenship.  Kazmierczak Test.; Exh. 500 (1998 Online Application).

18.     Also on this page, applicants were asked to check an online box to indicate:

    a.     their "investment objectives;"

    b.     their approximate household income;

    c.     their total net worth;

    d.     their liquid net worth;

    e.     whether they had other brokerage accounts;

    f.     their "investment experience and knowledge;"

    g.     their employer information; and

    h.     their bank account information.

Kazmierczak Test.; Exh. 500 (1998 Online Application).

19.     The applicant was also asked whether they were a "director, 10% shareholder, or policy-making officer of a publicly owned company," and a signature line then appeared

immediately after this question, as required by securities laws.  Renga Test.; Kazmierczak

Test.; Exh. 500 (1998 Online Application).

20.     The very next section of the E*TRADE on-line application, which the applicant

could neither intentionally nor unintentionally avoid, read as follows:

> **Please read and sign to apply for your E*TRADE account:**
>
> I am of legal age to contract.  I acknowledge that I have received, read,
> and agree to be bound by the terms and conditions as currently set forth
> in the E*TRADE Customer Agreement and as amended from time to
> time. . . .
>
> *       *       *
>
> I UNDERSTAND THAT THIS ACCOUNT IS GOVERNED BY A
> PRE-DISPUTE ARBITRATION CLAUSE CONTAINED IN
> PARAGRAPH 31B OF THE E*TRADE CUSTOMER AGREEMENT.
>
> All account applicants must sign below:
>
> X_____
>
> (All emphasis in original.)

Kazmierczak Test.; Exh. 500 (1998 Online Application).

21.     A second signature line followed certain questions about cash management features

on the account.  Kazmierczak Test.; Exh. 500 (1998 Online Application).

22.     Of course, in order to physically sign on the signature lines, the new customer

needed a "hard copy," so the application had to be printed.  Accordingly, the applicant was

directed that, "In order to complete this application, you must click on 'CONTINUE' and print the application." (Emphasis in original.) Kazmierczak Test.; Exh. 500 (1998 Online Application).

23.    Upon clicking the "CONTINUE" hyperlink, a summary of all of the information that was entered by the applicant was generated. At the top of that webpage, the applicant was advised to print the application on the screen, to review, sign and date it, and to mail the application to E*TRADE along with an initial deposit to fund the account. Kazmierczak Test.; Exh. 500 (1998 Online Application); Exh. 501 (F. Lovejoy Account Application); Exh. 502 (Approved Account Application).

24.    The instructions further provided that, "As soon as your signed forms are received (with an initial deposit) and approved, we will send you a welcome kit with everything you need to get started." Kazmierczak Test.; Exh. 500 (1998 Online Application); Exh. 501 (F. Lovejoy Account Application).

25.    Upon reviewing the information now summarized on one document, the applicant had to print the application, review and sign it in multiple locations, and mail it to E*TRADE. Kazmierczak Test.; Exh. 500 (1998 Online Application); Exh. 501 (F. Lovejoy Account Application); Renga Test.; Testimony of F. Lovejoy ("Lovejoy Test.").

### Lovejoy's Online Application Process and Application.

26.    On December 20, 1998, Lovejoy logged on to the E*TRADE website and indicated

that he wanted to apply for an E*TRADE account application online. Kazmierczak Test.;

Exh. 500 (1998 Online Application); Exh. 501 (F. Lovejoy Account Application); Renga

Test.; Lovejoy Test.

27.    Lovejoy generally followed the E*TRADE online account application process

described above, and entered the information into his computer, used hyperlinks to move

from webpage to webpage, and ultimately printed the application, reviewed it, and signed

it in three separate locations. Kazmierczak Test.; Exh. 500 (1998 Online Application);

Exh. 501 (F. Lovejoy Account Application); Renga Test.; Lovejoy Test.

28.    A review of the application filled out by Lovejoy indicates that he wanted to open

an individual cash and margin account. Kazmierczak Test.; Exh. 500 (1998 Online

Application); Exh. 501 (F. Lovejoy Account Application); Exh. 502 (Approved Account

Application); Lovejoy Test.

29.    Upon entering this information, as described above, Lovejoy would have

encountered, at the top of the next webpage, an instruction to "Please read E*TRADE's

Customer Agreement." As noted above, the words "Customer Agreement" were clearly a

hyperlink, were underlined, and appeared in a different color than the other words on the

page. Kazmierczak Test.; Exh. 500 (1998 Online Application); Exh. 501 (F. Lovejoy

Account Application).

30.    Also of note, Lovejoy indicated that he had other brokerage accounts at other

brokerage firms—both "full commission" and "discount (electronic)." Lovejoy mailed his

signed application along with a check for $2,000 representing his initial deposit. Lovejoy

also indicated that his "Investment Experience and Knowledge" was "Good."

Kazmierczak Test.; Exh. 500 (1998 Online Application); Exh. 501 (F. Lovejoy Account

Application); Lovejoy Test.

31.    Most importantly, after printing the application with the information entered,

Lovejoy signed the application immediately under the following:

> **Please read and sign to apply for your E\*TRADE account:**
>
> I am of legal age to contract. I acknowledge that I have received, read, and agree to
> be bound by the terms and conditions as currently set forth in the E\*TRADE
> Customer Agreement and as amended from time to time. . . .
>
> \*        \*        \*
>
> I UNDERSTAND THAT THIS ACCOUNT IS GOVERNED BY A PRE-
> DISPUTE ARBITRATION CLAUSE CONTAINED IN PARAGRAPH 31B OF
> THE E\*TRADE CUSTOMER AGREEMENT.
>
> All account applicants must sign below:
>
> X_____
>      **[Plaintiff Lovejoy's signature appears here]**

Kazmierczak Test.; Exh. 500 (1998 Online Application); Exh. 501 (F. Lovejoy Account Application); Exh. 502 (Approved Account Application); Lovejoy Test.

32.     Thus, Lovejoy was advised by a prominently displayed instruction and hyperlink to review the E*TRADE Customer Agreement as he filled out his application online, and—immediately above his signature—he was again alerted to the fact that:

- his E*TRADE account was governed by a separate Customer Agreement;
- the Customer Agreement contained an arbitration clause; and
- the arbitration clause was contained in paragraph 31B of the Customer Agreement.

Kazmierczak Test.; Exh. 500 (1998 Online Application); Exh. 501 (F. Lovejoy Account Application); Lovejoy Test.

33.     Upon receiving Lovejoy's application, E*TRADE processed and approved the application.  Lovejoy's E*TRADE account was assigned account number 1025-5403. Renga Test.; Exh. 501 (F. Lovejoy Account Application); Exh. 502 (Approved Account Application); Exh. 503 (Account Statements); Lovejoy Test.

34.     E*TRADE's computer system maintains records of system malfunctions which could impact the online application process.  Its records establish that E*TRADE's online application process was functioning properly on December 20, 1998—the day Lovejoy

entered information into E*TRADE's online application and printed it. Kazmierczak
Test.; Exh. 504 (Systems Report).

35.    As was customary, E*TRADE generated an account number, password, personal
identification number, and user name for Lovejoy so that he could access his account
online. Renga Test.; Exh. 505 (Welcome Letter); Lovejoy Test.

36.    During the relevant timeframe, E*TRADE had an arrangement with a company
called NPC, LLC ("NPC") whereby NPC would mail "welcome kits"—mentioned on
Lovejoy's application—to new E*TRADE customers. These welcome kits contained a
welcome letter with the new customer's account number, personal identification number,
user name, and password. The welcome kits also contained certain brochures, a "Quick
Guide," and a hard copy of the E*TRADE Customer Agreement. Renga Test.; Exh. 505
(Welcome Letter and Materials); Exh. 506 (Quick Guide); Exh. 507 (Customer
Agreement).

37.    It is undisputed that, shortly after applying for his E*TRADE account, Lovejoy
received a letter dated January 5, 1999 from E*TRADE that contained his account number,
personal identification number, user name, and password, as well as general information
and brochures. Renga Test.; Exh. 505 (Welcome Letter and Materials); Lovejoy Test.

38.    The letter invited Lovejoy to call E*TRADE on a toll free number with any

questions. Renga Test.; Exh. 505 (Welcome Letter and Materials); Lovejoy Test.

39.    Upon receiving the account information from E*TRADE that allowed online

access to his account, Lovejoy traded in the account online. In January 1999, Lovejoy

purchased two securities and received trade confirmations. After each trade, E*TRADE

mailed a trade confirmation to Lovejoy, confirming the details of the trade. At the top of

the reverse side of the trade confirmation, it states: "Please refer to the E*TRADE

Customer Agreement for a complete discussion of terms and conditions governing your

account. If you have questions regarding the Customer Agreement or this confirmation

please e-mail us through www.etrade.com or call 1-800-stocks-5 (1-800-786-2575)." This

was contained on each trade confirmation that Lovejoy received. Renga Test.; Exh. 503

(Account Statements); Exh. 508 (Trade Confirmations); Lovejoy Test.

40.    By the end of January 2001, Lovejoy had executed approximately 42 "buy" or

"sell" transactions in his account. Thus, he would have received numerous trade

confirmations referring him to the E*TRADE Customer Agreement. Renga Test.; Exh.

503 (Account Statements); Exh. 508 (Trade Confirmations).

41.    E*TRADE requires applicants to review the terms of its Customer Agreement

during the online application process and then to specifically represent to E*TRADE that

the applicant has in fact reviewed the terms and conditions set forth therein and agrees to be bound because those terms are material and important to E*TRADE. Renga Test.; Kazmierczak Test.; Exh. 501 (Account Application); Exh. 507 (Customer Agreement).

42.    Asking applicants to make a clear and unequivocal representation that they had read and agree to the terms of the Customer Agreement was the only way that E*TRADE could be assured that there would be no dispute as to whether those terms would govern the account. Indeed, E*TRADE specifically referenced the paragraph in the Customer Agreement that contained the arbitration clause—paragraph 31B—and required each applicant to sign immediately below the following statement, printed in all capital letters: "I UNDERSTAND THAT THIS ACCOUNT IS GOVERNED BY A PRE-DISPUTE ARBITRATION CLAUSE CONTAINED IN PARAGRAPH 31B OF THE E*TRADE CUSTOMER AGREEMENT." Stated simply, it was an essential part of the bargain from E*TRADE's perspective. Renga Test.; Kazmierczak Test.; Exh. 501 (Account Application); Exh. 500 (1998 Online Application); Exh. 507 (Customer Agreement).

43.    In the absence of an applicant's consent to those terms, E*TRADE would not open an account with that applicant. Renga Test.

44.    Indeed, E*TRADE specifically called applicants' attention to the existence of paragraph 31B of the Customer Agreement.

45.    Lovejoy claims that he does not recall seeing a reference to the E*TRADE
Customer Agreement during the online application process.  Lovejoy Test.

46.    E*TRADE's online application process prominently displayed a hyperlink to the
Customer Agreement and instructed applicants to review it.  Kazmierczak Test.; Exh. 500
(1998 Online Application).

47.    Moreover, even if Lovejoy did not see the hyperlink to the Customer Agreement,
he signed his name under a representation that he had, in fact, "received, read, and agree[d]
to be bound by the terms and conditions as currently set forth in the E*TRADE Customer
Agreement . . . ."  And, immediately above his signature, Lovejoy represented that he
"UNDER[STOOD] THAT THIS ACCOUNT IS GOVERNED BY A PRE-DISPUTE
ARBITRATION CLAUSE CONTAINED IN PARAGRAPH 31B OF THE E*TRADE
CUSTOMER AGREEMENT."  Renga Test.; Exh. 501 (Account Application).

48.    At a minimum, Lovejoy was on constructive notice of: (1) the existence of a
Customer Agreement containing terms governing the account he was applying for; and (2)
that paragraph 31B of that Customer Agreement contained some sort of agreement to
arbitrate.  Renga Test.; Exh. 501 (Account Application); Exh. 507 (Customer Agreement);
Exh. 500 (1998 Online Application).

49.    Further, on each of the many trade confirmations that Lovejoy received through January 2001, reference was again made to the terms and conditions of the E*TRADE Customer Agreement. Renga Test.; Exh. 508 (Trade Confirmations).

50.    In light of all of these circumstances, this Court concludes that Plaintiff Lovejoy reviewed or is deemed to have reviewed the E*TRADE Customer Agreement. He therefore had actual or constructive knowledge of the pre-dispute arbitration clause. Kazmierczak Test.; Exh. 500 (1998 Online Application); Renga Test.; Exh. 507 (Customer Agreement); Exh. 501 (Account Application); Exh. 508 (Trade Confirmations); Exh. 503 (Account Statements).

51.    Lovejoy further claims that he did not receive a hard copy of the E*TRADE Customer Agreement as part of his welcome kit because it was not in his records. Notably, also missing from his records, is the "Quick Guide," which is specifically referenced as being included in the body of the letter or the Customer Agreement. Renga Test.; Exh. 505 (Welcome Letter and Materials); Exh. 506 (Quick Guide).

52.    This Court also finds that a hard copy of the Customer Agreement that governed Lovejoy's account was included in the welcome kit that he received. E*TRADE presented credible testimony that the E*TRADE Customer Agreement would have been included in

the welcome kit. Renga Test.; Exh. 505 (Welcome Letter and Materials); Exh. 506 (Quick

Guide); Exh. 507 (Customer Agreement).

53.     And this Court concludes that the Customer Agreement was incorporated by

reference with the On-Line Account Application. Exh. 501 (Account Application); Exh.

507 (Customer Agreement); Exh. 500 (1998 Online Application); Renga Test.;

Kazmierczak Test.

54.     The Court further concludes that the term "pre-dispute arbitration clause" is not

ambiguous – it simply refers to an agreement between the parties, made before the

existence of any dispute, to arbitrate such dispute if and when a dispute arose. Renga

Test.; Exh. 501 (Account Application); Exh. 507 (Customer Agreement); Exh. 500 (1998

Online Application).

55.     Even if the Court concluded that the term was not clear on its face, and addressed

Plaintiff Lovejoy's claim that he did not understand the term "pre-dispute arbitration

clause," he was nonetheless on notice, because his decision not to review the broad

arbitration provision set forth at paragraph 31B of the E*TRADE Customer Agreement

does not relieve him of his responsibility to do so. Renga Test.; Exh. 501 (Account

Application); Exh. 507 (Customer Agreement); Exh. 500 (1998 Online Application).

56.     Thus, even if the Court were to address Plaintiff Lovejoy's claim that the term

"pre-dispute arbitration clause" is ambiguous, the result is the same—Plaintiff Lovejoy is

bound to arbitrate his dispute with the E*TRADE Defendants.  Renga Test.; Exh. 501

(Account Application); Exh. 507 (Customer Agreement); Exh. 500 (1998 Online

Application).

### Plaintiff Lovejoy's Familiarity with the Term "Predispute Arbitration Clause" and His Background.

57.     To determine whether Lovejoy understood the term "pre-dispute arbitration

clause"—or was at least placed on notice—his familiarity with this term in other brokerage

accounts, his experience in arbitrating other disputes with other brokerage firms, and his

educational level and profession are all relevant considerations.

58.     On his E*TRADE account application, Lovejoy indicated that he had maintained

other brokerage accounts.  In fact, Lovejoy had maintained several other accounts—

including other online brokerage accounts.  Prior to applying for his E*TRADE account,

Lovejoy maintained brokerage accounts with, among others, Paine Webber, People's

Securities, Ameritrade Securities (an online brokerage firm like E*TRADE), Morgan

Keegan, and approximately ten Mutual Fund companies.  Lovejoy Test.; Exh. 510

(Ameritrade Account Application); Exh. 512 (Ameritrade Account Application); Exh. 515

(Morgan Keegan Account Application); Exh. 517 (Morgan Keegan Account Application); Exh. 522A (People's Securities Account Application).

59.    With respect to Ameritrade Securities, Lovejoy applied for and opened two accounts. The first account application was filled out by Lovejoy online, and was printed and signed on December 28, 1997—about one year before Lovejoy applied for an E*TRADE account. Immediately above Lovejoy's signature on the Ameritrade account, the application advised him that, "This Brokerage Account Agreement contains pre-dispute arbitration clauses in Paragraphs 6 and 7 of the Terms and Conditions section." (Underlining added.) Exh. 510 (Ameritrade Application); Exh. 511 (Ameritrade Terms and Conditions).

60.    The second application for an Ameritrade application that Lovejoy filled out online, printed, signed and submitted to Ameritrade was signed by Plaintiff Lovejoy on April 23, 1998—approximately eight months prior to his E*TRADE application. This application, too, immediately above Lovejoy's signature, advised him that, "This Brokerage Account Agreement contains pre-dispute arbitration clauses in Paragraph 6 and 7 of the Terms and Conditions section." (Underlining added.) Exh. 512 (Ameritrade Application).

61.    The Ameritrade terms and conditions that Lovejoy agreed would govern both of his Ameritrade accounts contained a broad arbitration clause that required the parties to submit all disputes arising out of the Ameritrade account to arbitration. This arbitration clause is very similar to the E*TRADE arbitration clause. Exh. 511 (Ameritrade Terms and Conditions).

62.    Similarly, Lovejoy applied for and opened two accounts with Morgan Keegan & Company, Inc., another securities brokerage firm. Exh. 514 (Morgan Keegan New Account Approval); Exh. 515 (Morgan Keegan Account Application); Exh. 517 (Morgan Keegan Account Application); Exh. 516 (Morgan Keegan Client Agreement governing first account); Exh. 518 (Morgan Keegan Client Agreement governing second account).

63.    The first Morgan Keegan account application executed by Lovejoy was signed on December 27, 1995—approximately three years before he applied for an E*TRADE account. Exh. 515 (Morgan Keegan Account Application).

64.    Immediately above Lovejoy's signature is the representation that "THE UNDERSIGNED ACKNOWLEDGES THAT THE UNDERSIGNED HAS RECEIVED A DUPLICATE OF THIS AGREEMENT; AND THAT THIS AGREEMENT CONTAINS A BINDING AND ENFORCEABLE PREDISPUTE ARBITRATION PROVISION IN

PARAGRAPH 5 ON PAGE 1 HEREOF." (Capitalization in original; underlining added).

*Id.*

65.     The "predispute arbitration provision" contained at paragraph 5 of the agreement

was a broad agreement to arbitrate all disputes arising out of Lovejoy's securities account.

It is very similar to the broad arbitration clause contained in the E*TRADE Customer

Agreement at paragraph 31B—referenced in the E*TRADE account application as a

"predispute arbitration clause." Exh. 516 (Morgan Keegan Client Agreement); Exh. 507

(E*TRADE Customer Agreement).

66.     The second Morgan Keegan account application was signed by Lovejoy on January

5, 1998 – approximately one year before Lovejoy applied for an E*TRADE account. Exh.

517 (Morgan Keegan Account Application).

67.     On the second account application Lovejoy represented, immediately above his

signature, that "THE UNDERSIGNED ACKNOWLEDGES THAT THE

UNDERSIGNED HAS RECEIVED A DUPLICATE OF THIS AGREEMENT . . . AND

THAT THIS AGREEMENT CONTAINS A BINDING AND ENFORCEABLE

PREDISPUTE ARBITRATION PROVISION IN PARAGRAPH 5 ON PAGE 1

HEREOF." (Capitalization in original; underlining added.) Exh. 517 (Morgan Keegan

Account Application).

68.     Once again, the "predispute arbitration provision" contained at paragraph 5 of the agreement was a broad agreement to arbitrate all disputes arising out of Lovejoy's securities account. It is very similar to the broad arbitration clause contained in the E*TRADE Customer Agreement at paragraph 31B—referenced in the E*TRADE account application as a "predispute arbitration clause." Exh. 518 (Morgan Keegan Client Agreement); Exh. 507 (E*TRADE Customer Agreement).

69.     Clearly, the phrase "pre-dispute arbitration clause" is commonly used to refer to broad, mandatory arbitration agreements in the securities industry. Renga Test.; Exh. 510 (Ameritrade Application); Exh. 512 (Ameritrade Application); Exh. 511 (Ameritrade Terms and Conditions); Exh. 515 (Morgan Keegan Application); Exh. 517 (Morgan Keegan Application); Exh. 516 (Morgan Keegan Account Agreement); Exh. 518 (Morgan Keegan Account Agreement).

70.     At a bare minimum, it is clear that based on the fact that he opened four accounts prior to opening his E*TRADE account, and that each of those accounts used the term "predispute arbitration provision" to refer to a broad, mandatory agreement to arbitrate, he knew—or should have known—upon execution of his E*TRADE account application that the term predispute arbitration clause referred to a broad, mandatory agreement to arbitrate disputes arising out of his securities account. Renga Test.; Exh. 510 (Ameritrade

Application); Exh. 512 (Ameritrade Application); Exh. 511 (Ameritrade Terms and
Conditions); Exh. 515 (Morgan Keegan Application); Exh. 517 (Morgan Keegan
Application); Exh. 516 (Morgan Keegan Account Agreement); Exh. 518 (Morgan Keegan
Account Agreement); Exh. 501 (E*TRADE Account Application); Exh. 507 (E*TRADE
Customer Agreement); Exh. 500 (1998 Online Application).

71.      Consideration of Lovejoy's educational and professional background confirms the
Court's conclusion. Lovejoy is a well-educated and experienced trial attorney who has
dealt with hundreds of arbitration agreements. In fact, Lovejoy arbitrated a securities
claim on his own behalf arising out of his People's Securities, Inc. trading account. Exh.
520 (People's Securities' Complaint); Exh. 522 (Motion to Dismiss); Exh. 522A (People's
Securities Account Application); Lovejoy Test.

72.      Lovejoy graduated from high school, college, law school, and then earned an LLM
degree. He has been a practicing lawyer for more than 15 years, specializing principally in
litigation. He practiced with the New York City based law firm of Bingham Engler for
many years, and then opened his own firm, known as Lovejoy & Associates, several years
ago. Lovejoy Test.

73.    Lovejoy advises clients on contract claims, and has dealt with hundreds of arbitration clauses. Indeed, he has arbitrated claims on behalf of his clients. Lovejoy Test.; Exh. 523 (Letter from F. Lovejoy).

74.    Lovejoy knows well that one should read a contract fully before signing it, and knows the importance of being accurate and truthful in his representations made in a contract. He also knows that having signed a written document, he is charged with knowledge of its content and the meaning of its terms. Exh. 501 (Account Application); Lovejoy Test.

75.    Thus, even setting aside his familiarity with the term "predispute arbitration clause," when he represented to E\*TRADE that he had received, read, and agreed to be bound by the terms of the E\*TRADE Customer Agreement, and then signed his name immediately below the representation that: "I UNDERSTAND THAT THIS ACCOUNT IS GOVERNED BY A PRE-DISPUTE ARBITRATION CLAUSE CONTAINED IN PARAGRAPH 31B OF THE E\*TRADE CUSTOMER AGREEMENT," he knew that he was binding himself to the arbitration clause that requires him to arbitrate the claims set forth in his complaint. (Emphasis in original.) Exh. 501 (Account Application); Lovejoy Test.

76.     Moreover, if there was any doubt that Lovejoy knew that it was common for

securities firms to require customers to submit disputes concerning their accounts to

arbitration, that doubt is removed by the fact that Lovejoy, in fact, forced People's

Securities, Inc. to arbitrate a dispute concerning his securities trading account.  Exh. 520

(People's Securities' Complaint); Exh. 522 (Motion to Dismiss); Exh. 522A (People's

Security Account Application); Lovejoy Test.

77.     People's Securities, Inc. filed a Complaint against Lovejoy arising out of a

securities trading account that Lovejoy maintained at that brokerage firm.  Lovejoy Test.;

Exh. 522 (Motion to Dismiss); Exh. 520 (People's Securities Complaint).

78.     On January 31, 2000, Lovejoy invoked the arbitration clause contained in his

People's Securities' Customer Agreement to force People's Securities to arbitrate the

dispute.  The parties ultimately arbitrated before the National Association of Securities

Dealers ("NASD").  Lovejoy Test.; Exh. 522 (Motion to Dismiss).

79.     It is clear that arbitration agreements are common in the securities industry.  Renga

Test.; Exh. 510 (Ameritrade Application); Exh. 512 (Ameritrade Application); Exh. 511

(Ameritrade Terms and Conditions); Exh. 515 (Morgan Keegan Application); Exh. 517

(Morgan Keegan Application); Exh. 516 (Morgan Keegan Account Agreement); Exh. 518

(Morgan Keegan Account Agreement); Exh. 522A (People's Securities Customer

Agreement); Exh. 501 (E*TRADE Account Application); Exh. 507 (Customer

Agreement); Exh. 500 (1998 Online Application).

### Plaintiffs' Miscellaneous Defenses.

80.    Plaintiffs claim that even if their E*TRADE account was governed by the terms of

the E*TRADE Customer Agreement when it was opened, at some point during the course

of their relationship with E*TRADE, they closed the account, and then reopened it without

any paperwork—thereby somehow voiding the terms of the E*TRADE Customer

Agreement and, in fact, freeing their account of any terms or conditions whatsoever.

81.    The Court rejects this claim because the Plaintiffs presented no evidence that the

account was ever closed during the parties' relationship.  The E*TRADE account number

never changed, and the account statements do not reflect any closing of the account.

Renga Test.; Exh. 503 (Account Statements).

82.    Moreover, even if the account was closed, the E*TRADE Customer Agreement

does not in any way limit itself to a single account, instead, it states on the very first page

that, "In consideration for E*TRADE opening and maintaining one or more accounts (each

'an account'), you agree to the terms and conditions contained in this Agreement."  Renga

Test.; Exh. 507 (Customer Agreement).

83.    Similarly, Plaintiffs' claim that Eggleston can somehow avoid the arbitration

provision is also misguided.  Apparently, Eggleston claims that she was assigned some

interest in the account because Lovejoy deposited some money belonging to her into the

account.  She further claims that she is not bound to arbitrate because she never signed the

E*TRADE account application.  Aside from being legally deficient (discussed separately),

this claim is factually without merit.

84.    Under the terms of the E*TRADE Customer Agreement that Lovejoy signed, he

specifically agreed that his signature bound "his personal representatives and assigns."

Moreover, the term "you"—which is used throughout the Customer Agreement—is

defined to include not only the person who physically signs the application, but also that

person's "designate[s]."  E*TRADE Customer Agreement, 40, 1(s).  Thus, to the extent

that Eggleston claims an interest in the E*TRADE account, she too is bound to arbitrate

her claims against E*TRADE.  Renga Test.; Exh. 507 (Customer Agreement).

85.    To the extent Plaintiffs claim that the E*TRADE account was a "joint account," the

terms of the E*TRADE Customer Agreement make clear that the signature of either joint

owner binds the other, and that notice to either constitutes notice to both owners.

E*TRADE Customer Agreement, 25.  Renga Test.; Exh. 507 (Customer Agreement).

86.    For the foregoing reasons, this Court finds that Plaintiffs must arbitrate all claims

arising out of or relating to their E\*TRADE account, and this action is accordingly stayed.

## B.    Defendants' Proposed Conclusions of Law

Defendants' proposed conclusions of law are set forth below. Defendants

respectfully reserve the right to file a pre-trial memorandum addressing many of these

legal issues.

### The Standard to be Applied to the Issues Before the Court.

1.    The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-14, "reflects a 'liberal federal

policy favoring arbitration agreement' as a means of settling disputes." *Topf v. Warnaco,

Inc.*, 942 F. Supp. 762, 765 (D. Conn. 1996) (quoting *Moses H. Cone Memorial Hosp. v.

Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). This policy is reflected in the provision

that makes clear that any agreement to arbitrate in contracts affecting commerce are "valid,

irrevocable, and enforceable, save upon such grounds as exist at law . . . for the revocation

of any contract." *Topf*, 942 F. Supp. at 765 (quoting 9 U.S.C. § 2).

2.    Reinforcing the FAA's mandate, the Supreme Court has instructed that courts

apply the statute in accordance with ordinary contract principles, "with a healthy regard for

the Act's underlying policy . . . whether the issue at hand is a construction of the language

of the agreement itself, or a defense of arbitrability." *Dapuzzo v. Globalvest Mgmt. Co.,*
*L.P.*, 263 F. Supp. 2d 714, 719 (S.D.N.Y. 2003) (internal quotations omitted) (citing *Moses*
*H. Cone*, 460 U.S. at 24-25).

3.    Parties may petition the federal courts to enforce agreements to arbitrate.  9 U.S.C.
§ 3.  If the Court finds the dispute arbitrable, "it must stay the trial of the action until . . .
arbitration has been made in accordance with the terms of the agreement." *Id.* If "the
making of the arbitration agreement be in issue, the Court shall proceed . . . to the trial
thereof." *Id.*

4.    In determining the arbitrability of a particular dispute, a court must decide: (1)
whether the parties agreed to arbitrate; and (2) if so, whether the scope of the agreement
encompasses the claims being asserted. *Blashka v. Greenway Capital Corp.*, 94Civ.5633,
1995 U.S. Dist LEXIS 15195, at **10-11 (Oct. 17, 1995) (internal citations omitted).

5.    If the Court finds that the parties intended for their disputes to be arbitrated, "the
[Federal Arbitration Act] leaves no place for the exercise of discretion by a district court,
but instead mandates that district courts shall direct the parties to proceed to arbitration. . .
." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 220 (1985) (emphasis in original);
*Blashka v. Greenway Capital Corp.*, 94Civ.5633, 1995 U.S. Dist LEXIS 15195, at *11
(Oct. 17, 1995).

6.      "In determining the existence of an arbitration agreement, ordinary principles of

contract law are to be used," in this case, the law of Connecticut. *Topf v. Warnaco, Inc.*,

942 F. Supp. 762, 766 (D. Conn. 1996) (internal quotations omitted); *Russolillo v.

Thomson McKinnon* Sec., Inc., 694 F. Supp. 1042, 1044 (D. Conn. 1988).

7.      Under Connecticut law, the inquiry must focus on whether both parties to the

contract evidence an intent to be bound by that agreement. *Otis Elevator Co. v. GE Fanuc

Automation Corp.*, 303CV972, 2004 U.S. Dist. LEXIS 9371, at *5 (D. Conn. May 25,

2004).  This intent may be implied from the parties' conduct. *See id.*; *Gvozdenovic v.

United Airlines, Inc.*, 933 F.2d 1100, 1105 (2d Cir. 1991).

### The Customer Agreement Containing the Arbitration Clause was Incorporated by Reference into the Account Application Signed by Lovejoy.

8.      Under well-settled law, arbitration agreements may be incorporated by reference

into a contract. *See Salomon Smith Barney, Inc. v. Cotrone*, 81 Conn. App. 755, 759

(2004) (party who signed account application that referred to "pre-dispute arbitration

clause" contained in the separate customer agreement was bound to arbitrate because

"[w]here . . . the signatories execute a contract which refers to another instrument in such a

manner as to establish that they intended to make the terms and conditions of that other

instrument a part of their understanding, the two may be interpreted together as the

agreement of the parties"); *E&F Constr. Co., Inc. v. Rissil Constr. Assocs. Inc.*, 181 Conn.

317, 319-321 (plaintiff required to arbitrate with defendant because contract incorporated a separate contract which contained an arbitration provision); *Topf v. Warnaco, Inc.*, 942 F. Supp. 762, 768-769 (D. Conn. 1996) (party who signed contract that incorporated a handbook containing an arbitration agreement was bound to arbitrate).

9.    This is true even when: (1) the arbitration provision is not called to the attention of the signing party; and (2) the document containing the arbitration clause is not provided to the signing party. Indeed, each party is responsible for reading all of the terms of the contracts they sign. *See, e.g., Batter Bldg. Materials Co. v. Kirschner*, 142 Conn. 1, 7 (1954) (party who signed a construction contract, which incorporated specifications that were provided to plaintiff which, in turn, incorporated a particular American Institute of Architects form containing an arbitration clause, which was not provided to plaintiffs, was nonetheless required to arbitrate, because where "signatories execute a contract which refers to another instrument in such a manner as to establish that they intended to make the terms and conditions of that other instrument a part of their understanding, the two may be interpreted together as the agreement of the parties"); *Brown v. Dorsey & Whitney LLP*, 267 F. Supp. 2d 61, 81-82 (D.D.C. 2003) (plaintiff bound to arbitrate based upon arbitration clause in document never provided to plaintiff, but incorporated by reference into contract because plaintiff chose to sign the contract before taking the opportunity to

read the document incorporated by reference); *DaPuzzo v. Globalvest Mgmt. Co.*, L.P., 263

F. Supp. 2d 714, 733 (S.D.N.Y. 2003) (holding plaintiff investor who signed investment

subscription agreement that incorporated the terms of a separate partnership contract

containing an arbitration agreement, which he did not receive or execute until three years

after executing the initial agreement, required him to arbitrate, and noting that even if he

had never executed the partnership agreement, he would be bound to arbitrate because in

the original contract plaintiff acknowledged "having received and read the Partnership

Agreement, and agreed to be bound" to its terms and, "cannot escape the legal

consequences of his obligation to fully review the entire contractual document governing

his investments before committing to its contents").

10.    There is no question that by signing the E*TRADE Account Application, Lovejoy

entered into a contract with E*TRADE.

11.    There is also no question that the plain, unambiguous terms of the E*TRADE

Account Application made clear that the E*TRADE Customer Agreement is incorporated

by reference into and made a part of the E*TRADE Account Application. *See* E*TRADE

Account Application, p. 3 ("I acknowledge that I have received, read and agree to be

bound by the terms and conditions as currently set forth in the E*TRADE Customer

Agreement . . . .).

12.    In light of the foregoing, this Court need not reach the issue of whether Lovejoy

received a copy of the Customer Agreement—the Account Agreement clearly incorporated

it, and Plaintiff Lovejoy could simply have refrained from signing his name until he

obtained a copy of the referenced Customer Agreement. Accordingly, he is bound by its

terms.

**Lovejoy Was Advised of the Existence of an Arbitration Provision in the E\*TRADE
Customer Agreement.**

13.    Having heard testimony and reviewed exhibits detailing E\*TRADE's online

application process as it existed in December 1998—the time when Lovejoy applied for an

E\*TRADE account—the Court concludes that Lovejoy was alerted to both the fact that the

E\*TRADE Customer Agreement governed his account and that it contained an arbitration

clause.

14.    First, during the online application process, applicants were directed, by a

prominently displayed notice and hyperlink, to "Please read E\*TRADE's Customer

Agreement." Indeed, the words "Customer Agreement" appeared in a separate color from

surrounding words on the page, and were underlined. Second, immediately above

Lovejoy's signature, he acknowledged that he had received, read, and agree[d] to be bound

by the terms and conditions as currently set forth in the E\*TRADE Customer Agreement,

and as amended from time to time. . . ."

15.     Plaintiff Lovejoy's claim that he could not link to the E*TRADE Customer

Agreement, but signed the Account Application anyway, does not alter the fact that he is

bound by the terms of the E*TRADE Customer Agreement. A party is bound to the terms

of his executed agreement, regardless of whether he reads them. *DiUlio v. Goulet*, 2 Conn.

App. 701, 704 (1984) ("The general rule is that where a person of mature years and who

can read and write, signs or accepts a formal written contract affecting his pecuniary

interests, it is his duty to read it and notice of its contents will be imputed to him if he

negligently fails to do so. . . ."); *Batter Bldg. Materials Co. v. Kirschner*, 142 Conn. 1, 7

(1954) ("Nor is a party allowed, in the absence of accident, fraud, mistake or unfair

dealing, to escape his contractual obligations by saying, as each of the plaintiffs does here,

that he did not read what was expressly incorporated as specific provisions of the contract

into which he entered."); *DaPuzzo v. Globalvest Mgmt. Co.*, 263 F. Supp. 2d 714, 733

(S.D.N.Y. 2003) (requiring plaintiff to arbitrate, noting that he "cannot escape the legal

consequences of his obligation to fully review the entire contractual document governing

his investment before committing to its contents"); *Wash. Mut. Fin. Group, LLC v. Bailey*,

364 F.3d 260 (5th Cir. 2004) (holding that even an illiterate party is required to have the

terms of a written contract read to him, and cannot avoid arbitration clause therein if he

fails to do so).

**Lovejoy's Claim that he Did Not Understand the Phrase
"Pre-dispute Arbitration Clause" Must be Rejected.**

16.    The Court's conclusion is no different even if the Court were to address Lovejoy's

claim that he was confused by the term "pre-dispute arbitration" that appears immediately

above his signature on the E*TRADE Account Application. The E*TRADE Account

Application requires applicants to sign directly under a representation that they

"UNDERSTAND THAT THIS ACCOUNT IS GOVERNED BY A PRE-DISPUTE

ARBITRATION CLAUSE CONTAINED IN PARAGRAPH 31B OF THE E*TRADE

CUSTOMER AGREEMENT." Lovejoy does not deny that he saw this reference, or that

he represented to E*TRADE that he had received and read the Customer Agreement.

Instead, he claims that he did not understand that the term "pre-dispute arbitration clause"

required him to agree to submit a dispute to mandatory, binding arbitration. First, as noted

above, Lovejoy should have confirmed all of the terms of the agreement before executing

the contract. He did not, and therefore is bound. *See, supra.* Second, Lovejoy's claim that

he did not understand the meaning of the phrase "pre-dispute arbitration clause" to require

mandatory, binding arbitration fails as a matter of law and of fact, as described below.

17.    The term "pre-dispute arbitration clause" is not ambiguous. *Tallmadge Bros., Inc.*

*v. Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 498 (2000) ("A contract must

be construed to effectuate the intent of the parties, which is determined from the language

used interpreted in the light of the situation of the parties and the circumstances connected

with the transaction" . . . "[a] court will not torture words to import ambiguity where the

ordinary meaning leaves no room for ambiguity" . . . "any ambiguity in a contract must

emanate from the language used in the contract rather than from one party's subjective

perception of the terms"). Indeed, courts across the country have used and approved of the

phrase "pre-dispute arbitration clause" in referring to agreements reached by parties prior

to any dispute between them arising (hence, "pre" dispute). In fact, both the Securities and

Exchange Commission ("SEC") and the National Association of Securities Dealers

("NASD") use the phrase "predispute arbitration clause" in their rules and regulations

dealing with the enforceability of such clauses. *See, e.g., Salomon Smith Barney, Inc. v.

Cotrone*, 81 Conn. App. 755, 760 (2004) (holding investor who signed a brokerage account

application directly under a notice that called his attention to a "pre-dispute arbitration

clause" in customer agreement was bound to arbitrate); *Shearson/American Express, Inc. v.

McMahon*, 482 U.S. 220, 234, *reh. denied* 483 U.S. 1056 (1987) (expressly holding that

"pre-dispute" arbitration agreements between brokerage firms and customers are

enforceable); *Prudential Securities, Inc. v. Bender*, 1998 Conn. Super. LEXIS 2328, at *11

(Aug. 19, 1998) (Barnett, J.) (noting that Prudential's standard business practice is to

require customers to sign an agreement to arbitrate—which includes the word "pre-

dispute"); *City of Waterbury v. Merrill Lynch & Co.*, 1992 Conn. Super. LEXIS 3388, at *15 (Nov. 24, 1992) (Barnett, J.) (recognizing that federal law condones "pre-dispute arbitration agreements" between a broker and an investor); *see also Securities & Exchange Commission Rule*, 17 C.F.R. part 240 (1987) (noting that "predispute arbitration clauses (*i.e.*, agreements requiring customers to submit to arbitration all future disputes)" are enforceable); NASD Conduct Rule 3110(C) ("Any predispute arbitration clause shall be highlighted. . . ."). At a bare minimum, the phrase "pre-dispute arbitration clause" placed Lovejoy on notice of the existence of the crystal clear arbitration clause located at paragraph 31B of the E*TRADE Customer Agreement, which unequivocally required Lovejoy to submit all disputes relating to his E*TRADE account to arbitration.

18.    Moreover, to assess Lovejoy's understanding of the terms of the contract and of the meaning of the phrase "pre-dispute arbitration clause," it is appropriate to consider his educational, professional, and investment history. Here, Lovejoy:

- is extremely well-educated, having graduated from college and obtained two separate legal degrees;

- has worked as a trial attorney, has advised clients on contract issues, and has dealt with hundreds of arbitration clauses;

- runs his own law firm;

- has personally opened numerous brokerage accounts that required him to sign agreements to arbitrate disputes arising out of those accounts;

- has personally enforced an arbitration clause contained in the account application that he signed with People's Securities with respect to a trading dispute and arbitrated that dispute before the NASD; and—most significantly—

- had opened four brokerage accounts prior to opening his E*TRADE account, that used the phrase "pre-dispute arbitration" clause to refer to a broad, mandatory agreement to arbitrate.

These indisputable facts confirm the conclusion that Lovejoy agreed to arbitrate his claims with E*TRADE. *See e.g.*, *Brown v. Dorsey & Whitney, LLP*, 267 F. Supp. 2d 61, 82-83 (D.D.C. 2003) (confirming conclusion that plaintiff-attorney who signed employment agreement that referred to and incorporated the firm's undisclosed "dispute resolution policy," which contained an arbitration provision, was required to arbitrate claims because plaintiff was an attorney who had been educated at two "prestigious universities," and noting that "[w]hile not dispositive, the Court finds the plaintiff's education and extensive experience in the legal profession support the conclusion that she assented to be bound by the terms of defendant's dispute resolution policy despite the fact that she did not take the opportunity to actually read the policy"); *Scone Invs., L.P. v. American Third Mkt. Corp.*, 992 F. Supp. 378, 381 (S.D.N.Y. 1998) (holding that even though there was a dispute as to whether plaintiffs had signed an arbitration agreement, plaintiff was an attorney and

"clearly a sophisticated investor," and "[a]s a sophisticated investor, [he] can be assumed

to be familiar with the securities industry practice of requiring arbitration clauses");

*Blashka v. Greenway Capital Corp.*, 94civ5633, 1995 U.S. Dist. LEXIS 15191, at *15

(S.D.N.Y. Oct. 16, 1995) (holding plaintiff investor was required to arbitrate dispute with

brokerage firm despite brokerage firm's inability to produce signed customer agreement

because plaintiff was "a highly sophisticated investor, and had signed account agreements

in the past, all of which presumably included an arbitration clause," and, he was "was well

acquainted with the industry custom of using arbitration clauses"); *DaPuzzo v. Globalvest*

*Mgmt. Co., L.P.*, 263 F. Supp. 2d 714, 734 (S.D.N.Y. 2003) (confirming conclusion that

plaintiff should have been aware of an arbitration agreement based upon the fact that he

was a "sophisticated investor," and held a "high-ranking professional position" in the

financial services industry); *David L. Threlkeld & Co. v. Metallgesellschaft, Ltd.*, 923 F.2d

245, 249 (2d Cir. 1991) (noting as consideration in rejecting a challenge to the arbitration

provision that plaintiff was "a sophisticated commodities trader with extensive experience

in the field"); *Emeronye v. CACI Int'l*, 141 F. Supp. 2d 82, 86 n.5 (D.D.C. 2001)

("Moreover, the fact that plaintiff had a legal education and two law degrees supports that

plaintiff should be bound by the terms of the contract she signed."); *Topf v. Warnaco, Inc.*,

942 F. Supp. 762, 768-769 (D. Conn. 1996) (noting that plaintiff was "an experienced

business man," and this fact cast doubt on his claimed confusion as to whether he was

obligated to arbitrate based upon arbitration provision incorporated by reference into

contract he signed); *Cremin v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 957 F. Supp.

1460, 1477 (N.D. Ill. 1997) (rejecting plaintiff's claim that she did not knowingly agree to

arbitrate her claims and noting that she was "well educated, with an MBA in finance from

Northwestern University, and intelligent").

19.     Moreover, closely related to this proposition, courts have explicitly recognized that

when a party knows that arbitration clauses are frequently used in a particular industry,

they cannot claim surprise at learning that they agreed to arbitrate. *Threlkeld*, 923 F.2d at

249 (party knew that arbitration clauses were common in commodities trading industry and

could not claim ignorance of obligation to arbitrate); *Genesco, Inc. v. T. Kakiuchi & Co.*,

815 F.2d 840, 846 (2d Cir. 1987) (widespread use of arbitration clauses in industry puts

party on notice that contract contains one).

20.     Court's have recognized that arbitration agreements are the norm in the securities

industry. *See, e.g., Scone Invs., L.P. v. American Third Mkt. Corp.*, 992 F. Supp. 378, 381

(S.D.N.Y. 1998) (finding an attorney and experienced investor "can be assumed to be

familiar with the securities industry practice of requiring arbitration clauses"); *Ilan v.

Shearson/American Express, Inc.*, 632 F. Supp. 886, 890 (S.D.N.Y. 1985) ("In the

securities industry, the vast majority of brokerage firms require an investor to sign a

contract with an arbitration clause in order to open an account"); *Blashka v. Greenway

Capital Corp.*, No. 94Civ.5633, 1995 U.S. Dist. LEXIS 15195, at *15 (S.D.N.Y. Oct. 17,

1995) (recognizing that it is customary in securities industry for customers to agree to

arbitrate disputes in customer agreements).

21.     Taking these facts into account—particularly Lovejoy's experience with the phrase

"pre-dispute arbitration clause" in his other brokerage accounts—Lovejoy's claims of

confusion must fail.  He knew (or at least should have known) that the phrase "pre-dispute

arbitration" required that all disputes between the parties be submitted to arbitration based

upon the contracts that he executed with other brokerage firms.  Moreover, as a

sophisticated investor, Lovejoy was well-aware that it is customary in the securities

industry that brokerage firms require that account applicants agree to arbitrate any disputes

that arise—and in fact had arbitrated a dispute that he had with People's Securities.

Defendants had no obligation to explain any terms of the contract to Lovejoy—an

experienced attorney.

22.     Even if the Court were to view Plaintiffs' claim as alleging that E*TRADE's use of

the phrase "pre-dispute arbitration clause" constituted an insufficient disclosure, or even an

alleged attempt to mislead, Plaintiffs' claims still fail, as Defendants had no obligation to

explain the terms of the contract into which Lovejoy freely entered. *Topf v. Warnaco, Inc.*, 942 F. Supp. 762, 768-769 (D. Conn. 1996) (parties dealing at arms' length have no obligation to explain to each other the terms of a written contract and reference in employment agreement to handbook was sufficient); *Tuskey v. Volt Information Sciences, Inc.*, 2001 U.S. Dist. LEXIS 10980 (S.D.N.Y. Aug. 3, 2001) (party bound to arbitrate despite claims that she did not understand arbitration provision and it was not explained to her because "contract law is clear that parties are 'conclusively' bound by contracts they sign whether or not the party has read the contract as long as there is no fraud, duress or some other wrongful act of the other party").

### Plaintiffs' Claim That They Closed Their Account and Reopened the Account Free of any Terms is Misguided.

23.     Plaintiffs' claim that they closed their account for a brief period of time and then reopened it, thereby voiding all terms previously governing the account, must fail. Even if Plaintiffs closed the E*TRADE account—which they did not—the terms of the E*TRADE Customer Agreement would have continued to govern the account after it was reopened. *See E*TRADE Customer Agreement*, p. 1.

### Eggleston is Bound to Arbitrate to the Same Extent as Lovejoy.

24.     With respect to Eggleston's claim that she is not bound by the arbitration clause because she did not sign the agreement, the Second Circuit has made clear that a

nonsignatory party may be bound to an arbitration agreement if so dictated by the

"ordinary principles of contract and agency." *See, e.g., Smith/Enron Cogeneration Ltd.*

*Partnership v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d Cir. 1999); *McAllister*

*Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980). This Circuit has

recognized a number of theories under which nonsignatories may be bound to the

arbitration agreements of others, including the theory of estoppel. *See id.* For example, a

nonsignatory party is estopped from denying its obligation to arbitrate when it receives a

"direct benefit" from a contract containing an arbitration clause. *See, e.g., American*

*Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999). The

Court has also held that where the nonsignatory's interests and claims are essentially

identical to the signatory's, the nonsignatory can be subject to arbitration. *See Bird v.*

*Shearson Lehman/American Express*, 926 F.2d 116, 121 (2d Cir. 1991).

25.      Under these principles, courts have frequently bound nonsignatory spouses to an

arbitration clause executed by their spouse because of a benefit they received or because

their claims were identical. *See, e.g., Washington Mut. Fin. Group, LLC v. Bailey*, 364

F.3d 260, 267-68 (5th Cir. 2004) (wife bound to arbitration clause signed by husband

under doctrine of equitable estoppel); *Blatt v. Shearson Lehman/American Express, Inc.*,

1986 U.S. Dist. LEXIS 18344, at **11-13 (S.D.N.Y. 1986) (wife committed herself to

arbitration clause by participating in account with husband); *Rodriguez Font v. Paine Webber Inc.*, 649 F. Supp. 462, 466 (D.P.R. 1986) (because wife's claims relating to investment account were "essentially the same as those made by" her husband, she too is bound to arbitrate); *Downer v. Siegel*, 2002 U.S. Dist. LEXIS 15720, at *3 (E.D. La. 2002) (husband's signature to account agreement to manage community property bound wife to its arbitration clause).

26.    Similarly, the doctrine of estoppel prevents a nonsignatory party from having it both ways: by seeking relief under the agreement, and concomitantly disclaiming its arbitration provision. *See, e.g., Upstate Shredding, LLC v. Carolss Well Supply Co.*, 84 F. Supp. 2d 357, 363 (N.D.N.Y. 2000) ("Plaintiffs seek to have their cake and eat it too; they claim reliance on the [contract] to establish a claim for breach of [contract] and, at the same time, disclaim reliance on that same [contract] to avoid arbitration."); *Borsack v. Chalk & Vermilion Fine Arts, Ltd.*, 974 F. Supp. 293, 299 (S.D.N.Y. 1997) ("[T]he plaintiff cannot have it both ways. [She] cannot rely on the contract, when it works to [her] advantage, and repudiate it when it works to [her] disadvantage.") (citation and internal quotation marks omitted); *Filanto, S.p.A. v. Chilewich Inti'l Corp.*, 789 F. Supp. 1229, 1240 (S.D.N.Y. 1992) ("[Plaintiff] finds itself in an awkward position: it has sued on a contract whose [arbitration] terms it must now question"); *Tepper Realty Co. v. Mosaic*

*Tile Co.*, 259 F. Supp. 688, 692 (S.D.N.Y. 1966) (to permit plaintiffs to avail themselves of certain portions of the contract while disavowing the arbitration clause "would not only flout equity, it would do violence, we think, to the congressional purpose underlying the Federal Arbitration Act"); *see also Washington Mut. Fin. Group*, 364 F.3d at 268 (party may not "su[e] based upon one part of a transaction that she says grants her rights while simultaneously attempting to avoid other parts of the same transaction that she views as a burden—namely the arbitration agreement").

27.     To the extent Eggleston availed herself of the E*TRADE account, she received a benefit and is bound to arbitrate. Her claims are identical to those of her husband, and she has alleged breach of contract claims against Defendants. Thus, she cannot disclaim the arbitration clause contained in the Customer Agreement.

28.     Moreover, the E*TRADE Customer Agreement has provisions that make clear that Lovejoy's signature bound his wife. *See E*TRADE Customer Agreement*, 1, 25, 40.

29.     Finally, even if this Court were to conclude that Eggleston is not bound to arbitrate based upon her husband's signature on the account application, this Court would still exercise its authority to stay this action until such time as Lovejoy and E*TRADE arbitrate their disputes. Eggleston's claims are entirely duplicative of her husband's claims, and it is exceedingly likely that the arbitration will fully resolve any claims she may have against

Defendants. Indeed, Eggleston's claims are so inextricably intertwined with Lovejoy's

claims that it would subvert the purposes of the FAA to force Defendants to proceed with

this litigation before arbitrating Lovejoy's disputes, and the interests of judicial economy

are served by awaiting the arbitration. *Limonium Maritime, S.A. v. Mizushima Marinera,*

*S.A.*, 1999 U.S. App. LEXIS 30447, at **3-4 (2d Cir. Nov. 18, 1999) (trial court within its

broad discretion to stay adjudication of status of nonsignatories until after arbitration for

"sound reasons of judicial economy"); *Cosmotek Mumessillik ve Ticaret Ltd. Sirkketi v.*

*Cosmotek USA, Inc.*, 942 F. Supp. 757, 760 (D. Conn. 1996) (although request to stay

nonsignatory's claim is not governed by the FAA, court nonetheless has inherent power to

control its docket and therefore granted stay because "[a] stay may be appropriate where

issues involved may be determined in arbitration) (citing *Nederlandse Erts-*

*Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440, 441 (2d Cir. 1964).

## Conclusion

30.      There is no dispute that E*TRADE's arbitration clause set forth at paragraph 31B

of the E*TRADE Customer Agreement is broad and requires mandatory arbitration. *White*

*v. Kampner*, 229 Conn. 465, 472 (1994) (recognizing that arbitration clauses that use the

terms "all claims arising out of" or "any dispute" are broad in scope); *Welch Group, Inc. v.*

*Creative Drywall, Inc.*, 215 Conn. 464, 467 (1990).

31.    Plaintiffs must arbitrate all claims relating to or arising out of E*TRADE account

number 1025-5403, and this action is therefore stayed pursuant to 9 U.S.C. § 3.

## X.    DEFENDANTS OBJECTIONS TO PLAINTIFFS' LEGAL CLAIMS

Defendants are unable to file Objections to Plaintiffs' proposed legal conclusions

because Plaintiffs failed to provide them to Defendants in a timely manner.  In fact,

Plaintiffs provided their proposed legal conclusions on the day this Trial Memorandum

was due.  Defendants are filing a separate Motion to address this issue, and request an

additional three (3) days to file objections.

Dated:  November 15, 2004              Respectfully submitted,

                                       E*TRADE Securities, Inc., E*TRADE
                                       Financial Corp. (erroneously sued as
                                       E*TRADE, Inc.) and Stephen Tachiera

                                       By_____
                                          James A. Budinetz, Esquire
                                          Ct. Fed. Bar No.: ct16068
                                          Pepe & Hazard LLP
                                          225 Asylum Street
                                          Goodwin Square
                                          Hartford, CT  06103
                                          e-mail: jbudinetz@pepehazard.com
                                          Telephone:  860.241.2693
                                          Facsimile:  860.522.2796

## CERTIFICATE OF SERVICE

I hereby certify that I have, this 15th day of November 2004, sent the foregoing

via first class mail, postage prepaid, to:

>Frederick A. Lovejoy, Esq.
>P.O. Box 56
>Easton, CT  06612

James A. Budinetz

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| SUZANNE EGGLESTON and | : |
| FREDERICK A. LOVEJOY, | : |
| | : |
| Plaintiffs, | : 3:02CV188(JBA) |
| | : |
| -against- | : |
| | : |
| E-TRADE SECURITIES, INC., | : |
| E-TRADE, INC. and STEPHEN TACHIERA, | : November 15, 2004 |
| | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## V.    FURTHER PROCEEDINGS

This Court found in its ruling dated November 10, 2004 (Docket No. 41), that a trial is necessary to determine disputed issues of fact in order for it to rule if the Court should compel arbitration or try the case itself.

Additionally, discovery disputes concerning production of documents must be resolved.

## VI.    NATURE OF CASE

The issue to be determined by this Court is whether the plaintiffs are required to arbitrate their dispute or whether their action can proceed in this Court. Plaintiff Frederick A. Lovejoy opened an account with defendant E-Trade in December, 1998. The account was funded solely with monies belonging to plaintiff Frederick A. Lovejoy. Thereafter, in December 2000, plaintiff Frederick A. Lovejoy directed defendant E-Trade to sell and close his account.

In January 2001, plaintiffs Suzanne Eggleston and Frederick A. Lovejoy sent the sum of $200,000.00 to defendant E-Trade. Those funds were the joint property of both Suzanne Eggleston and Frederick A. Lovejoy.

1

Thereafter, a dispute occurred concerning: 1) a trade involving EMC stock, and 2) whether plaintiffs' instructions to close their account were followed.

As such, this Court must determine: 1) if both plaintiffs Suzanne Eggleston and Frederick A. Lovejoy are governed by the "pre-dispute resolution" clause contained in the December 1998 application executed by plaintiff Frederick A. Lovejoy, and which he specifically directed defendant E-Trade to close, 2) if some other terms govern their relationship, and 3) if the terms of the 1998 application are found applicable, whether they are enforceable.

VII.   WITNESSES AND EXHIBITS

    A.   Witnesses

        Plaintiffs intend to call the following witnesses at trial:

        1.   Frederick A. Lovejoy – Frederick A. Lovejoy will testify as to the documents he received and signed in December 1998, his conversations with defendant E-Trade in 1998, his instructions to close his account in December 2000, his communications in January 2001 concerning the opening of a joint account for himself and his wife, Suzanne Eggleston, and his additional instructions and communications with defendant E-Trade.

        2.   Suzanne Eggleston – Suzanne Eggleston will testify as to her ownership of one-half of the $200,000.00 in funds; i.e., $100,000.00, that was sent to defendant E-Trade in January 2001, where those funds had been derived, and the purpose and limitations surrounding the placement of those funds with defendant E-Trade.

    B.   Exhibits

        1.   Plaintiffs' Exhibits

        A)   December 2000 correspondence from plaintiff Frederick A. Lovejoy to defendant E-Trade

B)    January 2001 correspondence from plaintiff Frederick A. Lovejoy to defendant E-Trade

C)    Address change request

D)    Confirmation and monthly statements

VIII.    PLAINTIFFS' PROPOSED FINDINGS OF FACT

The Court finds that plaintiff Frederick A. Lovejoy closed an account he had opened in December 1998 in December 2000 ("the 1998 account").

The Court finds that the only funds ever contained in the 1998 account were those belonging solely to plaintiff Frederick A. Lovejoy.

That the Court finds that defendant E-Trade failed to provide its Customer Agreement to plaintiff Frederick A. Lovejoy on or about December 1998.

That the Court finds the use of the terms "predispute arbitration clause" as opposed to "subject to binding arbitration" to be ambiguous.

The Court finds that plaintiffs Suzanne Eggleston and Frederick A. Lovejoy sent the sum of $200,000.00 to defendant E-Trade in January 2001.

The Court finds that $100,000.00 of the $200,000.00 belonged to plaintiffs Suzanne Eggleston and Frederick A. Lovejoy, and the other $100,000.00 to plaintiff Frederick A. Lovejoy.

The Court finds that defendant E-Trade accepted the sum of $200,000.00 from plaintiffs and that it did not have the plaintiffs sign any contract/agreement relating to those jointly owned funds.

The Court finds that the sum of $200,000.00 came from the sale of plaintiffs' home on or about January 4, 2001.

3

The Court finds that defendant E-Trade unilaterally ignored the instructions of plaintiff Frederick A. Lovejoy to close the 1998 account.

The Court finds that defendant E-Trade ignored and/or failed to update the address provided to it on or about January 2001 for a period of approximately six months.

The Court finds that defendant E-Trade failed to send to plaintiffs any contractual information when they sent their joint monies to defendant E-Trade in January 2001.

IX.    PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW

The Courts have long held that the terms contained in a contract shall be afforded their plain meaning. Tallmadge Brothers, Inc. v. Iroquois Gas Transmission System, 252 Conn. 479 (2000).

Here, defendant E-Trade used the term ". . . GOVERNED BY A PRE-DISPUTE ARBITRATION . . ." rather than stating in the same amount of space ". . . SUBJECT TO BINDING ARBITRATION . . ."

Webster's Ninth New Collegiate Dictionary defines pre as follows:

Pre- *prefix* [ME, fr. OF & L: OF, fr. L *prae-*, fr. *Prae* in front of, before – more at FOR] **1 a** (1) : earlier than : prior to : before (*Pre*cambrian) (*pre*historic) (*pre*-English) (2) : preparatory or prerequisite to (*pre*medical) (*pre*journalism) **b** : in advance : beforehand (*pre*cancel) (*pre*pay) **2 a** : in front of : anterior to (*pre*axial) (*pre*molar) **b** : front : anterior (*pre*abdomen)

Thereafter, Webster's provides 195 examples of words using the prefix "pre"; i.e.,

| | | |
|---|---|---|
| pre-ad-mis-sion | pre-for-mu-late | pre-punch |
| pre-adult | pre-fresh-man | pre-pu-pal |
| pre-ag-ri-cul-tur-al | pre-game | pre-pur-chase |
| pre-an-es-thet-ic | pre-gen-i-tal | pre-qual-i-fi-ca-tion |
| pre-an-nounce | pre-har-vest | pre-qual-i-fy |
| pre-ar-range | pre-head-ache | pre-race |
| pre-ar-range-ment | pre-hir-ing | pre-re-ces-sion |
| pre-as-sign | pre-His-pan-ic | pre-re-hears-al |
| pre-au-dit | pre-hol-i-day | pre-re-lease |
| pre-bat-tle | pre-hu-man | pre-re-quire |

4

pre-boom
pre-civ-i-li-za-tion
pre-clear
pre-clear-ance
pre-code
pre-co-ital
pre-col-lege
pre-co-lo-nial
pre-com-bus-tion
pre-com-mit-ment
pre-com-pute
pre-con-so-nan-tal
pre-con-so-nan-tal-ly
pre-con-struct
pre-con-ven-tion
pre-con-vic-tion
pre-cool
pre-cop-u-la-to-ry
pre-coup
pre-crash
pre-crease
pre-cut
pre-dawn
pre-de-fine
pre-de-liv-ery
pre-dem-o-crat-ic
pre-de-par-ture
pre-des-ig-nate
pre-des-ig-na-tion
pre-de-val-u-a-tion
pre-de-vel-op-ment
pre-din-ner
pre-dis-charge
pre-dis-cov-ery
pre-dive
pre-drill
pre-dy-nas-tic
pre-ed-it
pre-elec-tion
pre-elec-tric
pre-em-bar-go
pre-em-ploy-ment
pre-en-roll-ment
pre-erect
pre-es-tab-lish
pre-eth-i-cal

pre-in-au-gu-ral
pre-in-cor-po-ra-tion
pre-in-dac-tion
pre-in-dus-tri-al
pre-in-ter-view
pre-in-va-sion
pre-launch
pre-life
pre-lit-er-ary
pre-log-i-cal
pre-lunch
pre-lun-cheon
pre-man-u-fac-ture
pre-mar-ket
pre-mar-ket-ing
pre-mar-riage
pre-meal
pre-mea-sure
pre-med-i-cate
pre-me-di-eval
pre-meet
pre-meno-paus-al
pre-merg-er
pre-meta-mor-phic
pre-mi-gra-tion
pre-mi-gra-to-ry
pre-mix
pre-mod-ern
pre-mod-i-fi-ca-tion
pre-mod-i-fy
pre-moist-en
pre-mold
pre-molt
pre-mor-al
pre-my-cot-ic
pre-noon
pre-no-ti-fi-ca-tion
pre-no-ti-fy
pre-num-ber
pre-open-ing
pre-op-er-a-tion-al
pre-or-der
pre-paste
pre-pill
pre-plan
pre-por-tion

pre-re-tire-ment
pre-re-turn
pre-re-view
pre-re-vi-sion-ist
pre-rev-o-lu-tion
pre-rev-o-lu-tion-ary
pre-rinse
pre-ri-ot
pre-rock
pre-ro-man-tic
pre-sale
pre-sched-ule
pre-screen
pre-sea-son
pre-sen-tence
pre-sen-tenc-ing
pre-ser-vice
pre-show
pre-slaugh-ter
pre-sleep
pre-slice
pre-song
pre-sort
pre-spec-i-fy
pre-split
pre-stamp
pre-ster-il-ize
pre-stor-age
pre-strike
pre-struc-ture
pre-sum-mit
pre-sweet-en
pre-tape
pre-tech-no-log-i-cal
pre-tele-vi-sion
pre-ter-mi-na-tion
pre-the-ater
pre-tour-na-ment
pre-train
pre-trav-el
pre-treat
pre-treat-ment
pre-trial
pre-trim
pre-type
pre-uni-fi-ca-tion

| | | |
|---|---|---|
| pre-ex-per-i-ment | pre-pres-i-den-tial | pre-uni-ver-si-ty |
| pre-fade | pre-price | pre-vi-a-ble |
| pre-fas-cist | pre-pri-ma-ry | pre-war |
| pre-fight | pre-prim-er | pre-wash |
| pre-file | pre-pro-duc-tion | pre-wean-ing |
| pre-fi-nance | pre-pro-gram | pre-whal-ing |
| pre-fire | pre-psy-che-del-ic | pre-work |
| pre-flame | pre-pub-li-ca-tion | pre-wrap |
| pre-for-mat | | |

As can readily be seen from the numerous examples listed in Webster's, "pre" clearly indicates and/or means to come before. As such, the simple reading of "pre-dispute arbitration" should mean an arbitration proceeding that would come before any actual dispute that might be commenced between the parties. If the terms of an arbitration agreement are ambiguous, they are not to be enforced. See Hartford Elec. Applicators of Thermalux, Inc. v. Alden, 169 Conn. 177, 182 (1975). A provision of a contract is ambiguous if it is susceptible to more than one reading. Metropolitan Life Insurance Co. v. Aetna Casualty and Surety Company, 255 Conn. 295, 305 (2001)

The term "pre-dispute arbitration agreement" does not in and of itself indicate that a party is agreeing to binding arbitration. Kingston v. Ameritrade, Inc., 302 Mont. 90, 97 (2000)

The use of hyperlinks that may connect a party to a relevant document does not bind a party if the link is not sufficiently clear or there are difficulties in obtaining the information to be relied on. Specht v. Netscape Communications Corp., 306 F.3d 17 (2d Cir. 2002)

X.    OBJECTIONS

A.    Plaintiffs' Objections to Defendants' Legal Claims

Plaintiffs object to defendants in that defendants attempt to re-argue its previous motion which was ruled on and denied by Judge Eginton in his Order dated November 10, 2003

(Docket No. 41). Plaintiffs further incorporate herein their Proposed Findings of Fact and

Conclusions of Law as part of their objection to defendants' legal claims.

Dated: Easton, Connecticut                     LOVEJOY & ASSOCIATES
        November 15, 2004                       Attorneys for Plaintiffs,
                                                Suzanne Eggleston and Frederick A. Lovejoy


                                        By:_____
                                            Frederick A. Lovejoy (CT 03121)
                                            P.O. Box 56
                                            Easton, Connecticut 06612
                                            (203) 459-9941
                                            (203) 459-9943 (telefax)

RussoDocument.doc

7

CERTIFICATION

THIS IS TO CERTIFY that a copy of the foregoing was sent by U.S. mail on November

15, 2004, postage prepaid, to:


James A. Budinetz, Esq.
Pepe & Hazard LLP
Goodwin Square
225 Asylum Street
Hartford, Connecticut 06103


_____
FREDERICK A. LOVEJOY

# EXHIBIT B

## **DEFENDANTS' EXHIBIT LIST**

The Defendants respectfully submit that they may offer the following Exhibits into evidence at the trial on the issue of arbitrability. The Defendants respectfully reserve their right to offer exhibits that may be provided in the future by Plaintiffs in response to discovery that remains outstanding. In addition, the Defendants may introduce additional exhibits for purposes of impeachment or for other good cause shown.

Moreover, Defendants respectfully reserve the right to enlarge or enhance the below exhibits to aid the Court's understanding of the exhibit.

500.    E*TRADE 1998 Online Account Application (with online Customer Agreement) demonstrating the online account application process in use by E*TRADE during December 1998.

501.    E*TRADE Account Application submitted by Lovejoy.

502.    Approved E*TRADE Account Application submitted by Lovejoy.

503.    E*TRADE monthly account statements for account number 1025-5403.

504.    Daily Status Report demonstrating that E*TRADE's computer system experienced no problems that would have affected the on-line application process on December 20, 1998.

505.    Welcome Letter and materials. This exhibit consists of a letter from E*TRADE to Lovejoy providing an account number, personal identification number, user name, and password for Lovejoy's account, and also contains some materials that accompanied the letter.

506.    E*TRADE Quick Reference Guide.  This document was mailed to E*TRADE's
        new customers as part of a welcome kit.

507.    E*TRADE Customer Agreement in effect in December 1998.

508.    Trade Confirmations for Account No. 1025-5403.

509.    Affidavit of Richard Boysen, Custodian of Records for Ameritrade, Inc.,
        authenticating fifteen pages of documents produced by Ameritrade in response to a
        subpoena as business records relating to Lovejoy's Ameritrade accounts.

510.    Ameritrade Account Application submitted by Lovejoy dated December 28, 1997.

511.    Ameritrade Terms and Conditions that governed Lovejoy's Ameritrade accounts.

512.    Ameritrade Account Application submitted by Lovejoy dated April 23, 1998.

513.    Affidavit of Vivian Ryan, Custodian of Records for Morgan Keegan & Co., Inc.
        ("Morgan Keegan") authenticating fifteen pages of documents produced by
        Morgan Keegan in response to a subpoena as business records relating to Lovejoy's
        Morgan Keegan accounts.

514.    Morgan Keegan & Co., Inc. New Account Approval executed December 20, 1995
        pertaining to Lovejoy's account with Morgan Keegan.

515.    Signature page to Morgan Keegan account executed by Lovejoy on December 27,
        1995.

516.    Morgan Keegan Client Agreement Terms and Conditions governing Lovejoy's first
        Morgan Keegan account.

517.    Signature page to Morgan Keegan Client Agreement executed by Lovejoy on
        January 5, 1998.

518.  Morgan Keegan Client Agreement Terms and Conditions governing Lovejoy's second Morgan Keegan account.

519.  People's Securities, Inc. New Account Request Form executed by Lovejoy on August 18, 1989.

520.  Complaint in *People's Securities, Inc. v. Lovejoy* dated January 17, 1996.

521.  Lovejoy's Amended Answer in *People's Securities, Inc. v. Lovejoy* dated June 20, 1996.

522.  Motion to Dismiss filed by Lovejoy and *People's Securities, Inc. v. Lovejoy*.

522A.  People's Securities Account Application executed by Lovejoy.

523.  Letter from Frederick Lovejoy dated June 3, 2004 to James Budinetz.

524.  Letter from Lovejoy to E*TRADE bearing a date of January 18, 2001.

525.  Check from Lovejoy to E*TRADE dated December 28, 1999.

526.  E*TRADE computer printout showing approval date.

527.  E*TRADE computer record showing opening date.

528.  Plaintiff's Objections and Responses to Defendant's Interrogatories and Requests for Production dated March 1, 2004, bearing a date of May 7, 2004.

529.  Requests for Admission propounded by E*TRADE to Plaintiffs dated August 5, 2004.

530.  Plaintiff's Surreply to Defendants' Reply Memorandum in Response to the Court's September 25, 2003 Order dated November 6, 2003.

531.  Declaration of Frederick Lovejoy dated July 28, 2004.

531A.   Letter from Frederick Lovejoy dated July 28, 2004 (with attachments).

532.    Complaint filed in this action, bearing a date of January 30, 2002.

533.    Letter from James Budinetz to Frederick Lovejoy memorializing agreement
        reached between counsel concerning the admissibility of certain exhibits.

534.    Deposition of Frederick Lovejoy dated May 18, 2004 (with exhibits).

535.    Deposition of Suzanne M. Eggleston dated May 18, 2004 (with exhibits).

536.    Deposition of Vivian Ryan of Morgan Keegan Securities, Inc. dated August 30,
        2004 (with exhibits).

537.    Subpoena and Return of Service for Ameritrade, Inc.

537A.   Subpoena and Return of Service for Morgan Keegan Company, Inc.

537B.   Subpoena and Return of Service for People's Securities, Inc.