IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| SUZANNE M. EGGLESTON and FREDERICK LOVEJOY, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )  CIVIL ACTION NO. 3:02CV188 (JBA) |
| E*TRADE SECURITIES, INC., *et al.*, | ) ) ) |
| Defendants. | )  FEBRUARY 11, 2005 ) |

## DEFENDANTS' PRE-TRIAL MEMORANDUM

In accordance with this Court's Order dated January 11, 2005, the defendants

(collectively "E*TRADE"), submit this Pre-Trial Memorandum.[1]

## I.  FACTUAL BACKGROUND

### A.  The Parties

E*TRADE Securities, Inc. is an online brokerage firm that allows customers to apply

for accounts through which they can buy and sell securities.  Customers access their account

via the internet using a passcode and other unique identifying information.  Customer accounts

are completely "self-directed," meaning that E*TRADE provides no investment advice of any

kind.  The customer is charged a fee for each purchase or sale securities, regardless of the size

of the trade.  In early January 1999, E*TRADE received an application from Frederick

---

[1] For a detailed recitation of all relevant facts and law, E*TRADE respectfully refers to Court to E*TRADE'S Proposed Findings of Fact and Proposed Conclusions of Law set forth at pages 6 through 34 and pages 34 through 53, respectively, of its Trial Memorandum dated November 15, 2004.

Lovejoy ("Lovejoy") seeking to open an online securities trading account. E*TRADE

approved the application and opened an account for Lovejoy.

Lovejoy graduated from high school, college, and law school. He has been a practicing

lawyer for more than 15 years, specializing principally in litigation, and worked for a New

York City based law firm for several years before opening his own firm, known as Lovejoy &

Associates several years ago. Lovejoy, by his own admission, has reviewed hundreds of

arbitration clauses on behalf of clients, and has even arbitrated a securities dispute with another

brokerage firm on his own behalf. Lovejoy had several securities brokerage accounts—

including an online brokerage account—prior to opening an E*TRADE securities trading

account in January 1999. Eggleston is Lovejoy's wife, and appears to claim an interest in the

account by virtue of an ownership interest in the money that Lovejoy deposited into the

account.

### B. Key Indisputable Facts

The sole issue before this Court is:

> **Whether plaintiffs Frederick Lovejoy and Suzanne Eggleston, husband
> and wife, are bound to arbitrate disputes arising out of Lovejoy's online
> securities account based upon a broad, mandatory arbitration clause
> contained in the E*TRADE Customer Agreement at paragraph 31B.**

Plaintiffs allege that they are not bound by the terms of the E*TRADE Customer Agreement

because they claim that they never saw or received it. E*TRADE denies this, and asserts that

Plaintiffs are bound by the terms of E*TRADE's Customer Agreement based on several

grounds, as discussed below.

There does not appear to be any dispute on the following core facts relevant to the

single issue before the Court:

2

- Lovejoy accessed the E*TRADE website via the internet on December 20, 1998 to apply for an E*TRADE securities trading account. To do so, Lovejoy typed information into an online E*TRADE account application. A copy of the completed application is appended hereto as **Exhibit A**.

- In response to questions on the online application, Lovejoy indicated that he had brokerage accounts at other brokerage firms—both "full commission" and "discount (electronic)" accounts. Lovejoy also indicated on the account application that his "investment experience and knowledge" was "good." *Id.*

- After entering information into the online application, Lovejoy printed the application with the information that he entered, was directed to review it, and signed the application by hand in three locations, including immediately under the following representation:

  **Please read and sign to apply for your E*TRADE account:**
  I am of legal age to contract. I acknowledge that I have received, read, and agree to be bound by the terms and conditions as currently set forth in the E*TRADE Customer Agreement and as amended from time to time. . . .

  \*        \*        \*

  I UNDERSTAND THAT THIS ACCOUNT IS GOVERNED BY A PRE-DISPUTE ARBITRATION CLAUSE CONTAINED IN PARAGRAPH 31B OF THE E*TRADE CUSTOMER AGREEMENT. All account applicants must sign below:
  X_____
  **[Plaintiff Lovejoy's signature appears here]**

  *Id.* (Emphasis in original)

- The E*TRADE Customer Agreement contains a broad, unrestricted arbitration provision that requires, *inter alia*, that all disputes arising out of or relating to the E*TRADE account be submitted to binding arbitration. All of the claims raised by Plaintiffs in their Complaint relate to their E*TRADE account.

- After filling out the online application, printing it, and signing it, Lovejoy mailed the application to E*TRADE along with an initial deposit of $2,000.00 through the U.S. Postal Service.

3

- In response to the application, E*TRADE opened an account for Lovejoy, and mailed him a letter providing information that would allow him to securely access his account.

- Thereafter, Lovejoy bought and sold securities using his online trading account. After each transaction in 2000, Lovejoy received a trade confirmation, which advised him to "refer to the E*TRADE Customer Agreement for a complete discussion of the terms and conditions governing your account."

- Lovejoy had opened other securities trading accounts prior to opening an E*TRADE account. Like the E*TRADE account application, several of these other account applications incorporated mandatory arbitration clauses set forth in a separate document.

## II.    ARGUMENT

As explained below, E*TRADE will establish at trial that Plaintiffs are bound by the broad arbitration agreement contained at paragraph 31B of the E*TRADE Customer Agreement based upon several independent grounds:

1.    Lovejoy saw (or should have seen) the prominently displayed direction during the E*TRADE online application that instructs him to "Please read E*TRADE's Customer Agreement." By clicking on these words, Lovejoy would have been linked immediately to the Customer Agreement (and the arbitration provision);

2.    Regardless of whether Lovejoy saw and/or chose to review the E*TRADE Customer Agreement, he represented to E*TRADE immediately above his signature on the application that he had received a copy of E*TRADE's Customer Agreement, and agreed to be bound by its terms—including the arbitration provision, which was explicitly referenced;

3.    Lovejoy is a sophisticated investor and attorney, who has personally invoked an arbitration provision in another of his securities account agreements and arbitrated a dispute with another brokerage firm. Moreover, prior to opening his E*TRADE account, he had entered into multiple account agreements that incorporated mandatory arbitration clauses by reference using virtually identical language to the E*TRADE account application; and

4

4.    Lovejoy received a hard copy of the E*TRADE Customer Agreement as part of his Welcome Kit that was sent to him by E*TRADE.

**A.    E*TRADE Prominently Displayed Its Hyperlink To The Customer Agreement and Directed Applicants To Read It During The Online Account Application Process.**

Through the testimony of Marcus Kazmierczak, an E*TRADE software engineer with responsibility for the design and maintenance of the E*TRADE online application process in 1998, E*TRADE will demonstrate that the instruction to read the Customer Agreement and the hyperlink to the Customer Agreement were prominently displayed as part of the online account application process in December 1998—when Lovejoy opened his account. At the top of one of the webpages in the online account application opening process, Lovejoy was instructed as follows:

**Please read E*TRADE's <u>Customer Agreement</u>.**

This instruction appears in bold typeface, and the words "Customer Agreement" are underlined and are purple in color, in contrast to the other surrounding words. The underlining and distinct color are intended to call the applicant's attention to the Customer Agreement, and to demonstrate that an applicant can click on the words "Customer Agreement" to link immediately to E*TRADE's Customer Agreement. Once at the Customer Agreement, an applicant can take as much time as necessary to review the agreement online or can print the Customer Agreement and review it in hard copy format. E*TRADE will also demonstrate that there were no system malfunctions with its online account application process on December 20, 1998 that would have affected Lovejoy's application process.

Thus, Plaintiffs cannot assert that they were not given notice of the existence of the E*TRADE Customer Agreement—or provided an opportunity to review it—during the

5

application process.  Of course, a party is bound to the terms of his executed agreement,

regardless of whether he reads them.  *DiUlio v. Goulet*, 2 Conn. App. 701, 704 (1984) ("The

general rule is that where a person of mature years and who can read and write, signs or

accepts a formal written contract affecting his pecuniary interests, it is his duty to read it and

notice of its contents will be imputed to him if he negligently fails to do so. . . .").

**B.    Lovejoy Represented To E\*TRADE That He Agreed To Be Bound By The Terms Of The Customer Agreement, Including The "Pre-Dispute Arbitration Clause Contained At Paragraph 31B."**

Even setting aside the fact that E\*TRADE provided Plaintiffs the opportunity to link to

the Customer Agreement during the application process, as described above, Plaintiffs are still

bound under Connecticut law based solely upon Lovejoy's signature immediately under the

following representations:

> **Please read and sign to apply for your E\*TRADE account:**
> I am of legal age to contract.  I acknowledge that I have received, read,
> and agree to be bound by the terms and conditions as currently set forth
> in the E\*TRADE Customer Agreement and as amended from time to
> time. . . .
>
> \*        \*        \*
>
> I UNDERSTAND THAT THIS ACCOUNT IS GOVERNED BY A
> PRE-DISPUTE ARBITRATION CLAUSE CONTAINED IN
> PARAGRAPH 31B OF THE E\*TRADE CUSTOMER AGREEMENT.
> All account applicants must sign below:
> X_____
> **[Plaintiff Lovejoy's signature appears here]**
> (Emphasis in original)

Thus—immediately above his signature—Lovejoy was (<u>again</u>) given notice of the fact that:

(1)    his E\*TRADE account was governed by a separate Customer Agreement; and

(2)    the Customer Agreement contained an arbitration clause contained in paragraph
31B of the Customer Agreement.

6

There can be no dispute that Lovejoy knew that a separate E*TRADE Customer Agreement was being incorporated into the contract that he was signing.  Connecticut has long recognized that arbitration agreements may be incorporated by reference into a contract.

In *Salomon Smith Barney v. Cotrone*, 81 Conn. App. 755 (2004), the Connecticut Appellate Court applied long-standing precedent to hold that a plaintiff who signed a securities account application directly under a representation that he had "received the Client Agreement which contains a pre-dispute arbitration clause in section 6" was bound to arbitrate disputes relating to his securities account.  Accepting the plaintiff's argument that the arbitration clause was set forth in a separate document, the Court flatly rejected Plaintiff's argument that the above language did not incorporate the arbitration clause by reference, holding:

> Where . . . the signatories execute a contract which refers to another instrument in such a manner as to establish that they intended to make the terms and conditions of that other instrument a part of their understanding, the two may be together as the agreement of the parties.

*Id.* at 759-60 (quotations omitted) (collecting cases); *see also Topf v. Warnaco, Inc.*, 942 F. Supp. 762, 768-769 (D. Conn. 1996) (party who signed contract that incorporated a handbook, which contained an arbitration agreement, was bound to arbitrate).

That arbitration agreements may be incorporated by reference is true even when:  (1) **the arbitration provision is not called to the attention of the signing party**; and (2) **the document containing the arbitration clause is not provided to the signing party**.  Indeed, all parties are responsible for reading *all* of the terms of the contracts they sign.

*Batter Building Materials Co. v. Kirschner*, 142 Conn. 1 (1965) is directly on point.  In *Batter Building*, the plaintiff claimed that it was not required to arbitrate certain construction

7

disputes with defendant because the document containing the broad arbitration agreement was not part of parties' contract. The parties' contract incorporated certain specifications, which were provided to the plaintiffs, but contained no arbitration clause. The specification, in turn, incorporated another document—which plaintiff apparently did not receive—that contained a broad agreement to arbitrate. The Court rejected plaintiff's argument that it was not bound by the arbitration provision, holding that parties are bound by the term of documents incorporated by reference in their agreements regardless of whether the party chose to read them. *Id.* at 6-7; *see also E&F Construction Co., Inc. v. Rissil Construction Assocs., Inc.*, 181 Conn. App. 317, 320-21 (1980) (fact that party did not receive document containing arbitration provision makes no difference if it was incorporated by reference in contract); *Brown v. Dorsey & Whitney LLP*, 267 F. Supp. 2d 61, 81-82 (D.D.C. 2003) (plaintiff bound to arbitrate based upon arbitration clause in document never provided to plaintiff, but incorporated by reference into contract because plaintiff chose to sign the contract before taking the opportunity to read the document incorporated by reference); *DaPuzzo v. Globalvest Mgmt. Co., L.P.*, 263 F. Supp. 2d 714, 733 (S.D.N.Y. 2003) (holding plaintiff investor who signed agreement incorporating a separate contract which contained an arbitration agreement, which plaintiff did not receive until years later, was required to arbitrate, because even if plaintiff had never received the document containing arbitration clause, he would still be bound to arbitrate because in the original contract plaintiff acknowledged "having received and read the Partnership Agreement, and agreed to be bound").

It is expected that Plaintiffs will rely upon *Specht v. Netscape Communications Corp.*, 306 F. 3d 17 (2d Cir. 2002) in a misguided effort to support their claims. To the contrary, the

facts of *Specht* make clear that Plaintiffs are bound to the terms of E*TRADE'S Customer Agreement.

In *Specht,* the Court addressed whether individual consumers who were "urged to download free software at the immediate click of a button," were bound by the terms of a license agreement that was referenced on a submerged screen. *Id.* at 32. The *Specht* court concluded that consumers were not bound by the license agreement's terms because the web page was created in such a manner to conceal the reference to the terms, and because there was no indication whatsoever that by clicking on an offer to download "free software" at the immediate click of a button, that the consumers were entering into a contractual relationship of any sort. *Id.* at 32-33. Moreover, the Court noted that even if a consumer had located and clicked on the reference to license terms, the consumer would have been linked to another screen, which listed various software license agreements. At that point, the consumer would then have been required to select the applicable license agreement, and link to yet another web page and—finally—view the license agreement terms. The Court further noted that at no time were the plaintiffs required to manifest their consent to the terms of the license agreement. *Id.* at 29-30. Under these circumstances, the Court found that the plaintiffs were not bound by the agreement to arbitrate contained in the license agreement.

The distinction between the facts of *Specht* and those presented here are self-evident. First, Lovejoy knew well that he was entering into a contractual relationship with E*TRADE and that there would be terms governing his online securities trading account. Certainly, this alone distinguishes this case from one involving a one-time "free download" of software. Second, unlike in *Specht*, Lovejoy was required to print his application in hard-copy and sign it

9

in three separate locations—including directly under the representation that he had received, read and agreed to the E*TRADE Customer Agreement and its pre-dispute arbitration clause. E*TRADE went to great lengths to ensure Lovejoy was alerted to the existence of the Customer Agreement, and even the arbitration clause itself.

In fact, it is noteworthy that the *Specht* Court—like *Batter Building* and *E&F Construction*—focused solely upon whether the plaintiff had reasonable notice *of the license agreement—not of the arbitration provision contained in the license agreement*.

In light of the foregoing, this Court need not reach the issue of whether Lovejoy actually received a copy of the Customer Agreement—the Account Agreement clearly incorporated it. If Lovejoy—an experienced litigation attorney—had some question about the terms governing his account, he simply could have refrained from signing his name until he obtained a copy of the referenced Customer Agreement.

   **C.    Lovejoy Was a Sophisticated Investor and Attorney Who Had Arbitrated Securities' Disputes Previously, and Knew Well That He Was Required To Arbitrate Account Disputes With E*TRADE.**

Remarkably, Lovejoy appears to claim that he is not bound by the terms of the E*TRADE Customer Agreement because he was confused by E*TRADE's use of the phrase "*pre-dispute* arbitration clause" in its account application. (Emphasis added) Both legally and factually, this is nonsense.

First, the phrase "pre-dispute arbitration clause" is not ambiguous. This phrase simply refers to an agreement reached by the parties—before any disputes have arisen—that they will arbitrate any disputes that may arise *in the future* (*i.e.*, the agreement is *pre*-dispute). Indeed, courts across the country have used and approved of the phrase "pre-dispute arbitration clause"

10

when referring to agreements reached by parties *prior* to any dispute between them arises. *See, e.g., Salomon Smith Barney, Inc. v. Cotrone*, 81 Conn. App. 755, 760 (2004) (holding investor who signed a brokerage account application directly under a notice that called his attention to a "pre-dispute arbitration clause" in customer agreement was bound to arbitrate); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 234, *reh. denied* 483 U.S. 1056 (1987) (expressly holding that "pre-dispute" arbitration agreements between brokerage firms and customers are enforceable); *Prudential Securities, Inc. v. Bender*, 1998 Conn. Super. LEXIS 2328, at *11 (Aug. 19, 1998) (noting that Prudential's standard business practice is to require customers to sign an agreement to arbitrate—which includes the word "pre-dispute")[2]; *City of Waterbury v. Merrill Lynch & Co.*, 1992 Conn. Super. LEXIS 3388, at *15 (Nov. 24, 1992) (recognizing that federal law condones "pre-dispute arbitration agreements" between a broker and an investor).  In fact, both the Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers ("NASD") use the phrase "predispute arbitration clause" in their rules and regulations dealing with the enforceability of such clauses. *Securities & Exchange Commission Rule*, 17 C.F.R. part 240 (1987) (noting that "predispute arbitration clauses (*i.e.*, agreements requiring customers to submit to arbitration all future disputes)" are enforceable); NASD Conduct Rule 3110(C) ("Any predispute arbitration clause shall be highlighted. . . .").

But at a <u>bare minimum</u>, the phrase "pre-dispute arbitration clause"—which Lovejoy indisputably saw—placed him on inquiry notice of the existence of some sort of arbitration clause located at paragraph 31B of the E*TRADE Customer Agreement.  Had Lovejoy

---

[2] All unpublished case law is attached hereto as **Exhibit B**.

bothered to examine paragraph 31B, he would have seen the broad, mandatory arbitration

provisions to which he agreed.  Indeed, it is well-settled that parties dealing at arms length

*have no obligation* to explain the terms of the contract to one another, and each is charged

with reading the terms of the contract it signs.  *Topf v. Warnaco, Inc.*, 942 F. Supp. 762, 768-

769 (D. Conn. 1996) (parties dealing at arms' length have no obligation to explain to each

other the terms of a written contract and reference in employment agreement to handbook was

sufficient); *Tuskey v. Volt Information Sciences, Inc.*, 2001 U.S. Dist. LEXIS 10980

(S.D.N.Y. Aug. 3, 2001) (party bound to arbitrate despite claims that she did not understand

arbitration provision and it was not explained to her because "contract law is clear that parties

are 'conclusively' bound by contracts they sign whether or not the party has read the contract

as long as there is no fraud, duress or some other wrongful act of the other party").

Third, to assess Lovejoy's claimed confusion over the phrase "pre-dispute arbitration

clause," it is appropriate to consider his educational, professional, and investment history.

Here, Lovejoy:

- **had applied for and opened four brokerage accounts with other brokerage firms prior to opening his E\*TRADE account—two with Ameritrade and two with Morgan Keegan—each of which used the phrase "pre-dispute arbitration" in the account application to refer to and incorporate a broad, mandatory agreement to arbitrate;**

- **has personally enforced an arbitration clause contained in the account agreement that he signed with People's Securities and arbitrated that dispute before the NASD;**

- **is extremely well-educated, having graduated from college and obtained two legal degrees;**

- **has worked as a trial attorney, has advised clients on contract issues, and has dealt with hundreds of arbitration clauses; and**

12

- runs his own law firm.

These indisputable facts confirm the conclusion that Lovejoy knowingly agreed to arbitrate his claims with E*TRADE. *See e.g.*, *Brown v. Dorsey & Whitney, LLP*, 267 F. Supp. 2d 61, 82-83 (D.D.C. 2003) (plaintiff-attorney who signed employment agreement that referred to and incorporated the firm's undisclosed "dispute resolution policy," which contained an arbitration provision, was required to arbitrate claims, noting that "[w]hile not dispositive, the Court finds the plaintiff's education and extensive experience in the legal profession support the conclusion that she assented to be bound by the terms of defendant's dispute resolution policy despite the fact that she did not take the opportunity to actually read the policy"); *Blashka v. Greenway Capital Corp.*, 94CIV5633, 1995 U.S. Dist. LEXIS 15191, at *15 (S.D.N.Y. Oct. 16, 1995) (holding plaintiff investor was required to arbitrate dispute with brokerage firm despite brokerage firm's inability to produce signed customer agreement because plaintiff was "a highly sophisticated investor, and had signed account agreements in the past, all of which presumably included an arbitration clause," and, he "was well acquainted with the industry custom of using arbitration clauses"); *DaPuzzo v. Globalvest Mgmt. Co., L.P.*, 263 F. Supp. 2d 714, 734 (S.D.N.Y. 2003) (confirming conclusion that plaintiff should have been aware of an arbitration agreement based upon the fact that he was a "sophisticated investor," and held a "high-ranking professional position" in the financial services industry); *David L. Threlkeld & Co. v. Metallgesellschaft, Ltd.*, 923 F.2d 245, 249 (2d Cir. 1991) (noting as consideration in rejecting a challenge to the arbitration provision that plaintiff was "a sophisticated commodities trader with extensive experience in the field"); *Emeronye v. CACI Int'l*, 141 F. Supp. 2d 82, 86 n.5 (D.D.C. 2001) ("Moreover, the fact that plaintiff had a legal education and two law

13

degrees supports that plaintiff should be bound by the terms of the contract she signed."); *Topf v. Warnaco, Inc.*, 942 F. Supp. 762, 768-769 (D. Conn. 1996) (noting that plaintiff was "an experienced business man," and this fact cast doubt on his claimed confusion as to whether he was obligated to arbitrate based upon arbitration provision incorporated by reference into contract he signed); *Cremin v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 957 F. Supp. 1460, 1477 (N.D. Ill. 1997) (rejecting plaintiff's claim that she did not knowingly agree to arbitrate her claims and noting that she was "well educated, with an MBA in finance from Northwestern University, and intelligent").

Closely related to this proposition, courts have explicitly recognized that arbitration agreements are the norm in the securities industry, and when a party is or should be aware of that fact, they cannot claim surprise at learning that they agreed to arbitrate their disputes. *Threlkeld*, 923 F.2d at 249 (party knew that arbitration clauses were common in commodities trading industry and could not claim ignorance of obligation to arbitrate); *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987) (widespread use of arbitration clauses in industry puts party on notice that contract contains one); *Scone Invs., L.P. v. American Third Mkt. Corp.*, 992 F. Supp. 378, 381 (S.D.N.Y. 1998) (finding an attorney and experienced investor "can be assumed to be familiar with the securities industry practice of requiring arbitration clauses"); *Ilan v. Shearson/American Express, Inc.*, 632 F. Supp. 886, 890 (S.D.N.Y. 1985) ("In the securities industry, the vast majority of brokerage firms require an investor to sign a contract with an arbitration clause in order to open an account"); *Blashka*, 1995 U.S. Dist. LEXIS 15195, at *15 (recognizing that it is customary in securities industry for customers to agree to arbitrate disputes in customer agreements).

14

Taking these facts into account—particularly Lovejoy's experience with the phrase "pre-dispute arbitration clause" in his other brokerage accounts that pre-date his E*TRADE account—Lovejoy's claims of confusion must fail. He knew (or at least should have known) that the phrase "pre-dispute arbitration" required that all disputes between the parties be submitted to arbitration.

### D.     Lovejoy Received a Welcome Kit From E*TRADE Containing a Hard Copy Of The Customer Agreement.

The first page of Lovejoy's Account Application provides:

> As soon as your signed forms are received (with an initial deposit) and approved, we will send you a welcome kit with everything you need to get started.

*See* Exh. A, p. 1. At trial, E*TRADE will establish that it used a third-party vendor to mail the Welcome Kits on behalf of E*TRADE during the relevant timeframe, and that it was E*TRADE's practice to include a hard copy of the Customer Agreement in the Welcome Kit. Although Lovejoy denies receiving a copy of the Customer Agreement, Plaintiffs do not deny receiving other information as part of an initial mailing from E*TRADE, which E*TRADE will establish constitutes the Welcome Kit.

This provides yet another manner in which E*TRADE apprised Lovejoy of the terms governing his account.

### E.     Plaintiffs' Miscellaneous Defenses Fail.

#### 1.     Plaintiffs Never Closed Their E*TRADE Account.

Plaintiffs claim that even if their E*TRADE account is governed by the terms of the E*TRADE Customer Agreement when it was opened, at some point during the course of their relationship with E*TRADE, they closed the account, and then reopened it without any

15

paperwork—thereby somehow voiding the terms of the E*TRADE Customer Agreement and, in fact, freeing their account of any terms or conditions whatsoever.

But there exists no evidence that the account was ever closed during the parties' relationship. The E*TRADE account number never changed, and the account statements do not reflect any such closing.

Moreover, even if the account was closed, the E*TRADE Customer Agreement does not in any way limit itself to a single account. Instead, it states on the very first page that, "In consideration for E*TRADE opening and maintaining one or more accounts (each 'an account'), you agree to the terms and conditions contained in this Agreement." *See* E*TRADE Customer Agreement.

### 2. Eggleston Is Bound To Arbitrate To The Same Extent As Lovejoy.

Plaintiffs' claim that Eggleston can somehow avoid the arbitration provision is also misguided. Apparently, Eggleston alleges that she acquired some interest in the E*TRADE account because Lovejoy deposited some money belonging to her into the account. She further claims that she is not bound to arbitrate because she never signed the E*TRADE account application. Aside from being legally deficient (as discussed below), this claim is factually without merit.

Under the terms of the E*TRADE Customer Agreement that Lovejoy signed, he specifically agreed that his signature bound "his personal representatives and assigns." Moreover, the term "you"—which is used throughout the Customer Agreement—is defined to include not only the person who physically signs the application, but also that person's "designate[s]." E*TRADE Customer Agreement, 40, 1(s). Thus, to the extent that Lovejoy

16

granted Eggleston some interest in the E*TRADE account, she too is bound to arbitrate her claims against E*TRADE.[3]

With respect to Eggleston's claim that she is not bound by the arbitration clause simply because she did not sign the agreement, the Court of Appeals has made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the "ordinary principles of contract and agency." *See, e.g., Smith/Enron Cogeneration Ltd. Partnership v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d Cir. 1999); *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980). This Circuit has recognized a number of theories under which nonsignatories may be bound to the arbitration agreements of others, including the theory of estoppel. *See id*. For example, a nonsignatory party is estopped from denying its obligation to arbitrate when it receives a "direct benefit" from a contract containing an arbitration clause. *See, e.g., American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999). The Second Circuit Court of Appeals has also held that where the nonsignatory's interests and claims are essentially identical to the signatory's, the nonsignatory can be subject to arbitration. *See Bird v. Shearson Lehman/American Express*, 926 F.2d 116, 121 (2d Cir. 1991).

Under these principles, courts have frequently bound nonsignatory spouses to an arbitration clause executed by their spouse because of a benefit they received or because their claims were identical. *See, e.g., Washington Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267-68 (5th Cir. 2004) (wife bound to arbitration clause signed by husband under doctrine of

---

[3] To the extent Plaintiffs claim that the E*TRADE account was a "joint account," the terms of the E*TRADE Customer Agreement make clear that the signature of either joint owner binds the other, and that notice to either constitutes notice to both owners. E*TRADE Customer Agreement, ¶ 25.

equitable estoppel); *Blatt v. Shearson Lehman/American Express, Inc.*, 1986 U.S. Dist. LEXIS 18344, at **11-13 (S.D.N.Y. 1986) (wife committed herself to arbitration clause by participating in account with husband); *Rodriguez Font v. Paine Webber Inc.*, 649 F. Supp. 462, 466 (D.P.R. 1986) (wife's claims relating to investment account were "essentially the same as those made by" her husband, so she was bound to arbitrate); *Downer v. Siegel*, 2002 U.S. Dist. LEXIS 15720, at *3 (E.D. La. 2002) (husband's signature on account agreement to manage community property bound wife to its arbitration clause).

In *Montise v. America Online, Inc.*, 346 F. Supp. 2d 563 (S.D.N.Y. 2004), the court addressed whether the plaintiff, who used his step-father's AOL account, was bound by the forum selection clause contained in AOL's license terms that governed the account. Plaintiff argued that he did not have notice of the terms because he was a mere guest-user of his step-father's AOL account, and he never entered into any contractual relationship with AOL. *Id.* at 564. The court concluded that the plaintiff was akin to a "sublicensee" of his stepfather—who did have notice of AOL's terms—and as such, the plaintiff could not have greater rights than him:

> Any other conclusion would permit individuals to avoid the Defendant's Terms of Service simply by having third parties create accounts and then using them as the Plaintiff did. As such, the Plaintiff, as a user of another's account, is subject to the Terms of Service, and the forum selection clause is enforceable in this case.

*Id.* at 566. This holding is precisely on point. To the extent that Lovejoy is bound by E*TRADE's Customer Agreement, so is the person that he permits to acquire an interest in his account. Certainly, Eggleston can have no greater rights than Lovejoy.

18

Similarly, the doctrine of estoppel prevents a nonsignatory party from having it both ways: by seeking relief under the agreement, and concomitantly disclaiming its arbitration provision. *See, e.g., Upstate Shredding, LLC v. Carolss Well Supply Co.*, 84 F. Supp. 2d 357, 363 (N.D.N.Y. 2000) ("Plaintiffs seek to have their cake and eat it too; they claim reliance on the [contract] to establish a claim for breach of [contract] and, at the same time, disclaim reliance on that same [contract] to avoid arbitration."); *Borsack v. Chalk & Vermilion Fine Arts, Ltd.*, 974 F. Supp. 293, 299 (S.D.N.Y. 1997) ("[T]he plaintiff cannot have it both ways. [She] cannot rely on the contract, when it works to [her] advantage, and repudiate it when it works to [her] disadvantage.") (citation and internal quotation marks omitted); *Filanto, S.p.A. v. Chilewich Int'l Corp.*, 789 F. Supp. 1229, 1240 (S.D.N.Y. 1992) ("[Plaintiff] finds itself in an awkward position: it has sued on a contract whose [arbitration] terms it must now question"); *Tepper Realty Co. v. Mosaic Tile Co.*, 259 F. Supp. 688, 692 (S.D.N.Y. 1966) (to permit plaintiffs to avail themselves of certain portions of the contract while disavowing the arbitration clause "would not only flout equity, it would do violence, we think, to the congressional purpose underlying the Federal Arbitration Act"); *see also Washington Mut. Fin. Group*, 364 F.3d at 268 (party may not "su[e] based upon one part of a transaction that she says grants her rights while simultaneously attempting to avoid other parts of the same transaction that she views as a burden—namely the arbitration agreement").

To the extent Eggleston availed herself of the E*TRADE account, she received a benefit and is bound to arbitrate. Her claims are identical to those of her husband, and she has

alleged breach of contract claims against Defendants. Thus, she cannot disclaim the arbitration clause contained in the Customer Agreement. [4]

## III.    CONCLUSION

For the foregoing reasons, this Court should stay this action and order Defendants to arbitrate their disputes with E*TRADE.

DEFENDANTS
E*TRADE SECURITIES, INC.,
E*TRADE GROUP INC. and
STEPHEN TACHIERA

James A. Budinetz, Esquire
Ct. Fed. Bar No.: ct16068
Pepe & Hazard LLP
225 Asylum Street
Goodwin Square
Hartford, CT  06103
e-mail: jbudinetz@pepehazard.com
Telephone:  860.241.2693
Facsimile:  860.522.2796

---

[4] Even if this Court were to conclude that Eggleston is not bound to arbitrate because she did not sign the account application, this Court should still exercise its authority to stay this action until such time as Lovejoy and E*TRADE arbitrate their disputes. Eggleston's claims are entirely duplicative of her husband's claims, and it is exceedingly likely that the arbitration will fully resolve any claims she may have against Defendants. Indeed, Eggleston's claims are so inextricably intertwined with Lovejoy's claims that it would subvert the purposes of the FAA to force E*TRADE to proceed with this litigation before arbitrating Lovejoy's disputes, and the interests of judicial economy are served by awaiting the arbitration. *Limonium Maritime, S.A. v. Mizushima Marinera, S.A.*, 1999 U.S. App. LEXIS 30447, at **3-4 (2d Cir. Nov. 18, 1999) (trial court within its broad discretion to stay adjudication of status of nonsignatories until after arbitration for "sound reasons of judicial economy"); *Cosmotek Mumessillik ve Ticaret Ltd. Sirkketi v. Cosmotek USA, Inc.*, 942 F. Supp. 757, 760 (D. Conn. 1996) (although request to stay nonsignatory's claim was not governed by the FAA, court nonetheless has inherent power to control its docket and therefore granted stay because "[a] stay may be appropriate where issues involved may be determined in arbitration") (citing *Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440, 441 (2d Cir. 1964)).

JAB/32581/2/712915v1
02/11/05-HRT/

**OF COUNSEL:**

Douglas P. Lobel
ARNOLD & PORTER
1600 Tysons Boulevard, Suite 900
McLean, VA 22102
703.720.7035 (voice)
703.720.7399 (fax)
douglas_lobel@aporter.com

Attorneys for Defendants
E*TRADE SECURITIES, INC.,
E*TRADE GROUP, INC.
(erroneously
sued as E*TRADE, INC.), and
STEPHEN TACHIERA

21

## CERTIFICATE OF SERVICE

I hereby to certify that I have, this 11th of February, 2005, served a copy of the

foregoing via first class mail, postage prepaid to:

> Frederick A. Lovejoy, Esq.
> 276 Center Road
> P.O. Box 56
> Easton, CT  06612
> Fax:  (203) 459-9943

James A. Budinetz

22

# EXHIBIT A

E*TRADE Account Applicati    Form : SPOE (AOL) : 47952021 JD1 5403    Page 1 of 4



## *More Research. More Tools. More Power.*

| Home | Portfolio & Markets | Stocks & Options | Funds | Trading | My Accounts | Community | Marketplace |

## Account Application

You are almost done with your application. Here's all you have to do now.

1. **Print this application *(To Print: Select File and then Print from your browser's menu).***
   (Do not continue without printing, you could lose all the information you have entered!)

2. **Sign on all indicated signature lines.**
   Review, sign (multiple signatures may be required) and date the application. (If you are transferring an account, you will be then prompted to continue to the appropriate form.)

3. **Mail all materials to E*TRADE.**
   Minimum deposit is $1,000 for Cash accounts, $2,000 for Margin accounts.

   **MAIL TO:**
   **E*TRADE Securities, Inc.**
   **P .O. Box 8160**
   **Boston, MA 02266-8160**

As soon as your signed forms are received (with an initial deposit) and approved, we will send you a welcome kit with everything you need to get started.

---

**For E*TRADE use only -**    **Application ID: 47952021**    **JD10255403**
    **Login Name: inchmaree**

## Account Registration

Note: Review your Account Registration, Trading Level, and Funding choices before you continue. To make changes, use your Web browser's "back" button.

**X Individual**

## Trading Level

**X Cash and Margin**

## Funding

There is a $1,000 minimum initial deposit for Cash accounts; $2,000 for Margin accounts.

**X Check enclosed: $**    2000.00
   - We accept personal, cashier's, and government checks that are properly endorsed.



DEFENDANT'S EXHIBIT 50L

MAY-20-04 THU 11:37 AM  LOVE(   & ASSOCIATES      FAX NO. 20  2664224014214818   P. 3

E*TRADE Account Application Form : SPOE (AOL) : 47952021 JD16255403                Page 2 of 4

- Make checks payable to E*TRADE Securities, Inc.
- Checks must be drawn in U.S. dollars and made payable to, or cleared through a U.S. bank.

## Quotes

**X** E*TRADE offers free real-time quotes on an individual basis to all customers.

## Account Holder

**Provide your name and address as you would like your account registered.**

Name: *(first, middle initial, last )* **Frederick A Lovejoy**

Address: *(cannot be P.O. Box )* **228 Rowland Road**

| City: | State/Province: | ZIP/Foreign Postal Code: |
|---|---|---|
| **Fairfield** | **CT** | **06430** |

Country: **United States**

Indicate whether address above is **X** Home or Business

Mailing address *(if different from registration )*

Name: *(first, middle initial, last )*

Address:

| City: | State/Province: | ZIP/Foreign Postal Code: |
|---|---|---|

Country: **United States**

*The tax information provided in this section will be used for IRS reporting. If you are opening a Custodial account, include minor's information in this section.*

Social Security Number or Taxpayer ID Number: **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**

Date of Birth: *(mm/dd/yyyy; please enter year in four-digit format )*

**06/6/1953**

| Home Phone: | Business Phone: |
|---|---|
| **203-226-5477** | **(203) 226-5477** |
| Non-U.S. Phone: | Your e-mail address: |

### Citizenship

**X** U.S. Citizen

| Country of citizenship: | Country of legal residence |
|---|---|
| **United States** | **United States** |

| *If other than U.S. citizen:* Passport #, Alien ID #, or Gov't ID #: | Country of Issuance: **United States** |
|---|---|

*(if Gov't ID, attach copy )*

Existing E*TRADE account numbers, if any:

Link new account to existing User Name shown here: *(Account registration must match )*  **Inchmaree**

How did you hear about E*TRADE?   **ONAOL98 - AOL**

## Account Information Profile

E*TRADE Account Application Form : SPOE (AOL) : 47952021 JD10255403    Page 3 of 4

Securities regulations require the following financial information to be completed. All information is kept strictly confidential. If you are applying for a Custodial Account, we need financial information for the custodian.

**Investment Objectives** *(Check all that apply. )*
X Growth            X Income

**Approximate Annual Household Income** *If joint account, check box based on combined income.*
X $100,000-$199,999

**Total Net Worth Excluding Home** *If joint account, check box based on combined total net worth.*
X $500,000-$999,999

**Liquid Net Worth** (cash, stocks, mutual funds, etc.) *If joint account, check box based on combined liquid net worth.*
X $200,000-$499,999

Do you have accounts at other brokerage firms or mutual fund companies? If yes, indicate type of firm. *(Check all that apply. )*
X Yes                        X Full Commission
                             X Discount (electronic)

_____

**Account Holder**

Investment Experience and Knowledge:
                              X Good

Employer *(If unemployed, self-employed, retired, a student or a homemaker, please state. )*
                              **Lovejoy & Associates**

Business City, State and Zip Code:     **3695 Post Road**

Specify Occupation *(If self-employed, please describe. )*   **Soutport, CT 06490**

Is your employer a registered broker/dealer? If yes, SEE YOUR COMPLIANCE OFFICER FOR WRITTEN APPROVAL, WHICH WE MUST RECEIVE PRIOR TO OPENING YOUR ACCOUNT.

Check one:                    X No. My employer is not a registered broker/dealer.

Are you a director, 10% shareholder, or policy-making officer of a publicly owned company? If so, specify company(s):

**Applicant Signature** _____

**Please read and sign to apply for your E*TRADE account:**

I am of legal age to contract. I acknowledge that I have received, read, and agree to be bound by the terms and conditions as currently set forth in the E*TRADE Customer Agreement and as amended from time to time. I ACKNOWLEDGE THAT E*TRADE DOES NOT PROVIDE INVESTMENT, TAX, OR LEGAL ADVICE OR RECOMMENDATIONS. Under penalty of perjury, I certify (1) that my Social Security (or taxpayer ID) number shown on this form is correct and (2) that I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the IRS that I am subject to backup withholding or (c) I have been notified by the IRS that I am no longer subject to backup withholding (cross out item 2 if it does not apply to you). [The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.]

I understand that E*TRADE will supply my name to issuers of any securities held in my account so that I might receive any important information from them, unless I notify you in writing not to do so.

I acknowledge that securities held in my Margin account may be pledged, repledged, hypothecated, or rehypothecated for any amount due E*TRADE in my account(s) or for a greater amount. I UNDERSTAND THAT THIS ACCOUNT IS GOVERNED BY A PRE-DISPUTE ARBITRATION CLAUSE CONTAINED IN PARAGRAPH 31B OF THE E*TRADE CUSTOMER AGREEMENT.

All account applicants must sign below:
X _____

E*TRADE Account Applicat... Form : SPOE (AOL) : 47952021 JD1 255403

Page 4 of 4

*Signature of Authorized Account Holder or Custodian   Date*

| For E*TRADE use only: | E*TRADE Account Number: |
|---|---|

I have received this application and believe the account is suitable for:

☐ Cash      ☐ Margin                    Approval: X_____ Date_____

☐ Options - Level One  ☐ Options - Level Two  ☐ Options - Level Three  Approval: X_____ Date_____

## Cash Management Features

**Designate which money market fund you wish to use for your uninvested cash. A prospectus will be mailed to you. Please read it carefully before you invest. Note: If you do not check a box, your uninvested cash will earn credit interest.**

Type Name of Authorized Account Holder
or Custodian *(first, middle initial, last)* :

**Frederick A Lovejoy**

**Between-Investment choices. Check one. A prospectus of the fund you choose, will be mailed to you. (International customer can only select Credit Interest Fund.)**
**X** Money Market Portfolio

Please indicate number of signatures required to process checks: **X** One Two

Free Checkwriting. We will mail your checks to you within three weeks of opening your account.

Print and sign below exactly as your account is registered. For joint accounts, both applicants must print and sign.

X *Frederick A C. Jovejoy* 12/28/88        FREDERICK A LOVEJOY

*Signature of Authorized Account Holder or Custodian   Date*

| For E*TRADE use only:  E*TRADE Account Number: | _____ |
|---|---|

If you have questions, e-mail us at *service@etrade.com*  or call Customer Service at 1-800-STOCKS-5 (1-800-786-2575) 8:00 a.m. to midnight ET.