Get a Document - by Citation - 1998 Conn. Super. LEXIS 2328    Page 20 of 22

Case 3:02-cv-00188-JBA    Document 95-3    Filed 02/11/2005    Page 1 of 20

plaintiff's brief involve commercial transactions not gifts.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

V

Of the plaintiff's nine non-jurisdictional special defenses only three have been briefed: waiver, estoppel and laches. As stated, these defenses concern what the plaintiff claims the defendants should have done or failed to do with regard to Jack Bender's arbitration hearing and its result. The plaintiff appears to have forgotten that it was the doing of James Lapides, its local manager, in transferring the Bristol Myers Squibb stock from the joint account to Jack Bender's individual account that enabled Jack Bender to compel arbitration. The plaintiff's evidence was that Lapides was advised to make the transfer by the plaintiff's [*44] legal department.

The court agrees that "waiver" is the intentional relinquishment of a known right and that it may be inferred from conduct. _Hensley v. Commissioner of Transportation_, 211 Conn. 173, 179, 558 A.2d 971 (1989). The court disagrees, however, with the plaintiff's contention that a waiver of the right to a trial occurred when David and Norman Bender testified that they signed the Client's Opening Agreement for the joint account and such testimony contradicted Attorney Doernberger's representation that the document had not been signed. Prior to bringing the interpleader action, the plaintiff was aware from Attorney Judelson's second letter that the defendants claimed to have signed the agreement. Attorney Doernberger's representation was also before trial. At most, the plaintiff's claim concerns a party's admission. See, _Pedersen v. Vahidy_, 209 Conn. 510, 519-20, 552 A.2d 419 (1989). It was something that should have been ascertained either through depositions, Practice Book 13-31(a) (formerly 248), or a request for admissions. _Id._ 13-22, 13-24 (formerly 236B, 238-240). See _Drew v. K-Mart Corp._, 37 Conn. App. 239, 250-51, 655 A.2d 806 (1995).

The [*45] court also agrees with the plaintiff's description of "estoppel" as having two parts: inducement and reliance. _Boyce v. Allstate Ins. Co._, 236 Conn. 375, 385, 673 A.2d 77 (1996). But, as pointed out in the preceding paragraph, the plaintiff's claim falls properly into the area of inconsistent admissions by the defendants or their counsel. Further, the plaintiff has neglected to mention a caveat to the rule of estoppel. HN23 "It is fundamental that a person who claims an estoppel must show that he exercised due diligence to know the truth, and that he not only did not know of the true state of things but also lacked any reasonable means of acquiring knowledge." _Chotkowski v. State_, 240 Conn. 246, 268, 690 A.2d 368 (1997). The caveat presents a burden that the plaintiff cannot overcome.

The plaintiff's final special defense "laches" is correctly stated but, again, is misapplied. In claiming laches, the plaintiff occupies the role of a defendant on the counterclaim. Laches consists of an inexcusable delay in bringing suit that prejudices the defendant. Delay, alone, is not sufficient to bar a plaintiff's right to sue; the delay in bringing suit must be unduly prejudicial. A conclusion [*46] that a plaintiff has or has not been guilty of laches is one of fact for the trier. An appellate court cannot decide the question unless the subordinate facts found make such a conclusion inevitable as a matter of law. _Cummings v. Tripp_, 204 Conn. 67, 88, 527 A.2d 230 (1987).

The plaintiff's interpleader complaint was returned to court on December 27, 1994. The defendants' original answer and counterclaim was filed on June 21, 1996. The claim of prejudice, however, is based on later actions by the defendants: their declination to participate in the arbitration; their inaction in failing to arrest or to stop the enforcement of the result of the arbitration; and their declination to sue Jack Bender or file a claim against his estate.

Get a Document - by Citation - 1998 Conn. Super. LEXIS 2328   Page 21 of 22

Case 3:02-cv-00188-JBA    Document 95-3    Filed 02/11/2005    Page 2 of 20

There are of course, several short answers to these claims of wrongdoing. The court repeats ad nauseam that it was the plaintiff who put Jack Bender in a position to compel arbitration. Also the court's finding, that since the Client's Opening Agreement for the joint account was never executed; the defendants were not bound by its arbitration clause was induced in part by the plaintiff's evidence. The plaintiff paid Jack Bender as ordered by **[*47]** the arbitrators without any attempt to vacate or modify the award. See Gen. Stat. 52-418, 52-419, 52-420. It was the plaintiff, not Jack Bender or his estate, who filed a motion to confirm the award against the defendants who were not parties to the arbitration. Finally, the court is unaware of any rule of law that dictates who a party may sue. The plaintiff's defenses of waiver, estoppel and laches are rejected because they were not proved.

VI

The defendants are entitled to relief and have requested it in two alternative forms. First, pursuant to 42a-8-315(1)(c) a mandatory injunction that will compel the plaintiff to deposit Bristol Myers Squibb stock in the joint account. Second, pursuant to 42a-8-315(1)(d), monetary damages equal in value to two thirds of the value of 1,000 shares of Bristol Myers Squibb stock, as of the date of transfer.

The court cannot grant the first of the requested remedies. Too much has happened to Bristol Myers Squibb stock in terms of splits and increased prices so that replacement would cause an unnecessary hardship to the plaintiff. The second remedy, however, will be granted. On September 1, 1994, the date of the wrongful transfer, the market **[*48]** value of the stock was $ 56 7/8 per share or $ 56,875.00 for the 1,000 shares. The defendants, David and Norman Bender are entitled to two thirds of this amount or $ 37,916.67.

The defendants have also requested prejudgment interest, an item that is within the court's discretion. Neiditz v. Housing Authority, 231 Conn. 598, 602, 651 A.2d 1295 (1995). In the court's opinion, the circumstances of the case do not warrant an addition of prejudgment interest to the award of damages.

Judgment is rendered in favor of the defendants on their counterclaim. The plaintiff is ordered to pay $ 37,916.67 and taxable costs to the defendants.

Jerrold H. Barnett, Judge

I wish to thank Joshua Yahwak, a student at Washington & Lee Law School, who was my clerk in the summer of 1998, for his help with much of the research for this memorandum.

JHB

Service: **Get by LEXSEE®**
Citation: **1998 conn super lexis 2328**
View: Full
Date/Time: Friday, February 11, 2005 - 11:56 AM EST

* Signal Legend:
- Warning: Negative treatment is indicated
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

Get a Document - by Citation - 1998 Conn. Super. LEXIS 2328    Page 22 of 22

Case 3:02-cv-00188-JBA    Document 95-3    Filed 02/11/2005    Page 3 of 20

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Get a Document - by Citation - 1992 Conn. Super. LEXIS 3388 Page 1 of 10

Case 3:02-cv-00188-JBA    Document 95-3    Filed 02/11/2005    Page 4 of 20

Service: **Get by LEXSEE®**
Citation: **1992 conn super lexis 3388**

1992 Conn. Super. LEXIS 3388, *

CITY OF WATERBURY v. MERRILL LYNCH & CO., ET ALS

No. 102136

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF WATERBURY

1992 Conn. Super. LEXIS 3388

November 24, 1992, Decided

**NOTICE:**     [*1]

THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendants, the investment advisor, an investment bank, and their officers, filed a motion to compel arbitration and stay the proceedings in an action filed by plaintiff City of Waterbury for breach of contract.

**OVERVIEW:** The City filed an action for breach of contract against, among others, its investment advisor, an investment bank, and the officers of those two entities. Defendants sought enforcement of an arbitration clause in the agreement between the City and the investment bank. The court held (1) by virtue of its non-discretionary investment agreement, the investment advisor became substituted for the City in dealing with the investment bank; (2) the agreement was not indicative of an intent to include the investment advisor and other defendants in the arbitration agreement of the previously executed agreement with the investment bank; (3) the investment advisor and investment bank were not alter egos of each other; and (4) the Federal Arbitration Act required that arbitrable claims were to be severed from non-arbitrable claims even though such action would promote piece-meal resolution.

**OUTCOME:** The court granted the motion to compel arbitration and stay proceedings as it related to the claims against the investment bank and its officer. The court denied the motion as it related to all other defendants. The claims ruled arbitrable were stayed until completion of the trial of the non-arbitrable claims.

**CORE TERMS:** arbitration, broker, customer, clearinghouse, undersigned, introducing, non-signatory, cash management, arbitration clause, portfolio, nondiscretionary, vice-president, arbitrability, arbitrable, signatory, arbitration agreement, third party, federal law, beneficiary, margin, motion to compel arbitration, submitted to arbitration, alter ego, stock, designated, affiliate, manager, advice, Connecticut Uniform Securities Act, contracting parties

### LexisNexis(R) Headnotes  ✦ Hide Headnotes

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
**HN1** Whether parties to a contract have agreed to arbitrate their disputes presents a question of fact. More Like This Headnote

Get a Document - by Citation - 1992 Conn. Super. LEXIS 3388                                Page 2 of 10

Case 3:02-cv-00188-JBA    Document 95-3    Filed 02/11/2005    Page 5 of 20

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

**HN2** Arbitration is a creature of contract. A person cannot be compelled to arbitrate a dispute unless he has agreed to do so. The question of what persons or entities are bound by an arbitration agreement affecting interstate commerce is one of federal law. Since the question involves general concepts of contracts and agency, federal courts look to state law in determining what the federal law of contracts or agency is or should be. Questions concerning arbitrability, however, are to be examined from the point of view that favors arbitration. More Like This Headnote

Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Disregard of Corporate Entity

**HN3** For a court to be able to find that one party is the alter ego of another, there must be proof of control in the case of a corporation not mere majority or even complete stock control, but complete domination, not only of finances, but of policy and business practices respecting to the transaction at issue so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own. More Like This Headnote

**JUDGES:** BARNETT

**OPINIONBY:** BARNETT

**OPINION:** MEMORANDUM OF DECISION RE: MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

In this case the court must decide whether all counts of the plaintiff's complaint should remain as a viable suit or whether the first three counts should be severed and sent to arbitration as sought by certain defendants. Reference to the pleadings places the matter into proper perspective. The amended complaint is in five counts. n1 The first three counts are directed to the defendants, Merrill Lynch & Co., Merrill Lynch Asset Management, Inc. (MLAM), Merrill Lynch, Pierce, Ferrer & Smith (MLPF & S), Frederick M. Genung and Edmund C. Hyland. Count 4 concerns the defendants, James Cahill and Colonial Equities Corporation n2 while count 5 contains allegations directed to the defendants, Wal-Don Group, Inc., Patrick F. Waldron and James R. Donovan.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 A sixth count wherein the defendants, MLAM, Frederick M. Genung and Edmond C. Hyland, were charged with conduct incident to the purchase of the bonds that the plaintiff alleged was in violation of the Connecticut Unfair Trade Practices Ace (CUTPA) § 42-110b et seq. was stricken pursuant to the court's memorandum of October 5, 1992, based on Russell v. Dean Witter Reynolds, Inc., 200 Conn. 172 (1986). **[*2]**

n2 In the original complaint the fourth count included allegations against Peter J. Curley, but the case was withdrawn as to him on November 4, 1991. Also, on August 19, 1991, the case was withdrawn as to an entity described as "Colonial Realty Company." Without further information, the court cannot say that "Colonial Realtty Company" and the defendant Colonial Equities Corporation are the same enterprise.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

In the first count the allegations are that one or more of Merrill Lynch & Co., MLAM, MLPF & S, Genung and Hyland, hereinafter referred to as the "Merrill Lynch defendants", breached a contract with the plaintiff when, on behalf of the plaintiff, subscription documents were signed for $ 506,005.95 worth of Colonial Diversified Zero Coupon Bonds in the face amount of $ 1,300,000.00. The second count refers to several allegations of negligence on the part of one or more of the Merrill Lynch defendants in the acquisition by the plaintiff of the Colonial Diversified Coupon Bonds, including a claim that said purchase was not permitted under the statute governing the investment of trust funds, Gen. [*3] Stat. § 45a-203 (formerly § 45-88). In the third count, the allegations are that in the purchase of the Colonial Diversified Zero Coupon Bonds, one or more of the Merrill Lynch defendants violated the Connecticut Uniform Securities Act (CUSA), specifically Gen. Stat. §§ 36-473 and 36-474.

As for the remaining defendants, the fourth count alleges CUSA violations relating to § 36-485 and for § 36-498(a)(2) by James Cahill and Colonial Equities Corporation, making them both liable to the plaintiff pursuant to § 36-498(c). In the fifth count, the claims are that Wal-Don Group, Inc., by virtue of a trust indenture forming part of the offer of the bonds, became a fiduciary with obligations to the plaintiff that were ignored and that Wal-Don is merely the alter ego of the defendants, Patrick F. Waldron and James R. Donovan.

The Merrill Lynch defendants contend that the plaintiff's claims against all of them are arbitrable because of a provision in the Cash Management Account Agreement between the trustees of the plaintiff's retirement fund, designated in the agreement as the "undersigned", and the defendant, MLPF & S. That provision reads as follows:

Agreement to Arbitrate Controversies [*4]

> Except to the extent that controversies involving claims arising under the Federal securities may be litigated, the undersigned n3 agrees that any controversy arising out of the business of MLPF & S or this Agreement shall be submitted to arbitration conducted under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc. or pursuant to the Code of Arbitration Procedure of the National Association of Securities Dealers, Inc. as the undersigned may elect. If the controversy involves any security or commodity transaction or contract related thereto executed on an exchange located outside the United States then such controversy shall, at the election of the undersigned be submitted to arbitration conducted under the constitution of such exchange or under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc. or the Code of Arbitration Procedure of the National Association of Security Dealers, Inc. Arbitration must be commenced by service upon the other of a written demand for arbitration or a written notice of intention to arbitrate, therein selecting the arbitration tribunal.
> [*5] In the event the undersigned does not make such designation within five (5) days of such demand or notice, then the undersigned authorizes MLPF & S to do so on behalf of the undersigned.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 The Trustees of the City of Waterbury Retirement Fund.

Get a Document - by Citation - 1992 Conn. Super. LEXIS 3388    Page 4 of 10

Case 3:02-cv-00188-JBA    Document 95-3    Filed 02/11/2005    Page 7 of 20

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Fortunately, in considering the question of arbitrability, the court is not confined to the rather open ended allegations of the complaint. The parties have furnished the agreement between the trustees of the plaintiff's retirement fund with MLPF & S and the agreement between said trustees, described therein as the plaintiff's Retirement Board, with MLAM. In addition, the Merrill Lynch defendants have submitted an affidavit from John Ruby, a vice-president of MLPF & S, and the manager of its Southbury office, and the plaintiff has provided portions of depositions taken of Barbara O'Brien, an employee of MLPF & S, and the defendant, Edmund C. Hyland, who works for MLAM. From the evidence presented, the court finds that the facts set forth below are relevant to the issue **[*6]** at hand.

On March 21, 1985, the agreement between the plaintiff's representatives and MLPF & S was executed. That agreement is in a printed form designated as the "Cash Management Account Agreement for Pension and Profit Sharing Plans." The agreement provides that the cash management account program offers an itemized financial service that links together three components: a securities account for the buying and selling of stocks, bonds and the like, a choice of money accounts and a check/card account. With respect to the securities account, the agreement states expressly that MLPF & S does not and will not have any discretionary authority or control over the plaintiff's investments and that MLPF & S will not serve as a primary and regular advisor regarding the plaintiff's investment decisions.

According to the agreement, cash accumulating in the securities account is to be automatically invested by MLPF & S into shares of the money account chosen by the plaintiff. No fees or commissions are to be charged for purchase or redemptions of money account shares. An unspecified affiliate of MLPF & S, however, will receive a fee for acting as investment advisor to each of the money **[*7]** funds.

The check/card account requires that a bank approval by MLPF & S accept the plaintiff's application to open an account. Checks drawn on such account will be honored to the extent of available funds in the securities account and in the designated money account.

John Ruby, in his affidavit, says that the cash management account agreement with MLPF & S was entered into prior to and in connection with the establishment by the plaintiff of an investment advisory agreement with MLAM. The cash management account agreement, however, does not mention or refer in any way to the investment advisory agreement or to MLAM. One provision of the cash management account agreement is that the plaintiff at any time, may withdraw any uninvested balance from its securities account upon notifying its account executive to MLPF & S by telephone or letter.

The agreement with MLAM was signed on June 5, 1985. Like the agreement between the plaintiff's representatives and MLPF & S, the MLAM contract is also a printed form. Pursuant to its terms, MLAM became the plaintiff's investment advisor and the manager of the securities in the plaintiff's portfolio. This agreement is nondiscretionary. The **[*8]** defendant, Edmund C. Hyland, described a nondiscretionary account as one in which the manager decides that investments should be bought and sold but before any transaction can be executed, approval of the customer must be obtained.

In the MLAM agreement several references to MLPF & S have been typed in. One clause directs that all transactions be carried out through MLPF & S as broker dealer in account 887-058967-05896 which is the number assigned to the plaintiff's cash management account. In another clause, the plaintiff directs that MLPF & S shall act as custodian of the assets of the portfolio. The affiliation of MLAM and MLPF & S is mentioned throughout the agreement and, in a third clause, the plaintiff authorizes MLAM to establish accounts with other securities dealers if transactions with its affiliate are prohibited by the (federal) Employee Retirement

Income Security Act.

It is the MLAM agreement that in addition to establishing the relationship between the plaintiff and MLAM, also imposes obligations on the part of both MLAM and the plaintiff to MLPF & S. Pursuant to the agreement, MLAM is appointed as the plaintiff's agent and attorney-in-fact to buy,sell or otherwise **[*9]** effect transactions in stocks, bonds and other securities for the plaintiff's account and in its name. This broad grant of authority is qualified, however, by another provision whereby before placing any orders for the plaintiff's account, MLAM is to obtain the plaintiff's consent. In fact, the only disagreement between the written contract and Mr. Hyland's description of a nondiscretionary account is that the written contract provides that consent does not have to be obtained if the investment is in a money market account or the action to be taken is ministerial in nature.

The agreement between the plaintiff and MLAM contains references to the affiliated status of MLAM and MLPF & S n4 but also to the independence of each corporation. MLAM is hired to give advice as to what securities should be bought or sold for the plaintiff's retirement account. MLPF & S is to act as the broker in such transactions and as custodian of the securities in the plaintiff's portfolio. The plaintiff's contract with MLAM provides that at no time shall MLAM have physical control of any of the assets of the portfolio. A specific provision in the contract between the plaintiff and MLAM is that notwithstanding **[*10]** its affiliation with MLPF & S, MLAM "is exclusively responsible for the performance of its duties and any liabilities to the [plaintiff] arising under this agreement or otherwise."

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n4 The agreement states that MLAM is a subsidiary of Merrill Lynch & Co., Inc., and an affiliate of Merrill Lynch, Pierce, Fenner & Smith.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

I.

Generally, HN1 whether parties to a contract have agreed to arbitrate their disputes presents a question of fact. A.T. & T. Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 6649, 206 S. Ct. 1415, 89 L. Ed. 2d 648 (1986). A. Dubrevil & Sons, Inc. v. Lisbon, 215 Conn. 604, 608 (1990). The plaintiff, however, has raised two defenses to the requested arbitration that the court interprets as defenses in law. First, the plaintiff claims that the method chosen to raise the arbitration question - a motion to compel arbitration and stay proceedings - is an improper procedure. n5 Second, **[*11]** the plaintiff contends that its CUSA claims in the third count of the complaint, as a matter of law, can be tried only in a "judicial" forum.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n5 In this section of the plaintiff's brief, the word "forget" has been handwritten. But the plaintiff pressed the claim of improper procedure in oral argument.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

Regarding these claims and other issues, the plaintiff and the Merrill Lynch defendants seemingly have agreed that their dealings affect interstate commerce and come under the Federal Arbitration Act (F.A.A.), 9 U.S.C. § 1-14, inclusive. Section 2 n6 of the F.A.A.

embodies a substantive rule applicable in state as well as federal courts, whereby Congress acting under the Commerce Clause n7 foreclosed state legislatures from undercutting the forceability of arbitration agreements. Southland Corporation v. Keating, 465 U.S. 1, 16, 104 S. Ct. 582, 79 L. Ed. 2d (1984). But the F.A.A. contains no express preemptive provision **[*12]** nor does it reflect a congressional intent to occupy the entire field of arbitration. Volt Info Sciences v. Board of Trustees of the Leland Stanford University, 487 U.S. 468, 477, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989). Therefore, even when the F.A.A.is applicable, state law still may be utilized in arbitration matters subject to preemption only to the extent of an actual conflict with federal law. Fahnestock & Co., Inc. v. Waltman, 935 F. 2d 512 (2d Cir.) cert. denied 112 S. Ct. 380, 116 L. Ed. 2d 381 (1991). Specifically, the procedures outlined in § 4 of the F.A.A. for raising the question of whether an agreement is arbitrable apply only to actions in the federal district courts. Southland Corporation v. Keating, supra at 16 and n. 10.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 The precise language of § 2, 9 U.S.C. § 2, is as follows: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration or controversy thereafter arising out of such contract or transaction or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration in existing controversy arising out of such a contract, transaction or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist or in equity for the revocation of any contract." **[*13]**

n7 U.S. Const. art. I § 8.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The plaintiff's objection to the motion of the Merrill Lynch defendants concerns Gen. Stat. § 52-410. n8 Under that section, anapplication for an order of arbitration is supposed to be initiated by a writ of summons and a complaint. Instead of using § 52-410, the Merrill Lynch defendants followed § 52-409, which states that if an action is brought by a party to a written agreement to arbitrate, the court, on motion by any party to the agreement, may stay the action until an arbitration has been had.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 The parties appear to have forgotten that the cash management account agreement between the plaintiff and MLPF & S specifies that it "shall be governed by and construed in accordance with the laws of the State of New York." No analysis of New York law has been offered to the court.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In Zarchen v. Union Equipment Co., 20 Conn. Sup. 44, 45 (1956), **[*14]** the requirements of a summons and complaint were determined to be mandatory. Zarachen, however, was a situation where the movant for arbitration was the plaintiff who had brought the suit. Of more recent date is KND Corporation v. Hartcom, Inc., 5 Conn. App. 333, 336-37 (1985) where the Appellate Court said "it would make little sense to require a party being sued to initiate an [§ 52-410] action" and sanctioned a § 52-409 motion when the issue of arbitration

Get a Document - by Citation - 1992 Conn. Super. LEXIS 3388 Page 7 of 10

Case 3:02-cv-00188-JBA    Document 95-3    Filed 02/11/2005    Page 10 of 20

was injected into a case by a defendant. The decision in KND Corporation v. Hartcom, Inc. prevents the court from considering Zarchen v. Union Equipment Co. as persuasive authority.

The plaintiff's second point is that similarity in language between the Connecticut Uniform Securities Act (CUSA) and federal securities legislation should mean that arbitration of the CUSA cause of action is prohibited Apparently, the source for this argument is Wilko v. Swan, 346 U.S. 427, 434, 74 S. Ct. 182, 98 L. Ed. 18 (1953), wherein a section of the Securities Act of [*15] 1933, 15 U.S.C. § 77n invalidating any stipulations waiving the Act's provisions was interpreted to prohibit the operation of a predispute arbitration clause. More than thirty years later, however, in Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 234, 107 S. Ct. 2332, 96 L. Ed. 2d 185 reh. denied 483 U.S. 1056, 108 S. Ct. 31 (1987) the Supreme Court refused to place the same construction on essentially identical language in the Securities Exchange Act of 1934, 15 U.S.C. § 78cc (a). And, in Rodriguez De Quijas v. Shearson/American Express, Inc., 109 S. Ct. 1917, 1922 (1989), Wilko v. Swan was overruled. At the present time, no federal statute prevents or renders ineffective a predispute arbitration agreement between a broker and an investor.

Obviously, Rodriguez De Quijas v. Shearson/American Express, Inc., supra is controlling authority for the present controversy. That decision was issued on May 15, 1989, two and one-half months [*16] before the Colonial Diversified Zero Coupon bonds were purchased. Further, the decision is retroactive, 109 S. Ct. at 1922. If the motion to compel arbitration rests on sound grounds, neither of the two foregoing claims provides an effective reason to deny it.

II.

HN2 Arbitration is a creature of contractQ. A person cannot be compelled to arbitrate a dispute unless he has agreed to do so. A. T. & T. Technologies, Inc. v. Communications Workers, 475 U.S,. 643, 648, 106 S. Ct. 1415, 89 L. Ed. 2d 648, 655 (1986) (quoting Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S. Ct. 1347, 4d Ed. 2d 1409 (1960)). The question of what persons or entities are bound by an arbitration agreement affecting interstate commerce is, as previously stated, one of federal law. Since the question involves general concepts of contracts and agency, federal courts have looked to state law in determining what the federal law of contracts or agency is or should be. Flink v. Carlson, 856 F. 2d 44, 46 and n. 3 (8th Cir. 1988). [*17] Questions concerning arbitrability, however, are to be examuined from the point of view that favors arbitration. Mitsubishi Motors Corporation v. Soler Chrysler - Plymouth, Inc., 473 U.S. 614, 626, 105 S. Ct. 3346, 87 L. Ed. 444 (1985).

Here, of course, the dispute as to arbitrability is between the plaintiff, a signatory to a contract containing an arbitration clause, and four non-signatories, Merrill Lynch & Co., MLAM, MLPF & S' vice-president Genung and MLAM's vice-president Hyland. The non-signatories predicate the claim for arbitration upon their relationship with MLPF & S the other signatory.

In certain situations, courts have deemed non-signatories to a contract containing an arbitration clause to be parties to the contract for purposes of the F.A.A... Merrill Lynch Commodities, Inc. v. Richall Shipping Corporation, 581 F. Supp. 933, 940 (S.D.N.Y. 1984). These instances are principally an agency relationship between a signatory and a non-signatory as was found in Okcuoglu v. Hess, Grant & Co., Inc., 580 F. Supp. 749, 751-52 (E.D. Pa. 1984), [*18] or a contract whereby the non-signatory was made a third party beneficiary as in Cauble v. Mabon Nugent & Co., 594 F. Supp. 985, 992 (S.D.N.Y. 1989) or where the non-signatory is, in effect, the alter ego of a signatory, see Fisser v. International Bank, 282 F. 2d 231, 234 and n. 6 (2d Cir. 1960) or where the contract incorporated by reference another contract to which the non-signatory is a party. Cianbro Corporation v.

Empressa Nacional de Ingenieria y Technologia, S.A., 697 F. Supp. 15, 18 (D. Me. 1988). All of these cases were decided on their own peculiar facts and with a view of ascertaining the intent of the contracting parties. The intent of the contracting parties becomes all-important when a non-party seeks to take advantage of the contractual language. See Mowbray v. Moseley, Hallgarten, Estabrook & Weeden, 759 F. 2d 1111, 1117 (1st Cir. 1986).

Okcuoglu v. Hess, Grant & Co., Inc., supra was decided upon the relationship that the introducing broker had with both the customers and the clearinghouse [*19] brokers. The introducing broker approved the customer for options trading through one clearinghouse, thus acting as that clearinghouse's agent and was authorized by the customers to execute the form by which their options trading was continued at the second clearinghouse. The forms used by both clearinghouses contained arbitration clauses and the introducing broker was permitted to invoke each of them as agent for the first clearinghouse and as agent for the customers when the form of the second clearinghouse was signed.

In Cauble v. Mabon Nugent & Co., supra the futures contract between the customer and the clearinghouse broker contained a clause that if the customer's account did not contain the amount of margin required, the broker could without notice liquidate the customer's open positions or take what other action it deemed necessary. Cauble was a situation where, although the customer's account was nondiscretionary, the introducing broker had supervision over the account including authority to collect margins for the clearinghouse broker who did nothing more than clear trades. The court in Cauble, was of the opinion that the services [*20] rendered by the introducing broker of which the customer and clearinghouse broker were fully aware, shared an interest in their part to regard the introducing broker as a third party beneficiary so that it too could sell the customer's interests if proper margins were not maintained.

Differences exist between the two decisions supporting an agency or third party beneficiary status for the so-called introducing broker n9 and the present case. Previously noted was the omission in the plaintiff's contract with MLPF & S of any reference to MLAM. Some courts have found that such omission alone is indicative of an intent not to include the advising broker in the arbitration agreement between the customer and clearinghouse broker. See Wilson v. D.H Blair, 731 F. Supp. 1359, 1362 (N.D. Ind. 1990). Parenthetically nothing in John Ruby's affidavit rebuts this inference. Moreover the differences appear in the plaintiff's agreement with MLAM as the following facts show. In that contract the plaintiff agreed to indemnify MLPF & S for any loss or damage sustained as a result of following MLAM's instructions. MLAM itself, however, would be liable, according [*21] to the contract for losses to the plaintiff that were caused through its negligent, willful or reckless misconduct or its violation of some applicable law. By virtue of its agreement, MLAM became substituted for the plaintiff in dealing with MLPF & S. But this status is not indicative of an intent to include MLAM and other Merrill Lynch defendants in the arbitration clause of the previously executed MLPF & S agreement. McPheeters v. McGinn, Smith & Co., Inc., 953 F. 2d 771 (2d Cir. 1992) Especially so, in this case, where the defendant Hyland, who managed the plaintiff's account at MLAM, testified in deposition that he had never seen the plaintiff's agreement with MLPF & S before.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n9 The Merrill Lynch defendants object to the plaintiff's reference to MLAM as an introducing broker. In the scheme of cases, however, that is what MLAM appears to be.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

The Merrill Lynch defendants do not claim to be alter egos of each other. HN3 For a court to

Get a Document - by Citation - 1992 Conn. Super. LEXIS 3388 Page 9 of 10

Case 3:02-cv-00188-JBA   Document 95-3   Filed 02/11/2005   Page 12 of 20

be able to find that one party is the alter **[*22]** ego of another, there must be proof of control in the case of a corporation not mere majority or even complete stock control, but complete domination, not only of finances, but of policy and business practices respecting to the transaction at issue so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own. Fisser v. International Bank, 202 F. 2d 231, 238 (2d Cir. 1960); Coastal States Trading, Inc. v. Zenith Navigation S.A., 446 F. Supp. 330, 336-37 (S.D.N.Y. 1977); see Dighello v. Busconi, 673 F. Supp 85-87 (D. Conn. 1987) aff'd mem. 849 F. 2 1487 (2d Cir 1988).

Only obliquely do the Merrill Lynch defendants argue for incorporation by reference of the plaintiff's agreement with MLPF & S into the plaintiff's agreement with MLAM. The court rejects the argument. The MLAM agreement purports to appoint MLPF & S as the closing broker and designates the plaintiff's account with MLPF & S by number. These acts had already happened as a result of the plaintiff's agreement with MLPF & S. In any event, **[*23]** a recital of some previously accomplished items is not sufficient evidence of an intention to incorporate by reference the provisions of one agreement into the other. See Ciambro Corporation v. Empressa Nacional de Ingenieria y Technologia, supra at 18; Coastal States Trading, Inc. v. Zenirh Navigation, S.A., supra at 338.

The principal contention of the Merrill Lynch defendants is that the arbitration claim is sufficiently broad to encompass the plaintiff's claims against all of them in that the transaction giving rise to the suit arose out of the business of MLPF & S. Again, the court must disagree. The wordage in question is "the undersigned agrees that any controversy existing out of the business of MLPF & S or this agreement shall be submitted to arbitration." When the account was executed the duties as well as the business of MLPF & S was to buy and sell securities as the plaintiff and subsequently MLAM requested. In the agreement, MLPF & S precluded itself from exercising discretionary authority or giving advice. A review of the amended complaint shows the gravamen of the plaintiff's suit to be lack of proper advice, lack **[*24]** of informed consent and improper management of the plaintiff's portfolio. If these allegations are proved, MLAM, at least, will be liable because of the functions assigned to it in its contract with the plaintiff. In the court's view, the arbitration clause does not encompass MLAM's functions and does not extend beyond MLPF & S and Frederick M. Genung, its vice-president. See McPreeters v. McGinn, Smith & Co., Inc., supra at 773; Mowbray v. Mosley, Hallgarten, Estabrook & Weeden, supra at 1117.

To be sure some of the plaintiff's allegations, particularly those concerning agency, go against its present opposition to arbitration. See J.J. Ryan & Sons, Inc. v. Rhone Poulewc Textile, S.A., 863 F. 2d 315, 320-21 (4th Cir. 1988). On the issue of arbitrability, however, the Merrill Lynch defendants are the proponents with the burden of persuasion. Except for the obvious situations of MLPF & S and Genung, the burden was not satiasfied.

III.

The F.A.A. requires that arbitrable claims be severed from non-arbitrable claims even though such action will promote piece-meal resolution. Dean Whitter Reynolds v. Byrd, 470 U.S. 213, 221, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985). **[*25]** The motion to compel arbitration and stay proceedings is therefore granted to the extent of the plaintiff's claims against MLPF & S and Frederick M. Genung. The claims ruled arbitrable, however, are themselves stayed until completion of the trial of the non-arbitrable claims. In this way the court seeks to prevent the arbitration hearing from having any preclusive effect on the litigation of the nonarbitrable claims. See Dean Whitter Reynolds v. Bird, supra at 222-223.

BARNETT, J.

Get a Document - by Citation - 1992 Conn. Super. LEXIS 3388  Page 10 of 10

Case 3:02-cv-00188-JBA   Document 95-3   Filed 02/11/2005   Page 13 of 20

Service: **Get by LEXSEE®**
Citation: **1992 conn super lexis 3388**
View: Full
Date/Time: Friday, February 11, 2005 - 11:49 AM EST

* Signal Legend:
- ● - Warning: Negative treatment is indicated
- ▲ - Caution: Possible negative treatment
- ◆ - Positive treatment is indicated
- Ⓐ - Citing Refs. With Analysis Available
- ⓘ - Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 10980 Page 1 of 8

Case 3:02-cv-00188-JBA    Document 95-3    Filed 02/11/2005    Page 14 of 20

Service: **Get by LEXSEE®**
Citation: **2001 us dist lexis 10980**

*2001 U.S. Dist. LEXIS 10980, \**

DANA TUSKEY, Plaintiff, -v.- VOLT INFORMATION SCIENCES, INC., VOLT SERVICES GROUP, STEVE SHAW, LOUISE ROSS AND JOHN SEXTON, each in their official and individual capacities, Defendants.

00 Civ. 7410 (DAB) (GWG)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2001 U.S. Dist. LEXIS 10980

August 3, 2001, Decided
August 3, 2001, Filed

**DISPOSITION:** [\*1] Defendants' motion to compel arbitration and to stay action granted.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employee brought suit against defendants company and its officials and claimed employment discrimination. The company and its officials moved to compel arbitration of the employee's claims pursuant to the Federal Arbitration Act, 9 U.S.C.S. § 1 et seq., and to stay the action pending the outcome of the arbitration. The company and its officials also sought to strike the employee's jury demand.

**OVERVIEW:** Plaintiff employee filed a charge of sex discrimination with the Equal Employment Opportunity Commission (EEOC). After the employee filed the charge, defendants company and its officials terminated her employment. The employee received a right to sue letter from the EEOC. The employee brought an employment discrimination action against the company and its officials. The employee had entered into an employment agreement that contained an arbitration provision. The company and its officials filed a motion to compel arbitration, to stay the proceedings pending its outcome, and to strike the employee's jury demand. The court found that the employee's allegations that she did not understand the agreement or had no opportunity to negotiate the clause were irrelevant. The employee's argument that the employment agreement was superseded by the amendment was frivolous. The language of the arbitration clause was clear that any dispute arising out of the employee's employment or the termination of employment would be resolved by final and binding arbitration. The Federal Arbitration Act, 9 U.S.C.S. § 1 et seq. did not exclude employment contracts from the scope of arbitrable claims.

**OUTCOME:** Defendants' motion to compel arbitration and to stay action was granted.

**CORE TERMS:** employment agreement, arbitration, arbitration clause, compel arbitration, arbitrable, Federal Arbitration Act, motion to compel arbitration, arbitration agreement, agreement to arbitrate, arbitrate, arbitrator, conclusively presumed, et seq, referable, termination, collective bargaining agreement, sufficient consideration, stay proceedings, enforceability, subjective, relevance, frivolous, negotiate, concede, assent, binding arbitration, claim arising, modify

**LexisNexis(R) Headnotes** ✦ Hide Headnotes

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 10980　　　　　　Page 2 of 8

Case 3:02-cv-00188-JBA　　Document 95-3　　Filed 02/11/2005　　Page 15 of 20

Civil Procedure > Entry of Judgments > Stay of Proceedings & Supersedeas
**HN1** A motion to stay an action and compel arbitration is not a motion for dispositive relief as set forth in 28 U.S.C.S. § 636(b)(1)(A). Accordingly, such a motion maybe decided by a magistrate judge. More Like This Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Enforcement
Civil Procedure > Entry of Judgments > Stay of Proceedings & Supersedeas
**HN2** See 9 U.S.C.S. § 3.

Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Enforcement
Civil Procedure > Entry of Judgments > Stay of Proceedings & Supersedeas
**HN3** The following four factors apply in determining whether or not a court should stay an action and compel arbitration under the Federal Arbitration Act, 9 U.S.C.S. § 1 et seq.: (1) the court must determine whether the parties agreed to arbitrate; (2) it must determine the scope of the agreement; (3) if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and (4) if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration. If the four factors are answered in the affirmative, the court must grant the application to stay the proceedings and compel the arbitration. More Like This Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Enforcement
Contracts Law > Contract Interpretation > Interpretation Generally
**HN4** Arbitration agreements are to be interpreted under federal law, which comprises generally accepted principles of contract law. Contract law is clear that parties are conclusively bound by the contracts they sign whether or not the party has read the contract as long as there is no fraud, duress or some other wrongful act of the other party. Those same principles have been applied to arbitration clauses. More Like This Headnote

Contracts Law > Consideration > Adequate Consideration
**HN5** Continued employment is adequate consideration for agreements entered into by the parties after employment has commenced. More Like This Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Limits
**HN6** Claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq. are arbitrable. More Like This Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Limits
**HN7** The Federal Arbitration Act, 9 U.S.C.S. § 1 et seq. does not exclude employment contracts from the scope of arbitrable claims. More Like This Headnote

Civil Procedure > Entry of Judgments > Stay of Proceedings & Supersedeas
**HN8** Section 3 of the Federal Arbitration Act, 9 U.S.C.S. § 1 et seq. provides that the district court shall stay the trial of an action brought upon any issue referable to arbitration under an agreement in writing for such arbitration. 9 U.S.C.S. § 3. More Like This Headnote

**COUNSEL:** For Plaintiff: Daniel Cherner, Esq., LAW OFFICES OF DANIEL CHERNER, New York, New York.

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 10980 Page 3 of 8

Case 3:02-cv-00188-JBA    Document 95-3    Filed 02/11/2005    Page 16 of 20

For Volt Information Sciences, Inc., Volt Services Group, Louise Ross, Defendants: Sharon H. Stern, Esq., JENKINS & GILCHRIST PARKER CHAPIN LLP, New York, New York.

**JUDGES:** GABRIEL W. GORENSTEIN, United States Magistrate Judge.

**OPINIONBY:** GABRIEL W. GORENSTEIN

**OPINION:** OPINION AND ORDER

GABRIEL W. GORENSTEIN, United States Magistrate Judge

The defendants in this employment discrimination case have moved to compel arbitration of the plaintiff's claims pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq., and to stay this action pending the outcome of the arbitration. They also seek to strike the plaintiff's jury demand. For the reasons stated below, the defendants' motion to compel arbitration and stay proceedings is granted. Thus, the Court need not reach the request to strike the jury demand. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 While the parties have not raised the issue, the Court notes that HN1 a motion to stay an action and compel arbitration is not a motion for dispositive relief as set forth in 28 U.S.C. § 636(b)(1)(A). Accordingly, such a motion maybe decided by a Magistrate Judge. See, e.g., Touton, S.A. v. M.V. Rizcun Trader, 30 F. Supp. 2d 508, 510 (E.D. Pa. 1998); Herko v. Metropolitan Life Ins., 978 F. Supp. 149, 150 (W.D.N.Y. 1997).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*2]

FACTUAL BACKGROUND

Plaintiff Dana Tuskey brought this action seeking relief under Title VII, 42 U.S.C. § 2000e et seq.; the New York State Human Rights Law, New York Exec. Law § 296 et seq.; and common-law claims of breach of contract and intentional infliction of emotional distress. All of Tuskey's claims relate to her employment with Volt Information Sciences, Inc ("Volt").

The complaint alleges that Tuskey was first employed by Volt in March 1998. Complaint P 9. Volt is a corporation listed on the New York Stock Exchange and is engaged in the business of providing, among other things, technical and clerical services in a consulting capacity to other businesses. Id. P 4. Tuskey's first position at Volt was as a technical recruiter in its Advanced Technology Services ("ATS") division of Volt. Id. P 10. Sometime during November or December 1998, Tuskey was made Branch manager of Volt's ATS division office located in Woodbridge, New Jersey. Id. P 12.

Shortly after being promoted to the Branch Manager position, Tuskey entered into an employment agreement with Volt in connection with her position as Branch Manager. See Affidavit [*3] of Dana Tuskey in Support of Plaintiff's Opposition to Defendant's Motion to Compel Arbitration dated March 20, 2001 at P 2 (hereinafter, "Tuskey Aff."). The employment agreement contained the following arbitration provision:

> 7. AGREEMENT TO ARBITRATE DISPUTES.
>
> Any dispute, controversy or claim arising out of, involving, affecting or related to

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 10980

Page 4 of 8

Case 3:02-cv-00188-JBA   Document 95-3   Filed 02/11/2005   Page 17 of 20

this Agreement, or breach of this Agreement, or arising out of, involving or related in any way to your employment or the conditions of your employment or the termination of your employment, including but not limited to disputes, controversies or claims arising out of or related to the actions of the Company's other employees, under Federal, State and/or local laws, shall be resolved by final and binding arbitration in accordance with the applicable rules of the American Arbitration Association in the state where you are or were last employed by the Company. The arbitrator shall be entitled to award reasonable attorneys' fees and costs to the prevailing party. The award shall be in writing, signed by the arbitrator, and shall provide the reasons for the award. Judgment upon the arbitrator's award may be filed in and enforced by **[*4]** any court having jurisdiction. This Agreement to Arbitrate Disputes does not prevent you from filing a charge or claim with any governmental agency as permitted by applicable law.

See Employment Agreement Letter dated December 16, 1998, P 7 (hereinafter "Employment Agreement"), reproduced as Exhibit B to Affidavit of Howard B. Weinreich in Support of Defendants' Motion to Compel Arbitration and Stay Action, dated February 16, 2001 (hereinafter, "Weinreich Aff."). Tuskey signed the Agreement on December 21, 1998. Employment Agreement at 8.

Tuskey signed an additional document concerning her employment with Volt on July 27, 1999. See Amendment Number 1, dated June 20, 1999 (Annexed as Exhibit A to Tuskey Aff.) (hereinafter "Amendment"). The Amendment was denominated "amendment Number 1" to the Employment Agreement. Id. at 1. It states that it "modifies" only "Paragraph 17 of the [Employment Agreement]." Amendment at 1. Following this statement are a number of terms that relate exclusively to Tuskey's compensation. Amendment at 1-2. Paragraph 17 of the original Employment Agreement also relates exclusively to compensation.

On February 11, 2000, Tuskey filed a charge **[*5]** of sex discrimination and retaliation with the EEOC. Complaint P 46. Subsequent to the filing of this charge, Volt terminated Tuskey's employment. Id. P 47. On July 3, 2000, Tuskey received a right to sue letter from the EEOC. Id. P 48. On September 29, 2000, Tuskey filed her Complaint in this case. Each factual allegation relates to her employment and termination at Volt.

On April 18, 2001, the defendants filed their motion to compel arbitration, to stay these proceedings pending its outcome, and to strike the plaintiff's jury demand.

DISCUSSION

I. MOTION TO COMPEL ARBITRATION

*HN2* The Federal Arbitration Act provides that

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default **[*6]** in

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 10980                    Page 5 of 8

Case 3:02-cv-00188-JBA    Document 95-3    Filed 02/11/2005    Page 18 of 20

proceeding with such arbitration.

9 U.S.C. § 3. **HN3** The following four factors apply in determining whether or not a court should stay an action and compel arbitration under the Federal Arbitration Act:

> First, [the Court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of the agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration.

Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 844 (2d Cir. 1987) (internal citations omitted). If the four factors are answered in the affirmative, the Court must grant the application to stay the proceedings and compel the arbitration. See, e.g., PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1198 (2d Cir. 1996).

Tuskey has not challenged the applicability of the second and fourth factors. Accordingly, we will examine only (1) the agreement to arbitrate and (2) whether [*7] the claims are arbitrable.

A. Agreement to Arbitrate

As previously described, the Employment Agreement signed by Tuskey contained an "Agreement To Arbitrate Disputes" clause. Employment Agreement P 7. In her response to the defendants motion and the accompanying affidavit, Tuskey does not contest that she signed the Employment Agreement. Rather, she appears to make three arguments to avoid its effect: (1) that the arbitration agreement is unenforceable because she did not understand it and it was never explained to her, see Tuskey Aff., PP 3, 5, 8; Plaintiff's Memorandum of Law In Opposition to Defendants' Motion to Compel Arbitration and Stay the Action or Alternative, to Strike the Jury Demand (hereinafter, "Plaintiff's Memorandum") at 5-6; (2) that the Employment Agreement was nullified by the Amendment, Plaintiff's Memorandum at 7-8; and (3) that the arbitration agreement did not contain "any specific waiver [of her statutory right to sue] as contemplated by the courts." Plaintiff's Memorandum at 5.

1. Enforceability of the Arbitration Agreement. With respect to the enforceability of the Employment Agreement, Tuskey makes numerous assertions in her affidavit that [*8] she did not "understand" the agreement, Tuskey Aff., PP 5, 8; that it was never "properly explained" to her, id. P 3; that she did not "have the opportunity to negotiate any of [its] terms" or "consult with an attorney," id. PP 4, 5; and that she was "told" she "had to" sign it, id. P 7. In her memorandum of law, however, Tuskey never makes clear why she believes those assertions are relevant. She states only that "there was no level playing field here" and seems to analogize her situation to those cases holding that an employee cannot be bound by an agreement to arbitrate that has never been ratified by an employee because it is contained in a collective bargaining agreement. See Plaintiff's Memorandum at 5. Tuskey cites to just two cases in support of her argument on this point: Bird v. Shearson

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 10980　　　　　　　　　　　Page 6 of 8

Case 3:02-cv-00188-JBA　　Document 95-3　　Filed 02/11/2005　　Page 19 of 20

Lehman/American Express, Inc., 926 F.2d 116 (2d Cir. 1991), and Genesco, supra. See Plaintiff's Memorandum at 5. These cases, however, have no relevance to her argument. Bird rejected an effort to avoid an arbitration agreement and Genesco enforced an agreement that had not even been signed by the party against whom it was being [*9] enforced.

As Genesco notes, HN4 arbitration agreements are to be interpreted "under federal law, which comprises generally accepted principles of contract law." Genesco, 815 F.2d at 845. Contract law is clear that parties are "conclusively" bound by the contracts they sign whether or not the party has read the contract as long as there is no fraud, duress or some other wrongful act of the other party. See, e.g, State Bank of India v. Star Diamonds, Inc., 901 F. Supp. 177, 179 (S.D.N.Y. 1995) (party is legally bound by his or her signature to a contract and is conclusively presumed to know its contents and to assent to them); Maines Paper and Food Service Inc. v. Adel, 256 A.D.2d 760, 761, 681 N.Y.S.2d 390 (3d Dep't 1998) (holding that the rule applies even where the plaintiff suffers from "an inability to understand the English language") (citing cases); Freda v. McNamara, 254 A.D.2d 251, 252-53, 678 N.Y.S.2d 135 (2d Dep't 1998) (plaintiff was bound by papers signed by him even though they were not explained to him); Schmidt v. Magnetic Head Corp., 97 A.D.2d 151, 157, 468 N.Y.S.2d 649 (2d Dep't 1983) [*10] (party's subjective knowledge of the contents of a contract at the time he signs it is irrelevant).

These same principles have been applied to arbitration clauses. See, e.g., Hart v. Canadian Imperial Bank of Commerce, 43 F. Supp. 2d 395, 405 (S.D.N.Y. 1999) ("plaintiff's subjective knowledge of the scope of the arbitration clause is irrelevant and he is presumed to have agreed to all the terms of the contract") (citing cases); Smith v. Lehman Bros., Inc., 1996 U.S. Dist. LEXIS 9485, *4, 1996 WL 383232 at *1 (S.D.N.Y. July 8, 1996) (plaintiff's assertion that he was not aware of arbitration clause does "not constitute economic duress, coercion, or fraud, [because he] is conclusively presumed to have assented to submit his claims to arbitration"); Maye v. Smith Barney Inc., 897 F. Supp. 100, 108 (S.D.N.Y. 1995) ("one who signs or accepts a written contract . . . is conclusively presumed to know its contents and assent to them") (citations and internal quotation marks omitted); Hall v. Metlife Resources/Div. of Metro. Life Ins. Co., 1995 U.S. Dist. LEXIS 5812, 1995 WL 258061, at *2-3 (S.D.N.Y. May 3, 1995) (arbitration clause binding where plaintiffs claimed in affidavits [*11] that they were unaware that forms they signed contained arbitration clauses). Thus, Tuskey's allegations that she did not "understand" the agreement or had no opportunity to negotiate the clause are irrelevant. This is all the more so in a case where the plaintiff herself alleges she was a capable, well-paid professional hired for managerial positions with significant job responsibilities. See Complaint PP 11-14; Amendment at 1-2.

2. Effect of the Amendment. Tuskey also argues that the Employment Agreement was superseded by the Amendment, which does not contain an arbitration clause. See Plaintiff's Memorandum at 7-8; Tuskey Aff., PP 9-10. This argument is frivolous. The Amendment states that it "constitute[s] amendment Number 1 . . . to your Employment Agreement dated December 16, 1998" and that "Paragraph 17 of the Agreement is modified" by the contents of the Amendment. Amendment at 1 (emphasis added). As noted, the contents of the Amendment relate exclusively to Tuskey's compensation, which was also the topic of paragraph 17 of the Employment Agreement. Nowhere does the Amendment purport to supersede or modify the other 17 paragraphs of the Employment Agreement, [*12] which included the arbitration clause.

3. Plaintiff's Waiver. Finally, Tuskey argues that "the arbitration clause in this case does not contain any specific waiver as contemplated by the courts," Plaintiff's Memorandum at 5, arguing that "it contains a general, boilerplate provision which really carries no meaning whatsoever." Id. at 5-6. This argument is also frivolous. Tuskey is apparently referring to the Supreme Court's decision in Wright v. Universal Maritime Serv. Corp., 525 U.S. 70, 142 L. Ed. 2d 361, 119 S. Ct. 391 (1998), in which the Court held that it would not "infer from a general contractual provision that the parties intended to waive a statutorily protected right

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 10980    Page 7 of 8

Case 3:02-cv-00188-JBA    Document 95-3    Filed 02/11/2005    Page 20 of 20

unless the undertaking is 'explicitly stated.'" Id. at 80 (citing cases). See Plaintiff's Memorandum at 4-5. Wright, however involved a clause in a collecting bargaining agreement that provided for arbitration only of "matters under dispute," which Wright noted could refer merely to matters disputed under the collective bargaining agreement. 525 U.S. at 80. Here, by contrast, the language of the arbitration clause is absolutely clear that "any **[*13]** dispute, controversy or claim arising out of, involving, affecting or related in any way to [Tuskey's] employment . . . or the termination of [Tuskey's] employment" would be resolved by "final and binding arbitration." Employment Agreement P 7. It would be difficult to imagine a clearer and more specific agreement to arbitrate. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 Tuskey's additional allegation that the Employment Agreement was not given to her until nine months after she was first employed by Volt, Tuskey Aff. at P 2, is similarly unavailing. Tuskey does not explain the legal relevance of this fact to the arbitrability of her claims. To the extent that her argument can be construed as a claim that there was lack of consideration for her promise to arbitrate, Tuskey's submissions concede that she continued her employment following the signing of the Employment Agreement. See Complaint PP 30-46; Tuskey Aff. P 9, 10. *HN5* Continued employment is adequate consideration for agreements entered into by the parties after employment has commenced. See Zellner v. Stephen D. Conrad, M.D., P.C., 183 A.D.2d 250, 256, 589 N.Y.S.2d 903 (2d Dep't 1992) (continued employment is sufficient consideration for covenant not to compete signed after employment had already commenced); cf. Andre v. Gaines Berland, Inc., 1996 U.S. Dist. LEXIS 9383, 1996 WL 383239 at *2 (S.D.N.Y. July 8, 1996) (continued maintenance of customer account sufficient consideration for agreement to arbitrate disputes between client and brokerage firm signed after brokerage relationship was already established).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*14]**

B. Arbitrability of Title VII Claims

The Second Circuit has ruled that *HN6* claims arising under Title VII are arbitrable. See Desiderio v. NASD, 191 F.3d 198, 206 (2d Cir. 1999); see also Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 35, 114 L. Ed. 2d 26, 111 S. Ct. 1647 (1991) (claims brought under the Age Discrimination in Employment Act are arbitrable); PriceWaterhouse-Coopers LLP v. Rutlen, 2000 U.S. Dist. LEXIS 5143, *4, 2000 WL 460478 at *2 (S.D.N.Y. April 20, 2000) ("consistent with [] federal policy . . . Title VII claims, like other federal statutory claims, are arbitrable"); Mahant v. Lehman Bros., 2000 U.S. Dist. LEXIS 16966, 2000 WL 1738399 at *3 (S.D.N.Y. November 22, 2000) (citing cases). Tuskey concedes that Desiderio is controlling authority but argues that it is "incorrect and flawed." Plaintiff's Memorandum at 3. Obviously, this Court is bound by its holding.

The plaintiff also argues that the FAA does not apply to labor and employment contracts, see 9 U.S.C. § 1 (excluding from coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce"), **[*15]** relying on Circuit City Stores, Inc. v. Adams, 194 F.3d 1070 (9th Cir. 1999). Subsequent to the filing of plaintiff's brief, however, the Supreme Court reversed the Ninth Circuit's decision in Circuit City. See Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 149 L. Ed. 2d 234, 121 S. Ct. 1302 (2001). The Court squarely held that *HN7* the FAA does not exclude employment contracts from the scope of arbitrable claims.

II. MOTION FOR STAY