Get a Document - by Citation - 2001 U.S. Dist. LEXIS 10980    Page 8 of 8

Case 3:02-cv-00188-JBA    Document 95-4    Filed 02/11/2005    Page 1 of 15

HN8 Section 3 of the Federal Arbitration Act provides that the district court shall stay the trial of an action brought "upon any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. See also McMahan Sec. Co. v. Forum Capital Markets, 35 F.3d 82, 85 (2d Cir. 1994) ("Under the Federal Arbitration Act . . ., a district court must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding."). Because the plaintiff's claims are subject to arbitration, this action must be stayed.

Conclusion

For the foregoing reasons, defendants' motion to compel arbitration and to [*16] stay this action is granted. The Clerk is requested to place the matter on the suspense calendar pending any motion to confirm the arbitrator's award.

SO ORDERED.

Dated: August 3, 2001

New York, New York

GABRIEL W. GORENSTEIN

United States Magistrate Judge

Service: **Get by LEXSEE®**
Citation: **2001 us dist lexis 10980**
View: Full
Date/Time: Friday, February 11, 2005 - 11:49 AM EST

* Signal Legend:
● - Warning: Negative treatment is indicated
▲ - Caution: Possible negative treatment
♦ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
Ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Service: **Get by LEXSEE®**
Citation: **1995 us dist lexis 15191**

*907 F. Supp. 683, \*; 1995 U.S. Dist. LEXIS 15191, \*\**

UNITED STATES OF AMERICA -against- EPHRAIM LEWIS, Defendant.

95 Cr. 300 (SAS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

907 F. Supp. 683; 1995 U.S. Dist. LEXIS 15191

October 16, 1995, Decided
October 17, 1995, FILED

## CASE SUMMARY

**PROCEDURAL POSTURE:** The government filed a recommendation that the court increase defendant's offense level for his conviction for tax evasion and for conspiracy to defraud the Internal Revenue Service and to evade taxes by two points for the use of sophisticated means pursuant to U.S. Sentencing Guidelines Manual § 2T1.1(b)(2).

**OVERVIEW:** Defendant, an accountant, participated with his accounting firm in a scheme to evade taxes. Defendant's participation persisted for eight years. The accounting firm created fictitious bank accounts in the names of bogus persons. Defendant wrote checks to these payees, and claimed deductions for the payments. The accounting firm deposited the checks, skimmed 10 percent of the payments, and paid the nondeductible expenses of defendant with the remainder. In declining the government's enhancement recommendation, the court held that this scheme was not sophisticated within the meaning of § 2T1.1(b)(2), based on that section's judicial gloss. This scheme was not sophisticated because there was no attempt to conceal defendant's identity, and defendant and the firm made no attempt to obscure the paper trail they left behind. The court acknowledged that the scheme was scaled-up and long-term, but held that these were not the hallmarks of sophistication.

**OUTCOME:** The court denied the government's recommendation that defendant's base-offense level be enhanced by two points for use of sophisticated means.

**CORE TERMS:** sophisticated, accounting firm, fictitious, tax evasion, enhancement, undertaken, shell, criminal activity, two-point, fraudulent, discovery, payees, jointly, deposited, diesel fuel, furtherance, utilized, invoices, evade, oil, guideline, participated, offshore, planning, conceal, entity, impede, reasonably foreseeable, warehouse, deposit

### LexisNexis(R) Headnotes ✦ Hide Headnotes

Criminal Law & Procedure > Sentencing > Sentencing Guidelines Generally
**HN1** The government has the burden of establishing, by a preponderance of the evidence, that a recommended sentencing enhancement applies. More Like This Headnote

Criminal Law & Procedure > Sentencing > Sentencing Guidelines Generally
**HN2** Part T of the United States Sentencing Guidelines Manual is the section addressing offenses involving taxation. The first subpart, U.S. Sentencing Guidelines Manual §

2T1.1, addresses the crime of tax evasion. The base offense level is determined by the amount of the tax loss. Next, two specific offense characteristics are defined. The second, U.S. Sentencing Guidelines Manual § 2T1.1(b)(2), states that if sophisticated means were used to impede discovery of the nature or extent of the offense, increase by two levels. U.S. Sentencing Guidelines Manual § 2T1.1, application note 6 states that: "Sophisticated means," as used in § 2T1.1(b)(2), includes conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case. An enhancement would be applied for example, where the defendant used offshore bank accounts, or transactions through corporate shells. The "Background" section of the commentary explains that although tax evasion always involves some planning, unusually sophisticated efforts to conceal the evasion decrease the likelihood of detection and therefore warrant an additional sanction for deterrence purposes. If the court determines that "sophisticated means" were used, the base offense level must be increased. More Like This Headnote

Criminal Law & Procedure > Sentencing > Sentencing Guidelines Generally

HN3 In determining specific offense characteristics, a court must consider relevant conduct, as determined on the basis of certain factors set forth at U.S. Sentencing Guidelines Manual (Guidelines) § 1B1.3. The Guidelines require a court to consider all reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense. Guidelines § 1B1.3(a)(1)(b). Guidelines § 1B1.3, application note 2 defines a "jointly undertaken criminal activity" as a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy. More Like This Headnote

Criminal Law & Procedure > Sentencing > Sentencing Guidelines Generally

HN4 Whether a scheme to evade taxes was "sophisticated" or not for the purposes of U.S. Sentencing Guidelines Manual § 2T1.1(b)(2) is essentially a question of fact. More Like This Headnote

**COUNSEL:** [**1] For EPHRAIM LEWIS (1), defendant: Robert G. Morvillo, Esq., Morvillo, Abramowitz & Grand, P.C., New York, NY.

U. S. Attorneys: Peter K. Vigeland, U.S. Attorney, New York, NY.

**JUDGES:** SHIRA A. SCHEINDLIN, U.S.D.J.

**OPINIONBY:** Shira A. Scheindlin

**OPINION:** [*684] OPINION

SHIRA A. SCHEINDLIN, U.S.D.J.

Defendant Ephraim Lewis has pled guilty to tax evasion and to conspiracy to defraud the IRS and to evade taxes. In its Presentence Report, the Probation Department has recommended that the Court increase the defendant's offense level by two points for the use of sophisticated means pursuant to U.S.S.G. § 2T1.1(b)(2). n1 The defendant opposes this recommendation. HN1 The Government has the burden of establishing, by a preponderance of the evidence, that the recommended sentencing enhancement applies.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Citations to the Sentencing Guidelines are to those in effect as of November 1, 1992 as the parties have stipulated that the 1992 Sentencing Guidelines apply.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

I. Factual Background

From 1984 through 1992, the defendant participated in a tax evasion scheme created by his accounting firm. During those years, Mr. Lewis inflated his itemized deductions, thereby evading the full amount of taxes he owed. In order [**2] to achieve this goal, the accounting firm sent Mr. Lewis schedules listing amounts and fictitious payees for checks that he was to prepare. Mr. Lewis then drew checks payable to fictitious payees as indicated on the accountants' schedules. The accounting firm then deposited these checks in the twenty-six accounts it had created in the names of these fictitious payees. The accounting firm then transferred the funds to other bank accounts, taking 10% for itself and using the remainder to pay expenses, such as credit card bills, as directed by the defendant.

By the time the scheme was uncovered, Mr. Lewis had written approximately 178 checks totalling $ 154,839.07. He then used the majority of these checks to claim fraudulent deductions. n2 For example, Mr. Lewis [*685] took a deduction of $ 2,895 on a schedule attached to his 1988 return for "commissions"; these commissions correlate to the checks that he prepared in 1988 payable to two fictitious payees. The scheme resulted in a total tax loss of approximately $ 40,000.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 The Government contends that Lewis used 88% of the total amount of checks written to the fictitious accounts to inflate his deductions. See Government Memorandum ("Gov't Mem.") at 4. Defendant contends, however, that there is little or no "matching" between the fictitious checks and the false deductions. See generally Defendant's Reply Memorandum ("Reply Mem.") at 5. Defendant points out that since the checks did not match the deductions, producing the checks would not have misled an auditor seeking support for the claimed deductions.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**3]

II. The Sophisticated Means Enhancement

HN2 Part T of the Sentencing Guidelines is the section addressing offenses involving taxation. The first subpart, § 2T1.1, addresses the crime of tax evasion. The base offense level is determined by the amount of the tax loss. Next, two specific offense characteristics are defined. The second, § 2T1.1(b)(2), states that "if sophisticated means were used to impede discovery of the nature or extent of the offense, increase by 2 levels." Application Note 6 states that:

> 'Sophisticated means,' as used in § 2T1.1(b)(2), includes conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case. An enhancement would be applied for example, where the defendant used offshore bank accounts, or transactions through corporate shells.

The "Background" section of the Commentary explains that "although tax evasion always involves some planning, unusually sophisticated efforts to conceal the evasion decrease the likelihood of detection and therefore warrant an additional sanction for deterrence purposes." If the Court determines that "sophisticated means" were used, the base offense level must be [**4] increased.

HN3 In determining specific offense characteristics, a court must consider relevant conduct, as determined on the basis of certain factors set forth at U.S.S.G. § 1B1.3. The Guidelines require a court to consider

> all reasonably foreseeable acts and omissions of others in furtherance of...jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1)(b). Application Note 2 defines a "jointly undertaken criminal activity" as "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." There is no question here that defendant's acts were taken in concert with the acts of the accounting firm. Thus, the defendant is responsible for all of the acts taken by the accounting firm in furtherance of their jointly undertaken criminal activity and all of the acts that were reasonably foreseeable in connection with that criminal activity. n3

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 This Section does not require that Lewis be held accountable for the overall tax evasion scheme perpetrated by the accounting firm. At oral argument, the Government described the scope of the full scheme to defraud. The accounting firm utilized over 150 fictitious accounts on behalf of many clients. See Transcript ("Tr") October 3, 1995 at 24. The Government further noted that this scheme has been in existence for more than thirty years. Id. at 30. Finally, when tax audits were conducted, the accounting firm produced both the escrow checks and phony invoices to support these checks. Id. Similarly, in the Presentence Report ("PSR"), the Probation Department describes conduct which does not relate to Lewis. (See, e.g., Unreported Skimming of Corporate Funds on Personal Returns (PSR at 7) and Payments Off the Books (PSR at 8)). Nonetheless, as is patently clear from the amount of loss attributed to Lewis ($ 40,000) by the Probation Department ($ 40,000 PSR at 13), he cannot be held accountable, nor judged, on the basis of the full breadth of misconduct perpetrated by the accounting firm.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**5]

III. Discussion

It is not easy to define the term "sophisticated means." Indeed, what one court views as sophisticated means may not be so viewed by another court. To some degree, then, the determination is subjective. As succinctly stated by one court, HN4 "whether the scheme was "sophisticated" or not is essentially a question of fact." United States v. Hunt, 306 U.S. App. D.C. 386, 25 F.3d 1092, 1097 (D.C. Cir. 1994).

The offense of tax evasion falls along a continuum of increasing sophistication as follows: failing to report cash income; creating and utilizing double books; inflating deductions; using numbered or offshore accounts that protect the identity of the account's owners; creating fraudulent tax shelters; establishing, [*686] maintaining and using shell corporations to make it difficult or impossible to trace the flow of money; engaging in complex commercial schemes including "land flips;" and creating phony foreign tax credits. Many other types of fraudulent schemes to evade taxes could surely be added to this list; the types of fraudulent conduct are as unlimited as the creativity of the criminal mind.

In any event, the question facing this Court is where to draw the [**6] line between a scheme that uses "sophisticated means" and one that does not. The analysis begins with the language of the Guidelines, continues with a review of cases interpreting that language and concludes with the application of the statute and caselaw to the facts of this case.

The examples of "sophisticated means" provided in the Application Notes are only examples, yet they are instructive in discerning the intent of the Commission. The use of offshore bank accounts implies that the perpetrator has used a means that will protect his or her identity. Similarly, "transactions through corporate shells" implies conducting business through corporate entities designed to shield the identity of the ultimate controlling person(s) or decision maker(s). In both instances, the examples describe "means" that are "sophisticated" at protecting against the discovery of the scheme or the identification of the person responsible for or benefitting from the fraudulent scheme.

A. Finding of No Sophisticated Means

A review of the cases interpreting this section reveals a similar distinction. In United States v. Rice, 52 F.3d 843 (10th Cir. 1995), the defendant, a certified public accountant, [**7] falsely claimed that more money had been withheld by his company than he owed in taxes, thereby causing him to receive a tax refund to which he was not entitled. The court held that

> In substance, Mr. Rice's fraud is the functional equivalent of claiming more in itemized deductions than actually paid. If that scheme is sophisticated within the meaning of the guideline, then every fraudulent tax return will fall within that enhancement's rubric.

Id. at 849. Because there was nothing about this scheme that prevented the identification of the criminal or the discovery of the fraud, the court found that sophisticated means had not been used.

In United States v. Kaufman, 800 F. Supp. 648 (N.D. Ind. 1992), the court refused to apply the two-point enhancement. Kaufman, an accountant, failed to report income from clients that were diverted from Kaufman's accounting firm to him. Kaufman either (i) instructed the client to pay him personally and directed the bookkeeper to show the debt as a write-off or (ii) created a phony deposit slips showing that the payment was deposited in the firm account when it was not. The deposit was then recorded in the accounts receivable [**8] journal which indicated payment of the claim without specifying the amount paid. While the scheme may have been somewhat complicated, the court found that defendant did not use sophisticated means to protect him from being identified as the perpetrator or from permitting a reasonably competent auditor to discover the fraud by reviewing the company's books. The court held that

there were no off-shore banks [and] no dummy corporations. Although Mr. Kaufman employed methods to evade detection by clients, the court cannot say his scheme was more complex or demonstrated greater intricacy or planning than a routine tax evasion case.

Id. at 655. The court made two further observations, both relevant to the case at hand. In addressing the issue of difficulty of detection, the court noted that under either of the two methods of hiding the failure to credit the payments to the firm, "the paper trial remained: no true deposit record would exist for payments Mr. Kaufman pocketed." Id. Finally, the Government argued that the scheme was sophisticated because the defendant embezzled the money repeatedly over a four year period and repeatedly failed to report the income. [**9] In rejecting the argument, the court stated that it "does not believe [*687] repetitive conduct demonstrates 'sophisticated means'." Id. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 The court further noted that repetitive, extended conduct may support a finding of more than minimal planning under guidelines provisions applicable to other crimes and that an earlier version of § 2T1.1(b)(2) referred to such provisions. By 1992, this was no longer the case.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

B. Finding of Sophisticated Means

In other cases, however, courts have applied or approved of the two-point enhancement for sophisticated means. See, e.g., United States v. Veksler, 62 F.3d 544 (3d Cir. 1995) (defendant used a "daisy chain"--a series of paper transactions through numerous companies, some of which were largely fictitious--to conceal taxable sale of diesel fuel oil); United States v. Hunt, 306 U.S. App. D.C. 386, 25 F.3d 1092, 1097 (D.C. Cir. 1994) (defendant devised "tax-favored" investments that were so sophisticated that "to this day neither the probation officer nor [**10] the government...can figure out exactly what he did"); United States v. Pierce, 17 F.3d 146 (6th Cir. 1994) (taxpayer exempted himself from withholding by providing false information to employer; failed to file tax returns; used several mailing addresses to impede discovery by the IRS; and directed his wife to file misleading returns); United States v. Hammes, 3 F.3d 1081, 1083 (7th Cir. 1993) (bookie concealed gambling income from computerized clearinghouse by using aliases and bettor code numbers, repeatedly moving his wire room, destroying records, and establishing offshore accounts); United States v. Charroux, 3 F.3d 827, 836-37 (5th Cir. 1993) (defendants structured elaborate transactions to hide their revenues from complicated land flips) United States v. Ford, 989 F.2d 347, 348 (9th Cir. 1993) (defendant set up Canadian corporations to generate fraudulent foreign tax payments which he then claimed on his domestic income tax return) United States v. Jagim, 978 F.2d 1032, 1041-42 (8th Cir. 1992), cert. denied, 124 L. Ed. 2d 664, 113 S. Ct. 2447 (1993) (defendants "extensively planned and executed" cattle breeding tax shelter scheme and lured potential participants); United [**11] States v. Becker, 965 F.2d 383, 390 (7th Cir. 1992) (doctor eliminated all bank accounts in his name and deposited income in a numbered account at a warehouse bank), cert. denied, 507 U.S. 971, 122 L. Ed. 2d 783, 113 S. Ct. 1411 (1993). n5 In all of these cases, the hallmark of the "sophisticated means" was the protection of the identity of the perpetrator and/or the

existence of the fraudulent scheme.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n5 The Government asserts that this case "most closely resembles" the instant case. Gov't Mem. at 9. I find little or no resemblance. In Becker, the taxpayer, a physician, attempted to conceal his very existence by failing to file any tax returns whatsoever and by eliminating all bank accounts in his own name.

He used a named entity to bill and collect his fees and opened a numbered account in a warehouse bank in which he deposited those checks. He wrote no checks in his own name; all checks were written on the warehouse bank account or by his son, in their own names. These elaborate efforts at hiding the identity of the taxpayer are quite different than those utilized by defendant Lewis.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**12]

Two of these cases are particularly relevant to the issue before this Court. In Veksler, the daisy-chain case, the court found that defendants' use of corporate shells was similar to that described in the Commentary to § 2T1.1(b)(2). A brief quotation provides the flavor:

> In each 'daisy chain,' the change in characterization of number two oil from tax-free home heating oil to taxable diesel fuel was effected through the use of a 'burn company,' which would purchase number two oil as tax-free home heating oil and then sell it to another company as diesel fuel. The burn company, which typically held an IRS Form 637, would produce invoices to its purchaser reflecting that the diesel fuel taxes had been paid and that the taxes were included in the price. Although the burn company was liable for the payment of taxes on the oil, it paid no taxes and typically existed for a brief time and then disappeared.

Id., 62 F.3d at 547 (emphasis added). In Jagim, the case involving the cattle breeding tax shelter scheme, the two-point enhancement was applied to Ziebarth, the defendant who conceived and initiated the scheme, and who brought the other participants, [**13] including Jagim, into the deal.

> [*688] The initial idea for E-Z Breeders was Ziebarth's and he willingly participated with Depew in the recruitment of participants...several of whom were Ziebarth's relatives. There is evidence that Ziebarth received the bulk of the ill-gotten gains from the scam, and that he was slated to receive a share of the profits that was larger than the amount that was to go to others...

978 F.2d at 1042. Nothing in this opinion indicates that the enhancement was applied to Jagim, although he was convicted of conspiring with Ziebarth to file false and fraudulent tax

returns and of assisting in the filing of such a return.

C. Application to Lewis

I find that the Government has failed to prove by a preponderance of the evidence that the two-point enhancement should be applied to Lewis. This is a case "where an individual taxpayer completed his individual 1040 form with false information to avoid paying some of his federal taxes." Id.; Charroux, 3 F.3d at 837 (citing Jagim). Here, nothing Lewis did was meant to conceal his identity. To the contrary, the checks he wrote were intended to be used as proof of his expenses. Furthermore, [**14] the scheme itself was relatively unsophisticated. While the accounting firm created bank accounts in fictitious names, it was not difficult to determine who opened the accounts, who controlled the accounts, and whose checks were deposited in the accounts. Similarly, the Government has failed to prove that either Lewis or the accounting firm actually created any shell corporations, utilized by Lewis, in order to build a paper trail that would shield the nature of the transactions and the identity of those in control of the transactions. While fictitious names were used to open the accounts utilized by Lewis, the absence of a shell corporation used to do business in furtherance of the scheme weighs against application of the two-point enhancement for sophisticated means.

The Government argues that the scheme is sophisticated because of its length and size. For example, the Government refers to the "vast and complex evasion scheme in which the defendant participated" (Gov't Mem. at 5) and to the eight years in which "Mr. Lewis wrote scores of Escrow Checks, which were negotiated through dozens of Satellite Accounts, in order to fabricate deductions" (Gov't Mem. at 6). While it is [**15] true that Lewis wrote 178 checks totalling $ 154,839.07 to 26 different payees over eight years, repetitive conduct alone does not mean that he used "sophisticated means" to impede discovery of the nature or extent of the offense.

Although Lewis is responsible for the reasonably foreseeable acts of others in furtherance of the jointly undertaken criminal activity, Lewis and the accounting firm are not in the same position. The jointly undertaken criminal activity is that undertaken between Lewis and the accounting firm, not the accounting firm and its other clients. While the accounting firm may have used "sophisticated means" to impede discovery of its overall scheme, Lewis was not involved in that overall scheme. n6 The scheme in which he participated did not involve the "unreported skimming of income from corporations," the "diversion of income to bogus entities," or "conducting 'transactions through corporate shells.'" n7 Gov't Mem. at 5-6.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 See note 3, supra.

n7 Similarly, the Government argues that "had Mr. Lewis ever been audited, the accounting firm was prepared to use his Escrow Checks as well as invoices that the firm would fabricate in the names of the fictitious payees on the Escrow Checks to 'justify' deductions, as they had done for many other clients." Gov't Mem. at 4. It is not appropriate to hold Lewis responsible for what the accounting firm might be prepared to do. This is mere speculation, not proof.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [**16]

Lewis' conviction for tax evasion and conspiracy to defraud the IRS is based on a single continuing scheme to evade the full payment of taxes by fraudulently inflating his deductions. In the hierarchy of tax evasion schemes, this one was relatively simple. Lewis wrote checks

to fictitious persons and entities to support business expenses or charitable contributions claimed on his tax returns. There is no proof that any of these entities had a bona fide existence. Furthermore, **[*689]** there is no proof that invoices were ever created to support the alleged expenses. The scheme included no mechanism for protecting the identity of the taxpayer or, indeed, the nature of the scheme. For these reasons, I find that the two-point enhancement for use of "sophisticated means" should not apply.

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York
October 16, 1995

Service: **Get by LEXSEE®**
Citation: **1995 us dist lexis 15191**
View: **Full**
Date/Time: Friday, February 11, 2005 - 11:50 AM EST

* Signal Legend:
● - Warning: Negative treatment is indicated
▲ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
Ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Service: **Get by LEXSEE®**
Citation: **1986 us dist lexis 18344**

*1986 U.S. Dist. LEXIS 18344, \*; Fed. Sec. L. Rep. (CCH) P92,976*

ESTHER BLATT and IRWIN BLATT, Plaintiffs, v. SHEARSON LEHMAN/AMERICAN EXPRESS, INC., and PETER LUX, Defendants

No. 84 Civ. 7715-CSH

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1986 U.S. Dist. LEXIS 18344; Fed. Sec. L. Rep. (CCH) P92,976

October 30, 1986, Decided; October 31, 1986, Filed

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendants, brokerage firm and stockbroker, moved to compel arbitration of claims asserted by plaintiff investors.

**OVERVIEW:** The investors, a husband and wife, signed a customer's agreement with the brokerage firm and the stockbroker that included an arbitration clause. The investors argued that the agreement could not be enforced because the wife did not sign the agreement. The court granted the brokerage firm and stockbroker's motion to compel arbitration of the investors' state law claims. The absence of the wife's personal signature, when the husband had signed the agreement, was not dispositive because there was no requirement that the arbitration agreement had to be signed in order to be enforceable. The wife had committed herself to the customer agreement, and the arbitration clause, by her act or conduct. She conceded that she wanted to participate in a joint account with her husband, and that she wanted the credit card that she received with the customer agreement. Because the issue of whether federal law claims under the Securities Exchange Act of 1934 were arbitrable was before the United States Supreme Court, the court stayed the proceedings as to those claims until a decision was issued.

**OUTCOME:** The motion to compel arbitration of the investors' state law claims was granted. The investors' federal law claims were stayed pending further order of the court.

**CORE TERMS:** signature, arbitration agreement, joint account, handwriting, arbitration, customer, investors, contract of adhesion, compel arbitration, exemplar, written agreement to arbitrate, registered representative, account number, brokerage firm, credit card, state law, election, affixed, binding, twice, Federal Arbitration Act, Securities Exchange Act, agreement to arbitrate, arbitration clause, enforceable, arbitrable, appearing, discovery, margin account, time stamp

**LexisNexis(R) Headnotes** ◆ Hide Headnotes

Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses
**HN1** A party may be bound by an agreement to arbitrate even in the absence of a signature. Instead, ordinary principles of contract and agency determine which parties are bound by an agreement to arbitrate. More Like This Headnote

Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses
While an arbitration agreement must be in writing to be enforceable, there is no

HN2 requirement that it be signed. It is sufficient that the parties by act or conduct are committed to it. More Like This Headnote

**COUNSEL:** [*1]

IRVING L. GARTENBERG, ESQ., Attorney for Plaintiffs, Harry W. Jacobs, Esq., Of Counsel

HARRY D. FRISCH, ESQ., Attorney for Defendants

**OPINIONBY:** HAIGHT

**OPINION:** HAIGHT, District Judge:

In this case I am asked by defendants Shearson Lehman/American Express, Inc. (hereinafter "Shearson") and Peter Lux to compel arbitration of claims asserted against them by plaintiffs Esther Blatt and Irwin Blatt. Plaintiffs are husband and wife. Defendants' motion falls within section 4 of the Federal Arbitration Act, 9 U.S.C. § 4. Some pertinent background appears in this Court's Memorandum Opinion and Order of July 15, 1985, familiarity with which is assumed." Following that opinion, the parties engaged in discovery and an evidentiary hearing has taken place. What follows constitutes the Court's findings of fact and conclusions of law.

I.

Plaintiff Irwin Blatt is on the faculty of City University of New York. He holds a Ph.D. degree, and has had post-doctoral training in psychoanalysis. Plaintiff Esther Blatt, his wife, is a high school teacher.

For a number of years the Blatts have received investment advice from defendant Peter Lux, who at the pertinent times was also a social friend. That acquaintance [*2] extended for at least ten years. Lux was employed as a registered representative at the brokerage firm of A.G. Becker from 1977 through March of 1981. Dr. and Mrs. Blatt maintained a margin account, under Lux's direction, at Becker during that period. In March 1981 Lux left Becker for employment with Shearson. The Blatts transferred their joint account from Becker to Shearson so that Lux could continue to advise them. Lux was first employed by Shearson in March 1981 at its office in Chathax, New Jersey.

At some time prior to March 26, 1981, Dr. and Mrs. Blatt executed two Customer's Agreements which were placed on file with Shearson. These agreements are on the same Shearson form, designated "3025 (12/80)" in the lower left-hand corner. This form may be used for an individual or a joint account. The Blatts opened a joint account. In that event, the form required Dr. Blatt to sign in two places marked "Customer's Signature," and Mrs. Blatt to sign in the two places marked "Joint Party's Signature." The second set of signatures (one by the customer, and the other by the joint party) signified the signators' assent to a Lending Agreement which appeared at the bottom of the form. The [*3] two agreements in question are in evidence as DX D and DX E.

Neither agreement is dated. On DX D, the signatures "Irwin B. Blatt" and "Esther Blatt" appear on the top lines. The Lending Agreement is not signed. At trial, both plaintiffs acknowledged these signatures to be in their respective handwriting.

DX E contains two "Irwin B. Blatt" signatures, and two "Esther Blatt" signatures. That is to say, the Lending Agreement was also executed, and the form fully completed.

The Blatts deny that the signatures appearing on DX E are theirs. I find to the contrary. Even

as a layman, I am competent to compare questioned handwriting with an authenticated exemplar. Rule 901(b)(3), F.R.Evid. By comparing the signatures on DX E with the acknowledged signatures on DX D and other exemplars obtained during discovery, I had formed the opinion that the signatures appearing on DX E were in the handwriting of Dr. and Mrs. Blatt respectively. I am confirmed in that conclusion by the expert opinion of Joseph McNally, called by Shearson, whose testimony I accept. n1

n1 I have considered plaintiffs' argument that the second of the two "Esther Blatt" signatures on DX E is marred. Plaintiffs say it is "misspelled," and ask me to infer that Mrs. Blatt would not misspell her own name. It is not so much a misspelling as an overwriting or correction, involving the adjacent letters "t" and "h" in "Esther." I find no significance in this. As we grow older and our handwriting changes, or if we write in haste, imperfections in our signatures inevitably occur. The points of similarity between this signature and known exemplars of Mrs. Blatt's handwriting far outweigh this blemish. **[*4]**

Thus I find that Dr. Blatt and Mrs. Blatt both signed the two Customer's Agreements, DX D and DX E.

I further find that both Customer's Agreements were on file with Shearson not later than March 26, 1981. I base that finding upon the testimony of Shearson's witness Daniel Lingiaru, and the interpretation he made of Shearson's microfiche records relating to the Blatts' joint account, DX T and DX U. See particularly Lingiaru's testimony at Tr. 189-191.

DX D and DX E contain in P13 an arbitration agreement which reads as follows:

"This agreement shall inure to the benefit of your successors and assigns, shall be binding on the undersigned, my heirs, executors, administrators and assigns, and shall be governed by the laws of the State of New York. Unless unenforceable due to federal or state law, any controversy arising out of or relating to my accounts, to transactions with you for me or to this agreement or the breach thereof, shall be settled by arbitration in accordance with the rules, then in effect, of the National Association of Securities Dealers, Inc. or the Boards of Directors of the New York Stock Exchange, Inc. and/or the American Stock Exchange, Inc. as I may elect. **[*5]** If I do not make such election by registered mail addressed to you at your main office within 5 days after demand by you that I make such election, then you may make such election. Judgment upon any award rendered by the arbitrators may be entered in any count having jurisdiction thereof."

Count 1 of plaintiffs' amended complaint pleads a cause of action for "churning" and related improprieties on defendants' part. Jurisdiction is alleged under sections 10(b) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t and Rule 10b-5 promulgated thereunder. Count 2 alleges claims arising out of ommon law fraud and breach of "fiduciary and other duties." The arbitration clause quoted above is broad enough to include such claims, assuming the legal enforceability of the clause. That subject is considered infra.

The Customer's Agreements, DX D and DX E, each bore the account number "027-48231-1-1-151." The numerals "027" indicate that this account was being handled out of Shearson's Chatham office.

Later in the spring of 1981 Lux moved from Shearson's Chatham branch to a Shearson branch at East Brunswick, New Jersey. All his accounts, including that of the Blatts, **[*6]** were moved from the Chatham to the East Brunswick branches. The Blatt joint account acquired the account number 631-01842-151. The prefix "631" indicated that the account was being handled by the East Brunswick office. This transfer of account and underlying securities was accomplished by computer. Shearson practices did not require the execution of

any new Customer's Agreements or related documentation in connection with this transfer, and no such documents were in fact generated.

On April 23, 1982 a further Customer's Agreement was executed. By this time, American Express, Inc. had acquired an interest in Shearson, and Customer's Agreements were in the name of "Shearson/American Express Inc." Following its affiliation with American Express, Shearson initiated a Financial Management Account or "FMA." The FMA was intended to allow "the clients greater flexibility and access to their money." Lux, Tr. 42. The FMA contained a credit card feature. The FMA customer "receives an American Express card that can be used, a gold American Express card that can be used to charge purchases, and if he doesn't pay for those purchases, it authorizes the money to be drawn from that account to pay [*7] for the purchases." Lux at Tr. 43.

The Customer's Agreement with Shearson/American Express Inc. dated April 23, 1982 is DX J on the trial. While there are some changes in the wording from Shearson's prior form, of which DX D and DX E are examples, these changes are insignificant. Paragraph 13, which provides for arbitration, is in exactly the same language as P13 of DX D and DX E quoted supra.

The April 23, 1982 Customer's Agreement, DX J, is a joint margin agreement with accompanying Lending Agreement, just as were the prior Shearson forms, DX D and DX E. Four signatures appear at the end of the document. Two of them read "Irwin B. Blatt." The other two read "Esther Blatt." It is common ground that Dr. Blatt signed his own name twice, and then, altering his handwriting somewhat, signed his wife's name twice. This Customer's Agreement bears the account number 631-01842-1-0-151. It continued to be administered by Lux. Dr. Blatt also maintained at Shearson, at least since February 1982, an individual account bearing the number 631-02053-151. As I understanding the pleadings, the amended complaint does not assert claims arising out of this particular account.

II.

The amended complaint [*8] asserts claims of the kind summarized above for the period "commencing August 1981 with the opening of Esther and Irwin's account with Shearson, through July 1983, when plaintiffs' account was exhausted. . . ." Amended Complaint at P9.

To the extent that plaintiffs' claims antedate execution of the April 23, 1982 FMA Customer's Agreement, both plaintiffs are explicitly bound by the joint agreements, DX D and DX E, which I have found they both signed shortly after they followed Lux from Becker to Shearson.

Counsel for plaintiffs profess an inability to understand why Shearson generated both DX D and DX E, and argue from that uncertainty that neither agreement should be regarded as binding. In addition, counsel point to a date and time stamp which appears on the back of DX E. That stamp, otherwise unidentified, reads in its entirely: "1982 MAR 25 PM 2:45." No witness from either side, and no attorney, is able to offer any explanation of how this date and time stamp came to be affixed, or who affixed it. It is a little mystery which I do not regard as being significant.

As for the execution of the two agreements, I consider the most plausible explanation to be that, shortly after Lux [*9] transferred from Becker to Shearson's Chatham office, various forms including Shearson's Customer's Agreement were mailed to the Blatts for signature. Dr. and Mrs. Blatt first executed DX D. On that form, they omitted to sign the Lending Agreement. The Shearson operating manuals make it clear that Shearson entertained a strong institutional preference for each customer and joint party signing the form twice, not once. Accordingly, a second form, DX E, was sent to the Blatts, and this time they both signed. Defendants offered no direct testimony that this sequence of events occurred. Given the length of time that has elapsed and the volume of documents generated by a single

registered representative (Lux testified that he had between 150 and 200 individual accounts), this is not surprising. But the circumstances, including Lux's testimony of his normal practices, support such a chronology; and as noted, I have found that both agreements, DX D and DX E, formed a part of Shearson's central files not later than March 26, 1981.

Thus the signatures of both Dr. Blatt and Mrs. Blatt on these agreements signify their acceptance of the arbitration agreement in P13. It will not do for these [*10] educated investors, with prior investment experience at a different brokerage house, to say that they did not read the agreement, or did not understand what they were signing.

At trial plaintiffs' counsel faintly suggested that the arbitration agreement was unenforceable because it was a contract of adhesion. In Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 216 n.2 (1985), the Supreme Court left open, as . not presented by the record below, an investor's argument "that as a contract of adhesion [an] arbitration agreement in subject to close judicial scrutiny, and that it should not routinely be enforced." This Court has rejected an investor's claim that the "industry wide practice of including Arbitration Clauses in standardized brokerage contracts" should be condemned as an insistence upon contracts of adhesion. Finkle & Ross v. A.G. Becker Paribas, Inc., 622 F.Supp. 1505, 1511-12 (S.D.N.Y. 1985) (Edelstein, J.) and cases therein cited. The present plaintiffs cite no authority to the contrary. I reject the contention that the arbitration agreement at bar fails as a contract of adhesion.

To the extent that Shearson's right to compel arbitration depends upon the April [*11] 23, 1982 Customer's Agreement, concededly it is not signed by Esther Blatt. There is no dispute that Irwin Blatt signed his name and then his wife's on that document.

The absence of Esther Blatt's personal signature is not dispositive. It is well settled that HN1 "a party may be bound by an agreement to arbitrate even in the absence of a signature. . . . Instead, ordinary principles of contract and agency determine which parties are bound by an agreement to arbitrate." McAllister Brothers Inc. v. A & S Transportation Co., 621 F.2d 519, 524 (2d Cir. 1980). See also A/S Custodia v. Lessin International, Inc., 503 F.2d 318, 320 (2d Cir. 1974); Fisser v. International Bank, 282 F.2d 231, 235 (2d Cir. 1960). Judge Weinfeld applied this rule to an investor's suit against a brokerage firm and its registered representative, observing: HN2 "While an arbitration agreement must be in writing to be enforceable, there is no requirement that it be signed. It is sufficient that the parties by act or conduct are committed to it." Starkman v. Seroussi, 377 F.Supp. 518, 522 (S.D.N.Y. 1974) (footnote omitted).

In the case at bar, I conclude that "by act or conduct" Mrs. Blatt committed herself [*12] to the April 3, 1982 Customer's Agreement, DX J, containing an arbitration clause. At trial she conceded her desire to participate with her husband in a joint account. She herself signed DX D and DX E, Shearson forms which had been preceded by a joint account at Becker. The March 1981 Shearson joint account generated monthly reports which were mailed to the Blatts' home, where presumably both Blatts looked at them. Mrs. Blatt did not suggest, prior to April 23, 1982, that she did not wish to participate in a Shearson joint account. The April 1982 form, DX J, is in all material respects identical to the earlier form, DX E. It was accompanied by another form, the "Financial Management Account Agreement," DX K, also dated April 23, 1982 and signed by Dr. Blatt for himself and his wife in the same manner as DX This part of the FMA package gave the Blatts American Express gold credit card privileges. Mrs. Blatt conceded at trial that she desired that credit card, intended to obtain one, and used it when she got it.

Either Mrs. Blatt clothed her husband with actual authority to sign DX J (which repeated in haec verba the arbitration agreement she herself had signed in DX E), or [*13] she subsequently ratified Dr. Blatt's action in entering into an FMA package, of which DX J is a